1   CLAUDIA POLSKY (CA Bar No. 185505)
2   Environmental Law Clinic
    UC Berkeley School of Law
3   434 Boalt Hall (North Addition)
    Berkeley, CA 94720-7200
4   Phone: (510) 642-5398
    Fax: (510) 643-4625
5   Email: cpolsky@law.berkeley.edu

6
    *Counsel for Plaintiffs ALERT Project/Earth Island Institute, Alaska Community*
7   *Action on Toxics, Cook Inletkeeper, Rosemary Ahtuangaruak,*
    *and Kindra Arnesen*
8
9   KRISTEN MONSELL (CA Bar No. 304793)
    Email: kmonsell@biologicaldiversity.org
10  Center for Biological Diversity
    1212 Broadway, Suite 800
11  Oakland, CA 94612-1810
    Phone: (510) 844-7137
12  Fax: (510) 844-7150

13
14  *Counsel for Plaintiff Center for Biological Diversity*

15                **IN THE UNITED STATES DISTRICT COURT**
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
16

17  ALERT PROJECT/EARTH ISLAND
    INSTITUTE; ALASKA COMMUNITY
18  ACTION ON TOXICS; COOK
    INLETKEEPER; CENTER FOR
19  BIOLOGICAL DIVERSITY; ROSEMARY
    AHTUANGARUAK; AND KINDRA          Case No.: _____
20  ARNESEN,
                                        **COMPLAINT FOR DECLARATORY**
21          Plaintiffs,                 **AND INJUNCTIVE RELIEF**

22  vs.

23  ANDREW WHEELER, in his official capacity
    as Administrator of the United States
24  Environmental Protection Agency; and the
    UNITED STATES ENVIRONMENTAL
25  PROTECTION AGENCY,

26          Defendants.

27
28

_____
                COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.       This lawsuit challenges the U.S. Environmental Protection Agency's (EPA) failure to update the obsolete and dangerous National Oil and Hazardous Substances Pollution Contingency Plan (National Contingency Plan, or NCP) for responding to oil spills, even as the nation substantially expands offshore oil drilling.  EPA's legal duty to maintain an up-to-date National Contingency Plan arises under the Clean Water Act (CWA), 33 U.S.C. §§ 1321(d), 1365(a)(2), and the Administrative Procedure Act (APA), 5 U.S.C. §§ 555, 706.

2.       The current NCP, which EPA last updated in 1994, permits open-ended use of chemical dispersants in response to offshore oil spills.  "Dispersants" are toxic products applied to oil spills with the goal of breaking up oil into smaller droplets to enhance biodegradation.  However, overwhelming scientific evidence indicates that dispersants likely do more environmental harm than good, and generally exacerbate a spill's ecological impact.  Further, dispersants have significant adverse human health impacts for oil spill responders and coastal residents.

3.       EPA has a statutory duty under the CWA to ensure that the NCP provides for effective oil spill response that minimizes damage and reflects contemporary developments in science and technology.  In dereliction of this duty, and in contravention of advice from its own Inspector General, the agency has failed to update the NCP in over a quarter-century.

4.        EPA has an additional duty under the APA to conclude a matter presented to it within a reasonable time.  ALERT and other Plaintiffs originally filed a rulemaking petition with EPA in November 2012 urging an NCP update, and in January 2015, EPA issued a proposed rule to update the NCP.  Yet, EPA has failed to issue a final rule in the nearly five years since the comment period closed, or the more than seven years since ALERT and other Plaintiffs filed their rulemaking petition.

5.       Plaintiffs like Gulf Coast commercial fisher Kindra Arnesen, who came into direct contact with dispersant chemicals in the aftermath of the BP Deepwater Horizon oil spill, have suffered or witnessed dispersant health impacts including: rashes, respiratory conditions, seizures, neurological problems, and cancer.  Other Plaintiffs, including Alaska Natives, fear

1

dispersant harms to traditional marine resources on which they depend for food, while others worry the use of dispersants will kill or harm fish, sea turtles, whales, and other wildlife.

6.      In the face of EPA's ongoing failure to act, Plaintiffs seek an order compelling the agency to complete its NCP update and promptly issue a final rule.

## JURISDICTION

7.      This action arises under the Clean Water Act (CWA), 33 U.S.C. § 1365(a)(2), and the Administrative Procedure Act (APA), 5 U.S.C. § 706.

8.      This Court has jurisdiction over these claims because the CWA grants district courts jurisdiction over citizen suits against the EPA Administrator for failure to perform a nondiscretionary duty.  33 U.S.C. § 1365(a)(2).  Additionally, this Court has federal question jurisdiction.  28 U.S.C. § 1331.

9.      On September 30, 2019, Plaintiffs provided 60 days' notice of this action to Defendants, as required by the CWA.  33 U.S.C. §1365(b)(1)-(2).  The mandatory notice period expired on December 1, 2019.

## VENUE AND INTRADISTRICT ASSIGNMENT

10.      Venue lies in the Northern District of California pursuant to 28 U.S.C. §1391(e)(1)(C), because this action is brought against a federal agency and an officer and employee of the United States in his official capacity; Plaintiff ALERT/Earth Island Institute's principal place of business is in the Northern District of California; and no real property is involved in this action.

11.      Pursuant to Local Rule 3-2(c) and (d), assignment to the Oakland or San Francisco Division is appropriate because Plaintiff ALERT/Earth Island Institute resides in Alameda County.

## PARTIES

Plaintiffs

ALERT/Earth Island Institute

12.      Plaintiff Earth Island Institute (EII) is a nonprofit organization incorporated under the laws of California and headquartered in Berkeley.  EII is a membership organization with

2

over 11,000 U.S. members.  EII's mission is to support environmental action projects and build the next generation of environmental leaders in order to achieve solutions to environmental crises threatening the survival of life on Earth.  EII acts as fiscal sponsor for the ALERT project.

13.     ALERT works collaboratively with at-risk communities to reduce toxic exposures from oil-chemical activities, and to build a healthy energy future globally.  ALERT has a "skill-up" organizational model that enhances environmental leadership capacity at the grassroots.  The organization's main advocacy focus is developing safe and effective oil spill response regulations, based on the latest science and law.  Regulations regarding dispersant use, particularly in response to offshore oil leaks and spills, are of particular interest.  ALERT builds coalitions to integrate meaningful citizen involvement in the national oil disaster planning and response system.  In so doing, ALERT aims to strengthen oil spill preparation and response policies, protect the health of response workers and the public, and build the capacity of local communities and Tribes to have meaningful involvement in decision-making before and during oil disasters.

14.     ALERT's director, Dr. Riki Ott, has advocated for EPA to update the NCP since she first became aware of the harm dispersants inflict on humans and the environment, and their general inefficacy as cleanup agents, when witnessing this first-hand during the 1989 *Exxon Valdez* oil spill and its aftermath.  After witnessing similar harms during the BP Deepwater Horizon spill "cleanup," she founded ALERT to continue this work.  EPA's ongoing delay in updating the NCP is of grave concern to ALERT and the front-line communities it serves, all of which oppose use of toxic chemical dispersants in oil spill response.

15.     ALERT is organizationally unique in its work to translate the science of dispersants' uses and impacts for the general public.  ALERT makes scientific reports and findings about dispersants accessible to laypeople directly impacted by these products.  It also develops and carries out trainings to empower front-line communities to use such information in their own self-defense and advocacy efforts.  ALERT is the only skill-up organization that focuses on improving oil spill response and banning use of toxic chemical dispersants.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

16.     ALERT has over 1,800 constituents from all over the U.S., including Alaska, the Great Lakes, and the U.S. Gulf Coast, that receive ALERT's information and tools.  They have diverse connections with and interests in waters impacted by dispersant use, including economic, recreational, physical, and spiritual connections.  All want waterways and human environments that are free from toxic dispersants.  Constituents who have been exposed to oil spills and dispersants are concerned that acute health impacts from those exposures, including symptoms such as dizziness, headaches, respiratory problems, chemical burns, and skin complications, often persist as chronic illnesses that impact their daily activities.

17.     Some of ALERT's front-line constituents, such as those that live and work on and near waterways used for oil extraction or transportation, are concerned with the risks dispersants pose to fisheries, water quality, and ecosystems.  Dispersants harm the fish and shellfish harvested by commercial and recreational fishers.  Dispersants endanger individuals who use beaches and/or contaminated waters for recreational boating, kayaking, swimming, and diving. Tourism professionals are concerned that such damage and long-lasting harm will destroy the ecosystems and features upon which their tourism businesses rely.  Constituents who are members of Alaska Native communities have unique interests in protecting the air, land, and water from oil spills and dispersants because of their deep spiritual connections to place, traditional ceremonies, and subsistence-living practices.  Oil spills and toxic dispersants inflict a violent disruption to their way of life, their economy, their history and identity, and their spiritual connections to land and water, all of which affects their lives in tangible and intangible ways.

18.     ALERT has acted as organizational lead in urging EPA to initiate an NCP rulemaking to address the harms of dispersants, and more recently, in pressuring EPA to complete this rulemaking.  For example, ALERT's Director is the primary author of the rulemaking petition submitted to EPA urging the agency to update the NCP.  EPA's failure to take final action on the petition and finalize the NCP rulemaking has forced ALERT to divert its focus and resources from education and advocacy on the substance of the NCP itself to simply getting the agency to issue a rule.  ALERT has spent thousands of hours and thousands of dollars, in the form of staff time and other resources, on this administrative process.  EPA's

4

delay in updating the NCP further harms ALERT and its constituents by increasing mental anxiety over future harms from the next major oil spill, which could happen anywhere, anytime.

ACAT

19.     Plaintiff Alaska Community Action on Toxics (ACAT) is a statewide non-profit environmental health and justice organization founded in 1997.  ACAT's mission is to ensure environmental health and justice in Alaska.  ACAT empowers communities to eliminate exposure to toxics through collaborative research, shared science, education, organizing, and advocacy.  ACAT protects the rights to clean air, clean water, and toxic-free food; supports the rights of indigenous peoples; and works to eliminate the release of toxic chemicals, including chemical dispersants, that may harm human health or the environment.  ACAT holds the precautionary principle as a core value, and believes that where a given toxicant is suspected to cause health problems, action should be taken to limit and avoid unnecessary exposure to that chemical.  ACAT conducts public education programs, including presentations, to educate Alaskans about the risks of chemical dispersants.

20.     ACAT has over 450 supporters from across Alaska with whom it interacts and whose interests it represents.  ACAT works primarily with Alaska Native communities that depend on the land and ocean for subsistence hunting, fishing, and gathering.  These include Alaska Natives who reside on Saint Lawrence Island in the Bering Strait and in communities along the coast of the Cook Inlet.  These Alaska Native communities are almost entirely dependent on traditional fishing and hunting for their food security.  Some of the subsistence fishers represented by ACAT also fish commercially, and are economically dependent on the health of the Bering Strait and Norton Sound.

21.     ACAT's members are concerned about the devastating impacts that they would suffer from a potential oil spill and the resulting use of chemical dispersants under the current NCP—a risk magnified by a recent increase in nearshore oil and gas development, and planned federal expansion of offshore oil and gas development off Alaska's coast.  EPA's failure to update the NCP to ensure that oil spill response methods are both effective and minimize harm

5

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    leaves ACAT supporters, and the marine ecosystem on which they depend, at risk of exposure to

2    chemical dispersants in the likely event of a nearshore or offshore oil spill.

3    Cook Inletkeeper

4        22.    Plaintiff Cook Inletkeeper is a community-based nonprofit organization that

5    combines advocacy, education, and science to protect Alaska's Cook Inlet watershed and the life

6    it sustains—resources that are particularly vulnerable to degradation from oil and gas

7    development. Cook Inletkeeper was formed in 1995 by Alaskans concerned about rapid

8    ecological changes and gaps in environmental protection in Cook Inlet. Cook Inlet provides

9    important habitat for halibut, salmon, and cod, among other species, and supports an endangered

10   Beluga whale population. The Inlet's fisheries generate over $1 billion a year in economic

11   activities. Cook Inletkeeper works to guarantee clean water, healthy fish and wildlife, strong

12   communities, clean energy, and lasting jobs, and works to address the root causes of climate

13   change and other impacts from oil and gas development. Cook Inletkeeper is the only

14   organization with a strong focus on the safety of oil and gas production in south-central Alaska,

15   one of the primary areas of the state in which the oil industry operates.

16       23.    Cook Inletkeeper has over 2,000 members. An additional 6,500 supporters

17   participate in its advocacy activities, such as by signing petitions and writing letters. These

18   members and supporters enjoy and depend on the waters of Cook Inlet. They include

19   commercial fishers, sport fishers, Alaska Natives, property owners, hunters, scientists,

20   ecologists, and subsistence users. Cook Inletkeeper's members use Cook Inlet for economic,

21   recreational, aesthetic, professional, scientific, subsistence, and other purposes and intend to

22   continue to engage in these activities frequently and to use and enjoy Cook Inlet and its wildlife

23   in the future.

24       24.    Cook Inlet has recently seen a resurgence in oil and gas activity, with a lease sale

25   in 2017 that now involves 14 active leases in federal waters. Alaska Outer Continental Shelf,

26   Cook Inlet Planning Area, Oil and Gas Lease Sale 244, 82 Fed. Reg. 23,295 (May 22, 2017).

27   Cook Inlet is slated for an additional lease sale under the current (2017-2022) federal program

28   for offshore leasing, putting it at risk of another major oil spill like the catastrophic *Exxon Valdez*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

spill, which deeply impacted the region thirty years ago.  Many of the organization's members fear the use of chemical dispersants in connection with a spill in this region.

25.     An oil spill response dictated by an outdated NCP that does not reflect current science and technology would adversely impact the unique Cook Inlet environment, including its rich fisheries and endangered species.  It would directly harm Cook Inletkeeper and its members, the vast majority of whom live, work, and recreate in the Cook Inlet region and depend on its clean water and healthy ecosystems for their livelihoods and way of life.

Center for Biological Diversity

26.     Plaintiff the Center for Biological Diversity (Center) is a nonprofit corporation headquartered in Tucson, Arizona, with offices across the country and in Baja California Sur, Mexico.  The Center has over 74,500 members throughout the United States, including California, the Gulf states, and Alaska.  The Center advocates for the protection of threatened and endangered species and their habitats through science, policy, and environmental law.  The Center's mission also includes protecting air quality, water quality, and public health.  The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as marine mammals, sea turtles, and fish are properly protected from destructive practices in our oceans.  The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices.  In pursuit of this mission, the Center has been actively involved in protecting our oceans from destructive offshore oil and gas drilling practices, including the use of dispersants.

27.     The Center brings this action on behalf of itself and its members.  Center members and staff regularly visit beaches, other coastal areas, and waters near offshore platforms in California and the Gulf of Mexico for swimming; surfing; kayaking; hiking; camping; viewing and studying wildlife like fish, sea turtles, and whales; photography; and other vocational and recreational activities.  Center members and staff also regularly visit Cook Inlet and the Beaufort Sea to observe, photograph, study, and otherwise enjoy beluga whales, ice seals, and other species.  Center members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefit from their activities in these areas.  Center members and staff

7

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

intend to continue to use and enjoy these areas frequently and on an ongoing basis in the future. Their use and enjoyment of the lands, coastline, waters, and species inhabiting these areas are entirely dependent on the continued existence of healthy, sustainable, and accessible ecosystems and populations. The use of dispersants in the event of an oil spill would degrade Center members' and staff's recreational, spiritual, scientific, cultural, and aesthetic enjoyment by harming water quality and wildlife that they study and observe in these areas, decreasing their ability to view species. Additionally, Center members and staff are concerned about the public health impact of the use of dispersants. They reasonably fear that EPA's failure to update the NCP would expose them to increased risk of rashes, respiratory problems, headaches, and other health issues in the event of an oil spill.

Rosemary Ahtuangaruak

28. Plaintiff Rosemary Ahtuangaruak is an Iñupiat woman living in Nuiqsut, Alaska. Nuiqsut is located on the North Slope of Alaska, within close proximity to a number of onshore, nearshore, and offshore oil and gas developments. The majority of Nuiqsut residents depend on subsistence hunting, gathering, fishing, and whaling for their food. Hunting also plays an important cultural and spiritual role within the community. Ms. Ahtuangaruak, like the rest of her Alaska Native community, depends on an extensive sharing network to ensure that she and her family have enough to eat. These sharing networks mean that the chemical contamination of one community's food source has a widespread effect on the food security of many Alaska Native communities. Ms. Ahtuangaruak has seen the impact that chemicals associated with oil and gas activities have had on the marine mammals and fish on which she, her family, and her community depend.

29. Ms. Ahtuangaruak trained as a physician's assistant at the University of Washington, and worked as a community health aide in her community for more than a decade. Through her work as a community health aide, Ms. Ahtuangaruak worked with people who had been exposed to chemical dispersants during the *Exxon Valdez* oil spill response. Ms. Ahtuangaruak also witnessed the use of dispersants firsthand during the BP Deepwater Horizon oil spill.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

30.     Concerned about the potential for chemical dispersants to adversely impact her community's food security, Ms. Ahtuangaruak has become active in organizing against their use in Alaska.  She petitioned EPA to update the NCP along with Plaintiffs ALERT and Kindra Arnesen.  She also worked with her community to pass a resolution opposing the use of chemical dispersants in oil and gas operations.  In total, Ms. Ahtuangaruak helped organize 31 Alaska Native villages to pass resolutions opposing the use of chemical dispersants.  Ms. Ahtuangaruak worries that despite these resolutions, without an update to the NCP, chemical dispersants could be used in response to a potential oil spill near her community, an action that would contaminate the ecosystems and animals upon which she and her community depend.  She believes that an NCP reflecting current science would contemplate the use of nontoxic or less toxic dispersants than the current NCP.

Kindra Arnesen

31.     Plaintiff Kindra Arnesen and her family have experienced direct, serious, and enduring personal health effects from the use of chemical dispersants in oil spill response that have impaired their personal lives and comfort, and threatened their livelihood.

32.     Ms. Arnesen resides in Buras, a coastal community in Southeast Louisiana.  In April 2010, at the time of the BP Deepwater Horizon oil spill, Ms. Arnesen resided in Venice, Louisiana, a nearby Gulf Coast community.

33.     Ms. Arnesen's community was devastated by the BP Deepwater Horizon spill.  She witnessed the application of dangerous chemical dispersants throughout the Gulf, and she and her family were directly exposed to chemical dispersants during the oil spill "cleanup" effort.  After her exposure to the dispersant Corexit, Ms. Arnesen developed skin rashes, frequent headaches, chronic fatigue, and chronic pain.  Ms. Arnesen's husband, George, has experienced significant physical changes in the wake of Corexit exposure, including a loss of body mass.  He has also experienced headaches, nausea, vomiting, vertigo, and frequent ear infections.  Ms. Arnesen's children, Aleena and David, have experienced skin rashes, respiratory problems, migraine headaches, and losses in consciousness.

9

34.     Nearly a decade since the BP Deepwater Horizon spill, Ms. Arnesen and her family still suffer health consequences associated with their oil and dispersant exposure.  They have not only had to endure great physical pain and discomfort because of Corexit exposure, but they have also dealt with the emotional toll of living in a community now plagued with cancer, where funerals have become a regular part of the social fabric.

35.     Ms. Arnesen and her husband have also suffered considerable economic loss. They own a commercial fishing business, and are economically dependent on the Gulf of Mexico's natural resources for their livelihood.  The toxic combination of oil and dispersant chemicals present in the wake of the BP Deepwater Horizon spill devastated local fish stocks— causing deformities, developmental problems, and a decline in the overall fish population— resulting in significant lost revenue for the Arnesen family business.  Even now, almost ten years since the BP Deepwater Horizon spill, the business has not recovered.

36.     Since the BP Deepwater Horizon spill, Ms. Arnesen has become an outspoken advocate for Gulf Coast communities and against the use of dangerous chemical dispersants like Corexit.  Oil spills are already a constant occurrence in Ms. Arnesen's community, and spill risk will only increase as U.S. oil and gas activity expands.  Ms. Arnesen petitioned EPA to update the NCP along with Plaintiffs ALERT and Rosemary Ahtuangaruak.  Ms. Arnesen worries that without an update to the NCP, the next response effort in a catastrophic oil spill will use dangerous and ineffective dispersants, like Corexit, that would once again hurt her family, her community, and the marine resources that sustain them.

37.     EPA's failure to comply with the law, and the resulting risk to response workers, public health, and the environment, harms the interests of Plaintiffs and their members.  The above-described injuries can be redressed by the relief requested in this case.  Plaintiffs have no adequate remedy at law.

Defendants

38.     Defendant Andrew Wheeler is the Administrator of the U.S. Environmental Protection Agency.  Mr. Wheeler is sued in his official capacity.  As Administrator of EPA, Mr. Wheeler is responsible for EPA's implementation of the Clean Water Act.  Administrator

10

1  Wheeler has the ultimate duty, authority, and ability to remedy the injuries alleged in this

2  complaint.

3      39.    Defendant U.S. Environmental Protection Agency is a federal agency of the

4  United States.  EPA is responsible for the implementation and administration of the provisions of

5  the Clean Water Act at issue, including the duty to update the NCP.

6  **STATUTORY AND REGULATORY FRAMEWORK**

7  The Clean Water Act and the National Contingency Plan

8      40.    The purpose of the Clean Water Act (CWA) is to "restore and maintain the

9  chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

10  Spraying dispersants in the waters of the United States threatens the integrity of the nation's

11  waters.

12      41.    The National Oil and Hazardous Substances Pollution Contingency Plan

13  (National Contingency Plan, or NCP) is a set of regulations promulgated by the EPA under

14  authority granted in the CWA.  The NCP's purpose is to provide an organizational structure for

15  preparation and response to oil spills and the discharge of other hazardous substances into the

16  waters of the United States.  40 C.F.R. § 300.1 (1994).  It applies to "discharges of oil into or on

17  the navigable waters of the United States, on the adjoining shorelines, the waters of the

18  contiguous zone, into waters of the exclusive economic zone, or that may affect natural resources

19  belonging to, appertaining to, or under the exclusive management authority of the United States."

20  *Id.* § 300.3(a)(1).

21      42.    The CWA directs the President to maintain and periodically amend the NCP.  33

22  U.S.C. § 1321(d)(2)-(3).  The President delegated this statutory duty to EPA via executive order.

23  Exec. Order No. 12777, 56 Fed. Reg. 54757 (Oct. 22, 1991).

24      43.    EPA must maintain an NCP that reflects improvements in scientific and

25  technologic knowledge, to "provide for . . . effective action to minimize damage" from oil spills

26  in the nation's waters.  33 U.S.C. § 1321(d)(2)-(3).

27      44.    The NCP establishes "national procedures for the use of dispersants and other

28  chemicals" in the wake of oil spills and hazardous substance discharges into the nation's waters.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

40 C.F.R. § 300.3(b)(9).  The NCP provides procedures for oil spill preparation, response, and removal, and establishes requirements for federal, regional, and area response plans.  *Id*. § 300.3(b)(1)-(8).

45.     The CWA directs EPA to develop an NCP that includes "a schedule identifying dispersants, chemicals, and other products that may be used under the NCP; the waters in which such [products] may be used; and the quantities of [products] that can be used safely in such waters."  33 U.S.C. § 1321(d)(2)(G).

46.     To that end, Subpart J of the NCP outlines procedures for the use of dispersants and other agents in oil and hazardous substance spill response.  Plaintiffs in this action are particularly concerned with Subpart J, which provides for the use of toxic dispersant chemicals in oil spill response, and additionally gives responders the ability to use response chemicals not identified in the NCP for Spills of National Significance.

47.     Subpart J outlines procedures for creating the NCP Product Schedule.  40 C.F.R. § 300.900 (1994).  Regional Response Teams and Area Committees, which are vested with certain authorities by other parts of the NCP, are required to engage in planning and preparedness for oil spill response.  As part of these duties, they determine "the desirability of using appropriate dispersants, surface washing agents, surface collecting agents, bioremediation agents, or miscellaneous oil spill control agents listed on the NCP Product Schedule, and the desirability of using appropriate burning agents."  *Id.* § 300.910(a).  These teams also develop preauthorization plans, outlining which dispersants may and may not be used in particular types of response efforts.  *Id.*

48.     Subpart J also specifies data requirements for dispersants used, including: information about special handling procedures and precautions for response workers; recommended application procedures; information about product effectiveness; and required toxicity testing.  40 C.F.R. § 300.915(a).  Subpart J additionally establishes protocols for responding to spills not anticipated by preauthorization plans.  In such circumstances, on-scene coordinators can authorize the use of any dispersant, including one not listed on the NCP Product Schedule.  *Id.* § 300.910(d).  This authority, which can be exercised in the wake of catastrophic

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

oil spills, allows responders to use response methods not contemplated by the NCP, including use of products that contain hazardous chemicals. *Id.* § 300.915(a).

49.     Finally, Subpart J establishes procedures for placing additional dispersants and chemicals on the NCP Product Schedule. *Id.* § 300.920.  It includes a disclaimer noting that just because a product appears on the NCP Product Schedule, the "listing does NOT mean that EPA approves, recommends, licenses, certifies, or authorizes the use of [PRODUCT NAME] on an oil discharge.  This listing means only that the data have been submitted to EPA as required by subpart J of the National Contingency Plan." *Id.* § 300.915(e).  The practical effect of Subpart J, however, is that dispersants listed on the Product Schedule are lawful and available for various entities and individuals to use in oil spill response.  This includes chemical dispersants that harm humans and the environment.

50.     The first NCP was published in 1968 in response to the *Torrey Canyon* oil spill in England, which sent millions of gallons of oil into the ocean and caused considerable environmental harm.  The 1968 NCP provided a system for oil spill reporting, containment, and cleanup in the United States.  In 1972, Congress incorporated the NCP into the newly enacted CWA, and expanded its scope to cover the release of other hazardous substances into the waters of the United States.  Congress contemplated that the NCP would be updated "from time to time" as advisable to ensure that it reflected current science and technology.  33 U.S.C. § 1321(d)(3).

51.     EPA last updated the NCP in 1994, after the *Exxon Valdez* oil spill (1989), and long before the BP Deepwater Horizon explosion and spill (2010).  The purpose of the 1994 rule was to implement the Oil Pollution Act of 1990, which amended the CWA and required revisions to the NCP to "enhance and expand upon the current framework, standards, and procedures for response" to oil spills.  National Oil and Hazardous Substances Pollution Contingency Plan; Final Rule, 59 Fed. Reg. 178, 47384 (Sept. 15, 1994).

52.     EPA has not updated the NCP since October 17, 1994.  The 1994 NCP permits extensive and even preauthorized use of chemical dispersants to expedite their use in oil spill response.

13

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Administrative Procedure Act

53.    The Administrative Procedure Act (APA), 5 U.S.C. § 551, *et seq.*, governs the regulatory conduct of federal agencies.  The APA obligates an agency to "conclude a matter presented to it" within a "reasonable time."  5 U.S.C. § 555(b).

54.    Under the APA, a reviewing court shall "compel agency action" where that action has been "unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

## FACTUAL AND PROCEDURAL BACKGROUND

Oil spill dispersants

55.    Dispersants are oil-based hazardous chemical mixtures that are applied to oil spills by aerial spraying, typically from planes but also from boats, with the objective of breaking oil slicks on the ocean's surface into small droplets so that the oil diffuses more readily into the water and air.

56.    In the aftermath of the BP Deepwater Horizon oil spill, unprecedented amounts of chemical dispersants were also applied on an experimental basis subsurface at the wellhead, despite being designed for use at the ocean's surface, and without efficacy testing regarding subsurface use.

57.    Chemical dispersants do not degrade oil, but rather change its distribution. Surface application of dispersants, combined with wave action, distributes much of the chemically dispersed oil—i.e., oil and dispersant combined—beneath the ocean surface into the water column below.  Chemically dispersed oil on the water surface is harder to contain and remove from a spill site than oil alone.  Submerged, chemically enhanced oil binds with naturally occurring organic particulates, loses buoyancy, descends through the water column, and eventually accumulates on the ocean floor.

58.    Chemical dispersants were first developed and used in the 1960s as industrial degreasing agents to clean oil tanker compartments and engine rooms.  The first generation of dispersants were more toxic than oil itself.  Despite reformulations over time to reduce toxicity, dispersants currently in use continue to pose serious toxicity concerns.  In 2010, over one million gallons of the dispersant Corexit 9572A were applied at the surface, and some 771,000 gallons of

14

Corexit 9500A dispersant were injected subsurface directly at a wellhead in the Gulf of Mexico off the Louisiana coast in response to the BP Deepwater Horizon oil spill.

The NCP's approach to dispersants

59.     The NCP originally contemplated dispersant use as a supplement to mechanical cleanup methods.  Over the past 30 years, however, federally sanctioned use of chemical dispersants in oil spill response has expanded rapidly.  Dispersants are increasingly chosen over mechanical cleanup methods, and have become a virtually automatic spill response.

60.     EPA uses inadequate and outdated testing standards to qualify dispersants for placement on the NCP Dispersant Schedule.  Toxicity test durations are insufficient, and tests problematically use the death of test organisms as their endpoint, rather than using more sensitive indicators of harm.  These antiquated testing standards underestimate the environmental harms of dispersant use.

61.     The laboratory tests for dispersant efficacy under the NCP exclude consideration of bacteria, varied salinity, sediment, and a myriad of other factors that affect the chemicals' efficacy in realistic field conditions.  Dispersants' failure to behave in the field as they do in laboratory settings was conclusively demonstrated by scientific study of the fate and effects of oil and chemically dispersed oil after the BP Deepwater Horizon oil spill.  The dispersants impeded oil biodegradation; acted to sink oil—which is expressly prohibited by the NCP—with impacts to the benthos; and combined with oil as chemically dispersed oil, which was more bioavailable and more toxic.

62.     In the twenty-six years since EPA last updated the National Contingency Plan, significant advances in understanding the behavior and risks of chemical dispersants and chemically dispersed oil on marine life and human life demonstrate that dispersants are dangerous, ineffective, and exacerbate harms caused by oil spills.  While crude oil and chemical dispersants are independently toxic, the synergistic toxicity of chemically dispersed oil is much greater.

63.     Deploying chemical dispersants on spilled oil in ocean ecosystems, particularly in nearshore environments or in close proximity to humans, results in severe human and ecological

15

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

harm.  The harm is not limited to where the dispersant was actually deployed, but rather occurs throughout the watershed and airshed as the chemically dispersed oil is incorporated into the hydrologic cycle.  Yet, the NCP has permitted deployment of thousands, tens of thousands, and millions of gallons of chemical dispersants in response to oil spills of varying scales.

Ecological effects of dispersants

64.     Studies have found numerous harmful ecological impacts from dispersants.  Dispersants can disrupt fertilization and larval development of fishes, corals, and other marine life at concentrations as low as 0.003 parts per million.  Dispersants can also penetrate birds' eggs and kill embryos.  Dispersants have severe toxic effects on the behavior and survival of clams, and toxic effects on fishes, shrimp, mussels, scallops, sea urchins, starfish, copepods, giant kelp, plankton, and bacteria.  One laboratory study found that in rats, undiluted dispersants are lethal, and diluted dispersants cause weight loss.  The same study suggested that marine mammals that survive the use of dispersants in oil response may nonetheless suffer from elevated toxicity levels because of altered metabolism.

65.     EPA's own toxicity tests on several dispersants listed for possible use in oil spill response have also demonstrated that a mixture of oil and dispersant is more toxic to aquatic vertebrates and invertebrates than either oil or dispersants alone.  Oil treated with Corexit 9500A at EPA-recommended ratios, for example, is fifty-two times more toxic to some organisms than either substance alone.

66.     The acute toxicity levels and sensitivity to chemically dispersed oil varies by species and organisms' life stage.  Organisms in larval and early life stages are often more sensitive than adults.  Dispersants have been shown to increase the toxicity of oil to fish larvae by making the chemically dispersed oil more bioavailable.  Research has also shown that chemically dispersed oil is substantially more toxic under the natural light conditions of aquatic habitats than under the artificial lighting used in laboratory toxicity testing.

67.     Dispersed oil further impacts forage fish and shellfish that filter the water for food, because the small droplets of chemically dispersed oil are within the size ranges of naturally occurring algae and particulates that are readily consumed as food.  Studies have also

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

shown that chemically dispersed oil is more likely to cause naphthalene, a toxic chemical present in crude oil, to be passed through the food chain.  This bioaccumulation can substantially reduce marine productivity.

68.    The toxic combination of oil and dispersant chemicals in the wake of the BP Deepwater Horizon spill devastated local fish and shellfish stocks, causing deformities, developmental problems, reproductive problems, and a decline in the overall populations. Chemically dispersed oil also reduces the amount of dissolved oxygen in water.  This is hazardous to marine organisms, leading to documented fish kills.  Studies also found that chemically dispersed oil was toxic to predators of the dinoflagellates that cause red tides, and may be linked with the devastating red tides after the BP Deepwater Horizon disaster.  Red tides have toxic and harmful effects on humans and wildlife.

69.    Dispersants and chemically dispersed oil are toxic to beneficial oil-eating bacteria that can naturally address oil spills.  This means that chemically dispersed oil is likely to persist in ocean environments longer than oil alone.

70.    Exposure to chemical dispersants has sickened thousands of oil spill response workers and volunteers, commercial fishers, and individuals who live or lived in areas where dispersants were deployed, and has in some cases caused fatalities.

71.    Acute health impacts of dispersant exposure include kidney and liver damage; neurological damage; respiratory and nervous system damage; seizures; skin irritation, burning, scabs, and lesions; temporary paralysis; and abdominal distress.  Plaintiff Kindra Arnesen, and her family members, personally experienced some of the symptoms collectively known as "BP syndrome" as a result of health problems in the wake of the dispersant-intensive response to the BP Deepwater Horizon oil spill.  This syndrome can include respiratory problems, skin rashes, frequent headaches, migraine headaches, nausea, vomiting, vertigo, ear infections, loss of body mass, and losses in consciousness.  Long-term health impacts of dispersants include reproductive harm, endocrine disruption that impacts multiple organ and system functions, chronic fatigue, chronic pain, chemical sensitivities, and various types of cancer.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

72.     The federal government has failed to protect spill response workers and people in communities downwind of aerial dispersant spraying, or with active dispersant staging or decontamination areas, or with landfills that accept toxic waste from spill response activities.  It has misrepresented the risks chemical dispersants pose to human health, failed to provide adequate personal protective equipment, failed to provide federally mandated response worker training, and failed to provide required worker resource manuals detailing various dispersants' health hazards. Some oil spill response workers have also been threatened with termination for wearing protective gear such as respirators, or even terminated after raising safety concerns. Many response workers affected by chemical dispersants have received inadequate medical care.

73.     The weight of current scientific evidence regarding adverse effects of dispersants indicates that informed action is necessary now to prevent further harm.

History of dispersant use in U.S. waters

74.     Chemical dispersants have been deployed in oil spill response in the United States and its waters since the 1960s.

75.     The first major spill in U.S. waters to use dispersants as a response method was the grounding of the Liberian tanker *Ocean Eagle* at the mouth of Bahia de San Juan, Puerto Rico on March 3, 1968.  An estimated 2.94 million gallons of spilled Venezuelan crude oil impacted a harbor, mangrove swamps, muddy tidal flats, coral sand beaches, and shallow warm seas.  In response, 14,000 gallons of chemical dispersants were applied to the spilled oil.  The dispersants and chemically dispersed oil damaged invertebrate communities, and were believed to have caused extensive damage to commercially important fish, some of which exhibited abnormal lesions.

76.     Between the *Ocean Eagle* spill and 1989, chemical dispersants were deployed in response to many oil spills in U.S. waters.  Although the amount of oil spilled, dispersants deployed, and environmental conditions varied from spill to spill, ecological harm remained a consistent result of oil spills and dispersant use.  The subsurface oil-in-water emulsions formed by chemical dispersion of oil spread oil throughout the water column and well beyond the area of the actual oil spill.  Dispersant use caused hundreds of thousands of metric tons of spilled oil to

18

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

settle on the bottom sediments of the Gulf of Mexico, a crucial and extensive habitat for commercially harvested shrimp.  Adult shrimp burrow in and stir up bottom sediments while foraging for food.  Shrimp and other invertebrates become contaminated by eating contaminated prey because they lack enzymes to metabolize and eliminate toxic chemicals.

77.     On March 24, 1989, what was then the largest oil spill in U.S. history occurred when the *Exxon Valdez* grounded on Blight Reef in Prince William Sound, Alaska.  Eleven million gallons of crude oil spilled into Prince William Sound, eventually impacting over 1,100 miles of Alaska's coastline.  Chemical dispersants were deployed on a large scale, but without a sufficient baseline understanding of how they would function in Alaska's cold, low salinity waters, and how they would impact the fragile arctic ecosystem.

78.     Over 45,000 gallons of dispersants total were deployed in multiple applications in and around Prince William Sound, with mostly inconclusive or unsatisfactory dispersal of the spilled oil.  Specially trained spill response crews also used dispersant-like oil-based products to remove oil that had coated shorelines.  Tests failed to show that the purported benefits of onshore application of these dispersant-like products outweighed the adverse environmental effects.

79.     *Exxon Valdez* response workers and volunteers who handled or came into contact with dispersants and dispersant-like products reported numerous health problems.  Their illnesses included persistent coughs, headaches, nausea, skin rashes, blisters, liver and kidney disorders, and urine blackened by dead red blood cells.

80.     On April 20, 2010, the largest oil spill in history began in U.S. waters.  After a concrete core failed to seal a well 40 miles off Louisiana's coast, natural gas traveled up to the platform of BP's Deepwater Horizon rig and ignited.  After burning for two days, the rig capsized and sank, releasing an estimated 130 to 210 million gallons of crude oil over 87 days.

81.     Over two million gallons of dispersants were deployed in the Gulf of Mexico in response to the BP Deepwater Horizon oil spill—a volume equivalent to the sixth largest oil spill in the United States.  This high-volume dispersant use occurred both at the sea surface and in subsea injections.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

82.     Dispersant use after the BP Deepwater Horizon spill exacerbated the harms from the oil spill.  Residents in coastal communities across four Gulf states reported a high incidence of cold and flu-like respiratory symptoms; headaches, vertigo, and other symptoms of central nervous system distress; skin lesions; and other health problems.

83.     A study found Coast Guard spill responders who were exposed to dispersants had markedly higher rates of coughing, wheezing, pulmonary issues, and gastrointestinal issues after the BP Deepwater Horizon spill than Coast Guard members who were exposed to oil alone.

84.     Dispersant use enhanced the sinking of oil after the BP Deepwater Horizon spill, contributing to oil deposition on the ocean floor that was unprecedented in scale.  The full ecological harm of smothering the ocean floor in oil is unknown, but presumed severe.

85.     Chemically dispersed oil particles in the Gulf of Mexico after the BP Deepwater Horizon oil spill substantially impacted marine wildlife from the upper ocean to the seafloor. These contaminated particles have been linked to large dolphin die-offs, fish kills, and deformities, and are suspected to have seriously depressed 2013 and 2014 fin fish and crab yields for fishers.

86.     The use of dispersants after the BP Deepwater Horizon spill disrupted both an entire ecosystem and a way of life for coastal communities that rely for their livelihoods and food security on commercial, recreational, and subsistence fishing.

Existing offshore oil and gas drilling and proposed expansions

87.     Federal leasing for offshore oil and gas development began in 1954 with the passage of the Outer Continental Shelf Leasing Act (OCSLA), which codified federal control of the Outer Continental Shelf (OCS) for purposes of oil and gas extraction.  43 U.S.C. §§ 1331-1356.

88.     OCSLA establishes four separate stages to developing an offshore oil well: (1) formulation of a five-year leasing plan by the U.S. Department of the Interior (Interior) which determines the leasing schedule for each OCS planning area; (2) lease sales; (3) exploration by the lessees; and (4) development and production.  43 U.S.C. §§ 1340, 1344, 1351.  Prior to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

drilling a well, an oil company must also obtain approval of an application for a permit to drill. 30 C.F.R. § 550.281(a)(1) (2011).

89.   Pursuant to various five-year leasing plans issued over the last several decades, there are currently more than 14.2 million acres of federal waters leased to oil and gas companies.  Bureau of Ocean Energy Management, Combined Leasing Report (Jan. 1, 2020).

90.   There are 23 offshore drilling platforms in federal waters off California, and 34 active leases on more than 178,000 acres.  *Id.*  Interior has approved more than 250 drilling permits in the Pacific region since 2016.  Bureau of Safety and Environmental Enforcement, Pacific Region Completed Applications for Permit to Modify, https://www.bsee.gov/stats-facts/ocs-regions/pacific-region-completed-applications-for-permit-to-modify-apm (last visited Jan. 21, 2020).

91.   There are more than 2,000 drilling platforms in federal waters in the Gulf of Mexico.  Bureau of Ocean Energy Management, Combined Leasing Report (Jan. 1, 2020).  There are currently 2,592 active leases on more than 13.8 million acres.  *Id.*  Interior approves hundreds of drilling permits in the Gulf of Mexico region each year.  Bureau of Safety and Environmental Enforcement, Status of Gulf of Mexico Well Permits, https://www.bsee.gov/stats-facts/ocs-regions/status-of-gulf-of-mexico-well-permits (last visited Jan. 21, 2020).

92.   There are currently 54 active leases in federal waters off Alaska, including 40 in the Beaufort Sea and 14 in Cook Inlet.  Bureau of Ocean Energy Management, Combined Leasing Report (Jan. 1, 2020).  In 2018, Interior approved a development plan for the Liberty project in federal waters in the Beaufort Sea.  Environmental Impact Statement on the Liberty Development and Production Plan in the Beaufort Sea Planning Area, 83 Fed. Reg. 54,136 (Oct. 26, 2018).  Interior also recently approved an exploration plan and drilling permit for drilling operations in the Beaufort Sea.  Bureau of Safety and Environmental Enforcement, BSEE Approves New Drilling Operations in the Arctic, https://www.bsee.gov/newsroom/latest-news/statements-and-releases/press-releases/bsee-approves-new-drilling-operations-in (Nov. 28, 2017).

21

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

93.     The current 2017-2022 National OCS Program calls for two lease sales each year in the Gulf of Mexico and one lease sale in the Cook Inlet, Alaska in 2021.  Notice of Availability of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program, 81 Fed. Reg. 84,612 (Nov. 23, 2016).

94.     Oil spills are an inevitable part of offshore drilling.  Interior has determined that from 2000–2015, there were 725 oil spills from offshore platforms and pipelines.  Bureau of Ocean Energy Management, *2016 Update of Occurrence Rates for Offshore Oil Spills*, 76 (July 13, 2016).  The average size of a spill was 6,810 barrels, or 286,020 gallons.  *Id.*

95.     Drilling in Cook Inlet or the Arctic Ocean increases the risk of a large or catastrophic oil spill because of the presence of sea ice and other harsh conditions.  For example, Interior estimates that drilling at the Liberty Project in the Beaufort Sea will result in 70 small oil spills.  Taking and Importing Marine Mammals; Taking Marine Mammals Incidental to Construction and Operation of the Liberty Drilling and Production Island, Beaufort Sea, Alaska, 84 Fed. Reg. 70,274 (Dec. 20, 2019).

96.     The risk of a large or catastrophic oil spill is heightened off California because of the age of the infrastructure, where oil companies have been drilling from platforms that have existed for approximately 30 to 50 years.

97.     Hurricanes and the increasing severity of storms in the Gulf of Mexico increase the risk of a large or catastrophic oil spill in the Gulf of Mexico.  Additionally, drilling activity has been moving into deeper waters, which heightens the risk of spills.

98.     In January 2018, Interior proposed expanding the area available for offshore oil and gas leasing by developing a new National OCS Program for 2019-2024.  If finalized, the new program would supersede the 2017-2022 National OCS Program currently in place.  Notice of Availability of the 2019-2024 Draft Proposed Outer Continental Shelf Oil and Gas Leasing Program, 83 Fed. Reg. 829 (Jan. 8, 2018).  The draft proposed program for 2019-2024 includes 47 lease sales during the five-year period: 12 in the Gulf of Mexico Region, 19 in the Alaska Region, 9 in the Atlantic Region, and 7 in the Pacific Region.  *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

99.     If Interior were to finalize the 2019-2024 program, it would result in the largest expansion of offshore oil and gas drilling ever proposed by the federal government.  The 2019-2024 draft program covers more than 98 percent of the undiscovered, technically recoverable oil and gas resources in federal offshore areas, and would open more than 90 percent of the total acreage of the OCS to oil and gas leasing.  *Id.*

100.     The high levels of current offshore oil and gas activity, and the proposal for further expansion, increase markedly the risk of oil spills, and the corresponding risk that chemical dispersants will be used in oil spill response.

Rollbacks of offshore drilling safety and environmental regulations

101.     Interior has also recently rolled back or begun to roll back regulations for oil and gas operations, notably those for blowout preventer systems and well control.  These deregulatory actions make oil and gas operations more dangerous.

102.     An oil well blowout, such as happened with the BP Deepwater Horizon rig, is the uncontrolled release of crude oil after pressure control systems have failed.  An offshore blowout leads to a marine oil spill.  In April 2016, after many years investigating the BP Deepwater Horizon spill, Interior finalized its Blowout Preventer Systems and Well Control Rule, which imposes blowout prevention and well control requirements.  30 C.F.R. § 250 (2016).  The final rule implemented recommendations resulting from investigations of the BP Deepwater Horizon spill and revised provisions related to "drilling, workover, completion, and decommissioning operations to enhance safety and environmental protection."

103.     On May 11, 2018, however, Interior proposed to amend, revise, or remove protections established in the 2016 rule, asserting that they created unnecessary burdens.  Oil and Gas and Sulfur Operations in the Outer Continental Shelf-Blowout Preventer Systems and Well Control Revisions, 83 Fed. Reg. 22128 (May 11, 2018).  In May 2019, Interior issued a final rule weakening or eliminating 71 provisions and safety standards.  30 C.F.R. § 250 (2019).

104.     Additionally, in September 2018, Interior issued a final rule revising or rescinding offshore drilling safety requirements in the 2016 Oil and Gas Production Safety Systems Rule.  30 C.F.R. § 250.800-899 (2018).  Among other changes, the revised rule eliminated the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

requirement that operators obtain independent, third-party certification that critical safety and pollution prevention equipment would be operational in extreme conditions.  The third-party certification requirement was recommended by an expert panel as a measure to improve the safety of offshore drilling operations.

105.    Pursuant to direction from the President, Interior has also rolled back or stated its intent to roll back other rules related to offshore oil and gas drilling, including those related to financial security for operations and exploratory Arctic drilling.  Exec. Order No. 13795, 82 Fed. Reg. 20815 (Apr. 28, 2017); Secretarial Order No. 3350 (May 1, 2017).  These rollbacks would also reduce the safety of offshore drilling and increase the likelihood of spills.

106.    On January 10, 2020, the Council on Environmental Quality proposed a rule weakening requirements for assessment of environmental impacts under the National Environmental Policy Act (NEPA).  Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 1684 (Jan. 10, 2020).  The Commission that investigated the BP Deepwater Horizon spill found that insufficient NEPA review was an important contributing factor.  National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, *Report to the President: Deep Water, The Gulf Oil Disaster and the Future of Offshore Drilling* (Jan. 2011).

Efforts to update the current NCP

107.    EPA has recognized that the 1994 NCP regulations are ineffective and must be updated.  EPA's Office of the Inspector General reviewed the NCP's dispersant provisions in 2011, and issued a report concluding that the NCP's approach to efficacy and toxicity review of dispersants was inadequate.  U.S. Environmental Protection Agency, Office of Inspector General, *Report: Revisions Needed to National Contingency Plan Based on Deepwater Horizon Oil Spill* (Aug. 2011).  The report cited the EPA Administrator's public declarations asserting the same. *Id.*

108.    The Inspector General's investigation revealed that as early as 1999, EPA was concerned about "poor reproducibility" of the NCP's dispersant efficacy testing protocols, and had funded a research study to develop a new testing procedure.

24

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

109.    After the BP Deepwater Horizon spill, the EPA Administrator conceded that there needed to be a wider range of tests to assess the effects cleanup methods have on human and environmental health.

110.    The Inspector General found that if EPA had updated testing protocols in Subpart J prior to the BP Deepwater Horizon spill, there would have been "more reliable efficacy data" available.

111.    In 2001, EPA indicated in the Unified Agenda of Federal Regulatory and Deregulatory Actions that it intended to update the 1994 NCP to help ensure protection of the environment when dispersants and other spill-mitigating agents are used to address oil spills onto land and water.

112.    EPA drafted a proposed rule it intended to promulgate in late spring 2010 to update the NCP's dispersant efficacy testing requirements, but the agency never publicly issued that proposed rule.  As the reason for setting this effort aside, EPA cited changes in management and shifting agency priorities. U.S. Environmental Protection Agency, Office of Inspector General, *Report: Revisions Needed to National Contingency Plan Based on Deepwater Horizon Oil Spill* (Aug. 2011).

113.    On November 14, 2012, Plaintiff ALERT, along with Plaintiffs Rosemary Ahtuangaruak and Kindra Arnesen, petitioned EPA to amend the NCP regulations.  The petition's principal concern was that the 1994 NCP and its chemical testing procedures allowed for the massive release of Corexit into U.S. waters in the wake of the BP Deepwater Horizon spill, harming human and marine life.  The petition highlighted the documented harms of dispersants to human health and sea life dating back to the *Exxon Valdez* oil spill in 1989.  The petition noted that the combination of dispersants and oil is more harmful to life than oil alone, and that dispersants kill beneficial oil-eating bacteria.  The petition implored EPA to issue a final rule that discontinues use of harmful chemical dispersants, that has more protective testing standards, and that has a protocol for the public to petition for delisting of products and removal from the Product Schedule.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

114.    On January 3, 2013, EPA indicated that it was considering a proposed rulemaking to revise Subpart J of the NCP and its provisions authorizing dispersant use.

115.    Plaintiff ALERT filed a supplemental petition in June 2014 after a year of EPA inaction.  The supplemental petition urged a complete overhaul of the NCP based on lessons learned from the BP Deepwater Horizon spill and subsequent freshwater spills that utilized dispersants and sickened response workers.  The petition noted the importance of updating the NCP based on new evidence and scientific information, and of including unconventional oil like tar sands oil and frack gas that are not covered under the current NCP.

116.    On January 22, 2015, EPA issued a Notice of Proposed Rulemaking to revise the NCP's Subpart J, the rules governing dispersant use.  National Oil and Hazardous Substances Pollution Contingency Plan, 80 Fed. Reg. 3380 (Jan. 22, 2015).  EPA stated the proposed rule was "anticipated to encourage the development of safer and more effective spill mitigating products, and would better target the use of these products to reduce the risks to human health and the environment."  *Id.*

117.    The proposed changes to the NCP were designed to implement lessons learned from the BP Deepwater Horizon spill about the toxicity, efficacy, and environmental impacts of dispersants.  *Id.* at 3381.  The proposed rule stated that the amendments would revise the NCP's efficacy and toxicity standards, environmental trade-off determinations, and dispersant monitoring requirements.  *Id.*

118.    The proposed rule provided a 90-day window for public comment.  *Id.* at 3380. When the comment period closed on April 22, 2015, EPA had received over 600 unique comments and 81,000 comments in total from industry, environmental organizations, and members of the public.  Many of those comments raised concerns over the high toxicity and low efficacy of dispersants used in oil spill response.  All Plaintiffs in this action submitted comments on EPA's proposed rule.

119.    EPA's intent to update the NCP regulations appeared on EPA's semi-annual regulatory agenda in 33 of the 35 versions from 2001 through fall 2016.  From Spring 2015 through Fall 2016, the rulemaking was designated as a "long-term action," indicating that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

regulatory development was pending but that the agency did not expect additional regulatory action in the next twelve months or by a specific date.  In prior years, in contrast, the NCP rulemaking had appeared on the agency's active rulemaking list.

120.    The rulemaking disappeared from EPA's Unified Agenda in Spring 2017, and has not since reappeared.

121.    EPA has not issued a final rule in the nearly five years since the comment period closed on its proposed rule.

122.    Plaintiff ALERT filed a Freedom of Information Act request with EPA on December 20, 2018 requesting documents pertaining to EPA's actions to finalize the rule. Despite Plaintiffs' consistent follow-up, EPA has not to date produced a single document.

123.    On March 24, 2019, coinciding with the thirtieth memorial of the *Exxon Valdez* oil spill, most Plaintiffs notified EPA of their intent to file suit under the CWA if EPA did not finalize its NCP rulemaking within 60 days.

124.    On September 30, 2019, all Plaintiffs sent a superseding notice of intent to sue if EPA did not finalize the NCP rulemaking within 60 days.

125.    As of this date, EPA has not finalized the proposed update to the NCP regulations.

## PLAINTIFFS' CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### Violation of the Clean Water Act

126.    Plaintiffs hereby reallege and incorporate each and every allegation in the preceding paragraphs.

127.    EPA has failed to update the NCP since 1994, and has thereby failed to incorporate scientific and technological developments to assure that the NCP is "effective" and can "minimize damage."  33 U.S.C. § 1321(d)(2)-(3).

128.    EPA recognized as early as 1999 that updates to the NCP are necessary, and has repeatedly determined that the current plan's approach to efficacy and toxicity review of dispersants is inadequate.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

129.   EPA's failure to update the NCP, as required by 33 U.S.C. § 1321(d)(3), constitutes a failure to perform a nondiscretionary duty under the CWA.  33 U.S.C. § 1365(a)(2).

130.   Under the CWA's citizen suit provision, any citizen may sue the EPA Administrator for failure to perform a non-discretionary duty required by statute, in this case, failure to update the NCP in accordance with developments in scientific and technologic knowledge.  33 U.S.C. § 1365(a)(2).

131.   Citizen-plaintiffs must provide the Administrator with notice of intent to sue at least 60 days prior to commencing litigation.  33 U.S.C. §1365(b)(2).  The notice period on Plaintiffs' September 30, 2019 notice ran on December 1, 2019, satisfying this requirement.

132.   Plaintiffs and their members are harmed and will continue to be harmed by EPA's violations of law described herein.  This Court has jurisdiction to adjudicate these claims and grant Plaintiffs' requested relief to remedy these harms.

## SECOND CAUSE OF ACTION

### Violation of the Administrative Procedure Act

133.   Plaintiffs hereby reallege and incorporate each and every allegation in the preceding paragraphs.

134.   EPA has failed to conclude the rulemaking process more than four years since the comment period on the proposed rule closed, more than five years since it accepted ALERT's supplemental petition for rulemaking, and more than seven years since ALERT's and other Plaintiffs' initial petition for rulemaking.

135.   EPA's ongoing failure to issue a final rule and take final action on the petition violates the APA requirement that an agency "within a reasonable time . . . conclude a matter presented to it," 5 U.S.C. § 555(b), and constitutes an agency action "unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

136.   Plaintiffs and their members are harmed and will continue to be harmed by EPA's violations of law described herein.  This Court has jurisdiction to adjudicate these claims and grant Plaintiffs' requested relief to remedy these harms.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**REQUESTED RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)   Declare that by failing to update the NCP in accordance with improvements in scientific and technological knowledge, EPA has failed to perform a nondiscretionary duty required by the CWA;

(2)   Declare that EPA has violated the APA by unlawfully withholding or unreasonably delaying issuance of a final rule to update the NCP;

(3)   Order EPA to issue a final rule to update the NCP on an expeditious schedule to be established by this Court;

(4)   Award Plaintiffs their costs, expenses, and reasonable attorney's fees in this action; and

(5)   Grant such other relief as the Court may deem just and proper.

Dated: January 30, 2020                     Respectfully submitted,

/s/ Claudia Polsky
CLAUDIA POLSKY (CA Bar No. 185505)
Environmental Law Clinic
UC Berkeley School of Law
434 Boalt Hall (North Addition)
Berkeley, CA 94720-7200
Phone: (510) 642-5398
Fax: (510) 643-4625
Email: cpolsky@law.berkeley.edu

*Counsel for Plaintiffs ALERT Project/Earth Island Institute, Alaska Community Action on Toxics, Cook Inletkeeper, Rosemary Ahtuangaruak, and Kindra Arnesen*

/s/ Kristen Monsell
KRISTEN MONSELL (CA Bar No. 304793)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612-1810

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Phone: (510) 844-7137
Fax: (510) 844-7150
Email: kmonsell@biologicaldiversity.org

*Counsel for Plaintiff Center for Biological Diversity*

30

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF