CLAUDIA POLSKY (CA Bar No. 185505)
Environmental Law Clinic
UC Berkeley School of Law
434 Law Building (North Addition)
Berkeley, CA 94720-7200
Phone: (510) 642-5398
Fax: (510) 643-4625
Email: cpolsky@law.berkeley.edu

*Counsel for Plaintiffs ALERT Project/Earth Island Institute, Alaska Community
Action on Toxics, Cook Inletkeeper, Rosemary Ahtuangaruak, and Kindra Arnesen*

KRISTEN MONSELL (CA Bar No. 304793)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612-1810
Phone: (510) 844-7137
Fax: (510) 844-7150
Email: kmonsell@biologicaldiversity.org

*Counsel for Plaintiff Center for Biological Diversity*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EARTH ISLAND INSTITUTE/ALERT PROJECT; ALASKA COMMUNITY ACTION ON TOXICS; COOK INLETKEEPER; CENTER FOR BIOLOGICAL DIVERSITY; ROSEMARY AHTUANGARUAK; AND KINDRA ARNESEN,<br><br>           Plaintiffs,<br><br>vs.<br><br>MICHAEL REGAN, in his official capacity as Administrator of the United States Environmental Protection Agency; and the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>           Defendants. | Case No.: 3:20-cv-00670-WHO<br><br>**PLAINTIFFS' NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Hearing date: July 7, 2021<br>Time: 2:00 pm<br>Dept: [Courtroom 2, 17th floor San Francisco Courthouse]<br>*Via Zoom unless otherwise indicated*<br>Judge: Hon. William H. Orrick |

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities
in Support, Case No. 3:20-cv-00670-WHO

1

<u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT .................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

STATEMENT OF THE ISSUES ........................................................................................ 1

RELEVANT FACTS AND BACKGROUND ..................................................................... 3

JURISDICTION .............................................................................................................. 7

STANDARD OF REVIEW ............................................................................................... 11

ARGUMENT ................................................................................................................. 11

    I.      EPA's Failure to Update its Obsolete National Contingency Plan Violates the
           CWA ........................................................................................................... 11

    II.     EPA's Years-Long Delay in Issuing a Final Rule Is Unreasonable ..................... 14

          A.     Factor One:  EPA's Protracted Delay Violates the
                 "Rule of Reason" ................................................................................. 16

          B.     Factor Two: The Clean Water Act Dictates Immediate Action ............... 17

          C.     Factors Three & Five: EPA's Delay Threatens Public
                 Health and Welfare ............................................................................. 17

          D.     Factor Four: No Higher, Competing Priorities Justify
                 EPA's Delay........................................................................................ 19

          E.     Factor Six: EPA's Delay Coincides with Numerous
                 Deregulatory Actions .......................................................................... 20

    III.    The Proper Remedy is for the Court To Impose Near-Term Deadlines
           for EPA to Update and Reissue its Proposed Rule, and Then to Promulgate
           a Final Rule. .............................................................................................. 22

CONCLUSION ................................................................................................................ 25

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities    i
in Support, Case No. 3:20-cv-00670-WHO

### TABLE OF AUTHORITIES

**Cases**

*Astrazeneca Pharms. LP v. Burwell*,
   197 F. Supp. 3d 53 (D.D.C. 2016) ......................................................... 23

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................... 11

*County of Maui v. Haw. Wildlife Fund*,
   140 S. Ct. 1462 (2020) ...................................................................... 12, 13

*Ctr. for Biological Diversity v. Brennan*,
   571 F. Supp. 2d 1105 (N.D. Cal. 2007) ................................................. 24

*Cutler v. Hayes*, 818 F.2d 879 (D.C. Cir. 1987) ......................................... 17

*East Bay Sanctuary Covenant v. Biden*,
   No. 18-17274, WL 1220082 (9th Cir. Mar. 24, 2021) ........................... 10

*Fair Housing of Marin v. Combs*,
   285 F.3d 899 (9th Cir. 2002) ................................................................. 10

*Forest Guardians v. Babbitt*,
   174 F.3d 1178 (10th Cir. 1999) ............................................................. 22

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs, Inc.*,
   528 U.S. 167 (2000) ............................................................................... 10

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ............................................................................... 10

*In re Am. Rivers & Idaho Rivers United*,
   372 F.3d 413 (D.C. Cir. 2004) ............................................................... 14

*In re California Power Exch. Corp.*,
   245 F.3d 1110 (9th Cir. 2001) ............................................................... 17

*In re A Community Voice*,
   878 F.3d 779 (9th Cir. 2017) .......................................................... *passim*

*In re Core Commc'ns*,
   531 F.3d 849 (D.C. Cir. 2008) ............................................................... 15

*In re Int'l Chem. Workers Union*,
   958 F.2d 1144 (D.C. Cir. 1992) ........................................................ 14, 15

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities          ii
in Support, Case No. 3:20-cv-00670-WHO

*In re Pesticide Action Network N. Am.,*
   798 F.3d 809 (9th Cir. 2015) ........................................................................... 20

*In re Zappos.com, Inc.,*
   888 F.3d 1020 (9th Cir. 2018) ........................................................................... 8

*Independence Mining Co. v. Babbitt,*
   105 F.3d 502 (9th Cir. 1997) ........................................................................... 16

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................................ 11

*Melendres v. Arpaio,*
   665 F.3d 990 (9th Cir. 2012) ............................................................................. 8

*Molski v. Evergreen Dynasty Corp.,*
   500 F.3d 1047 (9th Cir. 2007) ......................................................................... 23

*Nat. Res. Def. Council v. EPA,*
   956 F.3d 1134 (9th Cir. 2020) ............................................................. 16, 19, 20

*Perez v. Barr,*
   957 F.3d 958 (9th Cir. 2020) ........................................................................... 23

*S.C. Coastal Conservation League v. Ross,*
   No. 2:18-CV-03326-RMG, 2019 WL 259116 (D.S.C. Jan. 18, 2019) ................... 24

*San Francisco Baykeeper v. Whitman,*
   297 F.3d 877 (9th Cir. 2002) ............................................................................. 3

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) .......................................................................................... 8

*Telecomms. Rsch. & Action Ctr. v. FCC,*
   750 F.2d 70 (D.C. Cir. 1984) ............................................................... 15, 17, 20

*United States v. N.Y. Tel. Co.,*
   434 U.S. 159 (1977) ........................................................................................ 23

*Vietnam Veterans of Am. v. CIA,*
   811 F.3d 1068 (9th Cir. 2016) ......................................................................... 22

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities     iii
in Support, Case No. 3:20-cv-00670-WHO

**Statutes**

5 U.S.C. § 555(b) ................................................................................................................ 2, 14

5 U.S.C. § 706(1) ........................................................................................................ 7, 14, 22

28 U.S.C. § 1651(a) ................................................................................................................ 23

33 U.S.C. § 1251(a) ............................................................................................................ 4, 17

33 U.S.C. § 1321(d) ................................................................................................................ 12

33 U.S.C. § 1321(d)(1) ............................................................................................................ 4

33 U.S.C. § 1321(d)(2) ........................................................................................................ 2, 4

33 U.S.C. § 1321(d)(2)(G) ...................................................................................................... 5

33 U.S.C. § 1321(d)(3) ...................................................................................................... 5, 12

33 U.S.C. § 1362(12)(A) ........................................................................................................ 12

33 U.S.C. § 1365(a) ................................................................................................................ 23

33 U.S.C. § 1365(a)(2) ....................................................................................................... 7, 12

33 U.S.C. § 1473 ..................................................................................................................... 12

33 U.S.C. § 1474 ..................................................................................................................... 12

33 U.S.C. § 1477 ..................................................................................................................... 12


**Regulations**

40 C.F.R. § 300.900 ................................................................................................................ 5

40 C.F.R. § 300.910(a) ............................................................................................................ 5

40 C.F.R. § 300.910(d) ............................................................................................................ 5

40 C.F.R. § 300.915(a) ............................................................................................................ 5

40 C.F.R. § 300.920(a)(3) ....................................................................................................... 5

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities       iv
in Support, Case No. 3:20-cv-00670-WHO

**Federal Register Notices**

80 Fed. Reg. 3380 (Jan. 22, 2015) ........................................................................... 4, 5, 7

Exec. Order No. 12777, 56 Fed. Reg. 54,757 (Oct. 22, 1991) ....................................... 5

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56 ....................................................................................................... 1

Fed. R. Civ. P. 56(a) ................................................................................................. 11

Fed. R. Civ. P. 56(c) ................................................................................................. 11

**Other Authorities**

James T. O'Reilly, *Administrative Rulemaking* § 14.4 (2021) ..................................... 23

Samuel I. Ferenc, *Clear Rights and Worthy Claimants: Judicial Intervention in
    Administrative Action Under the All Writs Act*, 118 Colum. L. Rev. 127 (2018) .................... 23

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities          v
in Support, Case No. 3:20-cv-00670-WHO

<u>NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT</u>

On July 7, 2021 at 2:00 p.m., or as soon as possible thereafter, Plaintiffs Earth Island Institute/ALERT Project, Alaska Community Action on Toxics, Cook Inletkeeper, Center for Biological Diversity, Rosemary Ahtuangaruak, and Kindra Arnesen (collectively, Plaintiffs) will move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs move for summary judgment because there is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law.

Plaintiffs seek an order declaring that Defendant Michael Regan in his official capacity as Administrator of the United States Environmental Protection Agency (EPA), and EPA, (1) have failed to perform a nondiscretionary duty imposed by the Clean Water Act (CWA) when they failed to update the 1994 National Contingency Plan (NCP) to reflect improvements in scientific and technological knowledge, and (2) are violating the Administrative Procedure Act (APA) by unreasonably delaying issuance of a final rule to update the NCP. Plaintiffs also seek an order requiring EPA to (1) issue a new proposed rule to amend the NCP within 90 days of the Court's decision; (2) issue a final rule within one year of the Court's decision; and (3) provide the Court with a status report 180 days from the date of the Court's decision.

This Motion is based on this Notice, the supporting Memorandum of Points and Authorities and the declarations and exhibits attached thereto, all pleadings and documents on file in this action, and oral and documentary evidence presented at or before the Motion hearing.

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

<u>STATEMENT OF THE ISSUES</u>

Eleven years ago today, the largest catastrophic oil spill in U.S. history—the BP Deepwater Horizon well blowout in the Gulf of Mexico—gushed oil for 87 days, releasing roughly 200 million gallons of oil into the marine environment. The spill response involved use

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities          1
in Support, Case No. 3:20-cv-00670-WHO

of more than two million gallons of toxic chemicals to disperse spilled oil. Dispersant chemicals were aerially applied, drifting onto the skin and into the airways of disaster first-responders such as Coast Guard officers. These chemicals similarly affected Gulf coast residents. Health effects from the disaster, which included enduring respiratory illness and skin lesions, became so prevalent in impacted communities that they are known locally as "BP Syndrome." The oil-and-dispersant mixture also had toxic effects on the marine environment, including numerous species of wildlife.

More than a decade later, serious dispersant-induced human health harm persists among the dispersant-exposed. In parallel, long-term scientific studies of BP Deepwater Horizon effects have confirmed both the human and ecological risks of dispersant use. Broad deployment of chemical dispersants nonetheless remains a permissible and industry-preferred oil spill response method, pursuant to the EPA's 1994 "National Contingency Plan" (NCP) that governs oil spill response.

EPA has not updated its NCP in more than a quarter century, despite the Clean Water Act's command that the federal government maintain a scientifically and technologically current NCP that "shall provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges." 33 U.S.C. § 1321(d)(2). Further, despite the Administrative Procedure Act's command that an agency "within a reasonable time . . . conclude a matter presented to it" (5 U.S.C. § 555(b)), EPA has not concluded a pending rulemaking to update the NCP more than *eight years* after several Plaintiffs first filed a petition seeking a rule revision, more than *seven years* after Plaintiff Earth Island Institute filed a supplemental petition, and more than *six years* since EPA issued a proposed rule.

Both agency failures are unlawful. The Court should thus grant Plaintiffs' motion, and impose deadlines by which EPA must issue a scientifically current proposed rule and final rule.

Plaintiffs' Notice of Motion, Motion for Summary Judgment, and Memorandum of Points and Authorities in Support, Case No. 3:20-cv-00670-WHO

2

RELEVANT FACTS AND BACKGROUND

Oil spills of varying sizes are a routine and inevitable incident of oil production and transport. Between 2006 and 2015, excluding the catastrophic BP Deepwater Horizon spill, the Bureau of Ocean Energy Management recorded 334 oil spills of more than one 42-gallon barrel of oil from offshore platforms.[1] These spills caused a total of 10,951 barrels of oil to enter the Gulf of Mexico.[2] Thus, on average, at least 37 oil spills occur annually from platforms in the Gulf, with roughly 1,200 barrels of oil entering waters. The NCP allows broad use of dispersant chemicals in response efforts, posing a constant threat to Plaintiffs' interests.

Chemical dispersants break up oil slicks on the water's surface and disperse oil particles.[3] In the process, they can act as sinking agents, sending oil below the surface, where it becomes difficult or impossible to remove. [AR] *Supplement to Petition for Rulemaking to Amend National Contingency Plan (NCP) Product Schedule* 10 (Jun. 2, 2014) (*2014 Pet. Supp.*).[4] The ability of dispersant chemicals to seemingly disappear huge swaths of oil has clear public relations value, but their ability to actually remediate oil spills is much less certain. Scientific evidence indicates that dispersants exacerbate a spill's ecological impact, and have significant adverse human health effects. [AR] *Petition for Rulemaking to Amend National Contingency Plan (NCP) Product Schedule* 8–9 (Nov. 14, 2012) (*2012 Pet.*) (describing evidence of harms to

---

[1] Bureau of Ocean Energy Management/Bureau of Safety and Environmental Enforcement, *2016 Update of Occurrence Rates for Offshore Oil Spills* 16, Table 5, https://www.bsee.gov/sites/bsee.gov/files/osrr-oil-spill-response-research/1086aa.pdf.
[2] *Id.*
[3] *The Use of Dispersants in Marine Oil Spill Response*, National Center for Biotechnology Information (Apr. 5, 2019), https://www.ncbi.nlm.nih.gov/books/NBK556755/.
[4] This is not a case to be decided upon a traditional administrative record, insofar as there can be no bounded record where an agency has failed to act. *See, e.g., San Francisco Baykeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002).  Plaintiffs nonetheless here designate by [AR] the documents that Defendants have certified to the Court as the "administrative record." Plaintiffs propose to submit a Joint Appendix with Defendants at the conclusion of briefing.

human health); *2014 Pet. Supp.* 33 (citing numerous studies finding that oil and dispersants, when combined, are more toxic to marine life than oil alone).

An early large-scale application of dispersants occurred in 1969 off the coast of Santa Barbara in response to a well blowout that released 42 million gallons of oil. *Id*. at 6. Dispersants were later a significant part of the 1989 *Exxon Valdez* oil spill response in Prince William Sound, Alaska, and an even bigger part of the 2010 BP Deepwater Horizon oil spill response in the Gulf of Mexico. *2012 Pet.* 6; *2014 Pet. Supp.* 7.

The massive dispersant volume deployed in response to BP Deepwater Horizon—nearly two million gallons (80 Fed. Reg. 3380, 3381 (Jan. 22, 2015))—was indeed unprecedented. Further, almost half of this dispersant was injected at a deep wellhead (*id.*), despite dispersants' design for use atop the ocean and corresponding lack of efficacy testing for subsurface use.[5]

The Clean Water Act (CWA) of 1972 is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Cognizant that oil and hazardous substances threaten the integrity of such waters, Congress, through Section 311 of the CWA, mandated that the President "shall prepare and publish a National Contingency Plan for removal of oil and hazardous substances" in the waters of the United States. *Id*. § 1321(d)(1).

Section 311's "overall intent is to require a number of activities to ensure the efficacy of the NCP and the ability to safely provide for mitigation of any pollution." *Order Re Mot. to Dismiss* 8, ECF No. 42 (*June 2 Order*). Accordingly, Congress instructed that the NCP "shall provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges." 33 U.S.C. § 1321(d)(2). To this end, the CWA states that the President "may, from time to time, as the President deems advisable, revise or otherwise amend"

---

[5] National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling: Report to the President* 144 (2011), https://www.govinfo.gov/app/details/GPO-OILCOMMISSION.

1  the NCP. *Id.* § 1321(d)(3). The President delegated this statutory duty to EPA by executive

2  order. Exec. Order No. 12777, 56 Fed. Reg. 54,757 (Oct. 22, 1991). The last NCP update was in

3  1994, more than a quarter-century ago. *See* 80 Fed. Reg. at 3383.

4        The NCP must include "a schedule identifying dispersants, chemicals, and other products

5  that may be used under the NCP; the waters in which such [products] may be used; and the

6  quantities of [products] that can be used safely in such waters." 33 U.S.C. § 1321(d)(2)(G).

7  Subpart J of the NCP contains a Product Schedule that identifies allowable dispersants. *See* 40

8  C.F.R. § 300.900.

9        The 1994 NCP permits extensive use of chemical dispersants. It contemplates

10  preauthorized use of chemical dispersants in response to oil spills, allowing responders to deploy

11  these chemicals without spill-specific authorization from any regulator. *See id.* § 300.910(a). The

12  NCP further delegates broad discretion to on-scene response coordinators to authorize the use of

13  *any* dispersant in certain situations, including those not on the Product Schedule. *Id.* §

14  300.910(d). The practical effect of Subpart J is thus that chemical dispersants are broadly

15  available for oil spill response. Indeed, dispersants are increasingly chosen over mechanical

16  cleanup methods, and have become a virtually automatic spill response. *2012 Pet.* 6; *2014 Pet.*

17  *Supp.* 9.

18        There is no toxicity threshold for placing a dispersant on the NCP Product Schedule.

19  Rather, to qualify products for inclusion, manufacturers are simply required to submit to

20  EPA, *inter alia*, information about the products' effectiveness, and the results of toxicity

21  testing. 40 C.F.R. § 300.915(a). Toxicity test results do not, however, automatically disqualify a

22  dispersant from placement on the Schedule. *See id.* § 300.920(a)(3). Further, current tests use the

23  death of test organisms as their endpoint for evaluation, rather than the more sensitive endpoint

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities
in Support, Case No. 3:20-cv-00670-WHO

5

of harm from sub-lethal chemical exposure.[6] Thus, dispersant testing under the current NCP greatly underestimates the environmental and human health harms of dispersant use.

Dispersant testing under the 1994 NCP also significantly overestimates dispersants' utility in remediating oil spills. Laboratory tests for efficacy specified by the NCP, for instance, omit variables such as salinity and sediment that greatly affect dispersant performance in realistic field conditions. *2012 Pet.* 10.

In 2011, EPA's Office of the Inspector General (OIG) issued a report concluding that the NCP's approach to efficacy and toxicity review of dispersants was inadequate, and that the agency had known this for more than a decade. [AR] EPA, Office of Inspector General, *Report: Revisions Needed to National Contingency Plan Based on Deepwater Horizon Oil Spill* 21 (Aug. 2011) (*2011 EPA-OIG Report*). The report specifically found that "EPA has not updated the NCP since 1994 to include the most appropriate efficacy testing protocol," and noted that if the NCP had reflected up-to-date testing procedures for dispersant efficacy, "more reliable efficacy data" would have been available at the time of the BP Deepwater Horizon spill. *Id.* at 8.

In November 2012, several Plaintiffs filed a rulemaking petition with EPA urging an NCP update. *See 2012 Pet.*[7] Facing ongoing agency inaction, Plaintiff Earth Island Institute filed a supplemental petition in June 2014. *See 2014 Pet. Supp.*

In 2015, in response to both external and internal pressure to revise the NCP, EPA issued a Notice of Proposed Rulemaking.  The Notice announced its intention to update the NCP—and

---

[6] *See, e.g.,* Darrin Greenstein *et al., Comparison of Methods for Evaluating Acute and Chronic Toxicity in Marine Sediments*, 27 Envtl. Toxicology & Chemistry 933 (2008) (describing utility of testing for chronic as well as acute toxicity to marine life), http://www.sccwrp.org:8060/pub/download/DOCUMENTS/JournalArticles/558_ChronicMethodsETC.pdf).
[7] Plaintiffs Earth Island Institute, Rosemary Ahtuangaruak, and Kindra Arnesen filed the 2012 Petition. *2012 Pet.* 19–20.

in particular, Subpart J—to "address[] the efficacy, toxicity, environmental monitoring of dispersants, and other chemical and biological agents, as well as public, state, local, and federal officials' concerns regarding their use." 80 Fed. Reg. at 3380.

As urged in Earth Island Institute's petitions, the proposed NCP changes were meant to implement lessons from the BP Deepwater Horizon spill about the toxicity, environmental impacts, and efficacy (or lack thereof) of chemical dispersants. *Id.* at 3381. EPA stated that the proposed rule was "anticipated to encourage the development of safer and more effective spill mitigating products, and would better target the use of these products to reduce the risks to human health and the environment." *Id.* at 3380. EPA anticipated that NCP amendments would revise efficacy and toxicity standards, environmental trade-off determinations, and dispersant monitoring requirements. *Id.* at 3381.

Nearly six years since the public comment period on the proposed rule closed, however, and more than seven years since Plaintiffs filed their second rulemaking petition, EPA has failed to issue a final rule. This leaves all oil spill responses governed by a dangerously outdated plan, even as 12.45 million acres of the Outer Continental Shelf is subject to active petroleum leases, with 2.5 million acres currently producing.[8]

## JURISDICTION

This action arises under the CWA, 33 U.S.C. § 1365(a)(2), and the APA, 5 U.S.C. § 706(1). Plaintiffs have standing to sue because of substantive injuries traceable to EPA's failure to update the NCP (as required by the CWA), and procedural injury based on EPA's failure to take final action on Earth Island Institute's rulemaking petitions (as required by the APA).

---

[8] *See* Bureau of Ocean Energy Management, *Combined Leasing Report as of April 1, 2021,* https://www.boem.gov/sites/default/files/documents/regions/pacific-ocs-region/oil-gas/Lease%20stats%204-1-21.pdf.

1    Although this Court need only find one party with standing to assert jurisdiction (*Melendres v.*

2    *Arpaio*, 665 F.3d 990, 999 (9th Cir. 2012) ("[O]nce the court determines that one of the plaintiffs

3    has standing, it need not decide the standing of the others")), all Plaintiffs here satisfy standing

4    requirements.

5           EPA's delay in finalizing its rulemaking creates the "substantial risk" of a concrete future

6    harm, which is an injury-in-fact to individual plaintiffs Rosemary Ahtuangaruak and Kindra

7    Arnesen. *See, e.g.*, *In re Zappos.com, Inc.,* 888 F.3d 1020, 1024 (9th Cir. 2018) ("A plaintiff

8    threatened with future injury has standing to sue . . . [if] there is a 'substantial risk that the harm

9    will occur'" (quoting *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158 (2014)). The delay in

10   updating the 1994 NCP preserves a "harmful status quo, in which dangerous dispersant

11   chemicals are the go-to method for oil spill response." Declaration of Kindra Arnesen (Arnesen

12   Decl.), ¶ 42. The Gulf coast regularly sees oil spills, with actual or threatened use of NCP-

13   sanctioned dispersants in response: Ms. Arnesen describes seeing "tanks on boats, prepared to

14   spray dispersants in the next spill." *Id*. ¶¶ 31–32.

15

16          Ms. Ahtuangaruak's Native community in Alaska is also at risk, because it is "completely

17   surrounded by oil and gas development, both onshore and offshore." Declaration of Rosemary

18   Ahtuangaruak (Ahtuangaruak Decl.) ¶ 9. Further, global wind, weather, and tide patterns make

19   the Arctic a "totem pole for contaminants" from elsewhere. *Id*. ¶¶ 24, 35.

20          Without a finalized rule, these demonstrated harms will likely recur. Members of Ms.

21   Arnesen's family, who have had direct contact with dispersants, have experienced loss of muscle

22   mass, severe nausea and migraines, vomiting, vertigo, and chronic fatigue. Arnesen Decl. ¶¶ 11,

23   13. Those working with dispersants have suffered neurological effects, chronic illnesses, and

24   chemical hypersensitivity. Ahtuangaruak Decl. ¶¶ 25–27. Even those not directly exposed have

25

26

27

28

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities
in Support, Case No. 3:20-cv-00670-WHO                  8

suffered post-spill rashes, migraines, sinus infections, palpitations, and even loss of consciousness. Arnesen Decl. ¶¶ 8, 14–15.

Plaintiffs Arnesen and Ahtuangaruak have also been harmed—and without regulatory change, are likely to be harmed again—by dispersants' adverse effects on the marine life on which they depend for food and economic survival. In the Gulf, where dispersants and oil have mixed in the marine ecosystem, fish have turned up with oil sludge in their stomachs, and dramatic drops in fishing yields after the BP Horizon Oil Spill disaster point to "water desert" conditions for commercial fishing. *Id*. ¶¶ 27–29.

Ahtuangaruak's Inupiaq community depends on a high-meat diet of marine resources, such as whales and fish, that are at risk of chemical contamination from dispersant use. Ahtuangaruak Decl. ¶¶ 13, 20–21. It would cost a "fortune" these communities cannot afford to replace their traditional diet with purchased foods. *Id*. ¶ 19. Marine resource impacts of oil spills and their toxic cleanups have greatly compromised the income of commercial fishers, Arnesen Decl. ¶ 29, and the social stability of village communities. Ahtuangaruak Decl. ¶ 19.

Organizational Plaintiffs Earth Island Institute/ALERT Project, Alaska Community Action on Toxics (ACAT), and Cook Inletkeeper are harmed by EPA's rulemaking delay because it directly conflicts with their missions: to protect the environments and local communities affected by oil spills. *See* Declaration of Pamela Miller (Miller Decl.) ¶ 7; Declaration of Robert Shavelson (Shavelson Decl.) ¶ 5; Declaration of Dr. Riki Ott (Ott Decl.) ¶ 16. Indeed, one of ALERT's founding purposes was to "ensure that EPA updated the [NCP] for responding to oil leaks and spills, and restricted dispersant use." Ott Decl. ¶ 16.

Related, these Plaintiffs have had to expend organizational resources "building an informed public" and encouraging that public to advocate for an NCP update. Ott Decl. ¶ 23; Shavelson Decl. ¶ 18; Miller Decl. ¶ 11. They have accordingly diverted organizational

resources from core functions: "thousands of hours and thousands of dollars" for Earth Island

Institute's ALERT Project (Ott Decl. ¶ 29); "at least 250 hours of staff time" for

Cook Inletkeeper (Shavelson Decl. ¶ 21); and "a full two to four months working solely on

dispersant issues" for ACAT's Executive Director. Miller Decl. ¶¶ 15–16.

This concrete drain on these organizational Plaintiffs' resources, which directly impairs

fulfillment of their missions, makes their harm more than a mere setback to abstract interests.

*East Bay Sanctuary Covenant v. Biden,* No. 18-17274, WL 1220082, at *10 (9th Cir. Mar. 24,

2021) ("an organization has direct standing . . . where it establishes that the defendant's behavior

has frustrated its mission and caused it to divert resources in response to that frustration of

purpose"); *accord, Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002).

Plaintiff Center for Biological Diversity (CBD) has representational standing because "its

members would otherwise have standing to sue in their own right, the interests it seeks to protect

are germane to the organization's purpose, and neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple*

*Advert. Comm'n*, 432 U.S. 333, 343 (1977). EPA's challenged inaction threatens to directly

injure CBD's members' recreational, aesthetic, scientific, and other interests. *See* Declaration of

Blake Kopcho (Kopcho Decl.) ¶¶ 6–7, 9–10 (CBD member discussing interests in recreating off

Southern California and observing wildlife, and threats to his interests from the use of dispersant

chemicals); Declaration of Miyoko Sakashita ¶¶ 3–8 (describing CBD's mission and its

members' interests); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs, Inc.*, 528 U.S.

167, 183 (2000) ("We have held that environmental plaintiffs adequately allege injury in fact

when they aver that they use the affected area and are persons 'for whom the aesthetic and

recreational values of the area will be lessened' by the challenged activity." (internal citation

omitted)).

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities
in Support, Case No. 3:20-cv-00670-WHO                    10

All these harms are "fairly trace[able]" to EPA's failure to finalize its proposed rule, and are "likely" to be "redressed by a favorable decision." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). For example, once the rule is finalized, the diversion of certain Plaintiffs' resources will end. ALERT "could refocus its efforts on building knowledge, skills, and resilience in the frontline communities it serves" (Ott Decl. ¶ 30); Cook Inletkeeper could refocus on its "larger goal of transitioning to a just, clean energy future" (Shavelson Decl. ¶ 15); and ACAT could refocus on the community educational events, advocacy, and research that advance its core mission. Miller Decl. ¶ 15. Each and every Plaintiff thus has Article III standing to sue EPA for its unlawful actions.

STANDARD OF REVIEW

Summary judgment is proper if the depositions, affidavits or declarations, or other materials in the record show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). The moving party can meet its burden by simply pointing out a lack of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies its initial burden, the non-moving party must go beyond the pleadings and present specific facts proving that there is a genuine issue for trial. *Id.* at 324. Summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

ARGUMENT

**I.    EPA's Failure to Update the National Contingency Plan Violates the CWA**

This Court has already determined that EPA has violated the Clean Water Act, which requires the agency to maintain an NCP that provides for effective oil spill response—response

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities
in Support, Case No. 3:20-cv-00670-WHO                    11

that minimizes damage, and reflects contemporary developments in science and technology. *See* 33 U.S.C. §§ 1321(d), 1365(a)(2). In its Order denying Defendants' Motion to Dismiss Plaintiffs' Clean Water Act claim, the Court considered "whether, as a matter of law, the CWA imposes a nondiscretionary duty on the EPA to update or amend the National Contingency Plan." *June 2 Order* 1. The Court concluded that "EPA has such a duty," and thus Plaintiffs "[are] allowed to bring a cause of action pursuant to the CWA's citizen-suit provision." *Id.*

A U.S. Supreme Court case decided after the Motion to Dismiss was briefed confirms the correctness of this Court's CWA ruling. In *County of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462 (2020) (*County of Maui*), the Court emphasized the importance of context in determining the meaning of statutory terms in the CWA. In that case, the Court explained that the commonplace word "from," as used in the CWA definition there at issue (33 U.S.C. § 1362(12)(A)), necessarily drew its specific meaning from context. *Id.* at 1473. The Court reasoned that an agency interpretation of a particular word is "neither persuasive nor reasonable" where it "would open a loophole allowing easy evasion of the statutory provision's basic purposes." *Id.* at 1474.

In adopting a functional rather than literal definition of pollutant discharges that require a CWA permit, the Court acknowledged that although "a more absolute position . . . may be easier to administer. . . [it would] have consequences that are inconsistent with major congressional objectives, as revealed by the statute's language, structure, and purpose." *Id.* at 1477.

Here, to find that EPA has a merely discretionary option to update the NCP because of the use of the word "may" in the relevant CWA provision would directly undermine that provision's goal: to ensure that the NCP provides effective oil spill response, in keeping with advancements in technology and science. *See* 33 U.S.C. § 1321(d)(3). Such an interpretation would thus condone "easy evasion of the statutory provision's basic purposes."

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities
in Support, Case No. 3:20-cv-00670-WHO

12

*See County of Maui*, 140 S. Ct. at 1474. Interpreting EPA's duty to update the NCP as discretionary is thus "neither persuasive nor reasonable." *See id*.

Further supporting the legal conclusion that EPA must update the NCP, the agency has twice agreed with recommendations from its OIG that were intended to remedy inadequacies in NCP dispersant review protocols. In so doing, EPA has *de facto* deemed it "advisable" to revise the NCP that contains those protocols.

In the agency's formal response to OIG's 2011 report, EPA called out the need for an NCP update, with EPA's leadership stating: "We agree with the seven recommendations contained in this report." *Memorandum from Asst. Administrator to Inspector General re: Response to Final OIG Evaluation Report "Revisions Needed to National Contingency Plan Based on Deepwater Horizon Oil Spill"* (Nov. 11, 2011).[9] EPA then provided an action plan for each of the seven recommendations, and predicted that it would execute those plans by mid-to-late 2012. *Id.* at 1-3. In early 2012, OIG accepted and "closed" all the corrective actions and plans. *Memorandum from Inspector General to Asst. Administrator re: Response to Corrective Action Plan for OIG Report No. 11-P-1534* (Feb. 7, 2012).[10] These included EPA actions and plans for revisions to NCP Subpart J, and for a framework for contingency plan updates. *Id.* at 2.

In 2013, the OIG followed up on its 2011 audit, "to determine whether the contingency planning structure for responding to oil spills and hazardous substance releases is effective, and whether plans are updated to reflect lessons learned from recent major events and new developments or industry trends." EPA-OIG, *EPA Could Improve Contingency Planning for Oil*

---

[9] https://www.epa.gov/sites/production/files/2015-10/documents/11-p0534_agency_response_oswer-1st.pdf.
[10] https://www.epa.gov/sites/production/files/2015-10/documents/11-p-0534_ig_comment_on_response_oswer-2nd.pdf.

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities
in Support, Case No. 3:20-cv-00670-WHO          13

*and Hazardous Substance Response* (Feb. 15, 2013).[11] The OIG found that corrective actions were still needed. *Id.* EPA again agreed with the OIG's recommendations. *See id.*

OIG found significant defects in the NCP nearly a decade ago, and again a year and a half later. EPA could not, and did not, deny the need to execute OIG's recommendations. To the contrary, EPA responded by developing action plans to address each distinct recommendation, and estimated completion dates falling primarily in 2012–2013. This timing evidenced how pressing these NCP shortcomings were, and are. To this day, however, EPA continues to delay its NCP update. This failure abrogates the agency's nondiscretionary duty under the CWA.

## II.     EPA's Years-Long Delay in Issuing a Final Rule Is Unreasonable

EPA has failed to conclude its rulemaking to update the NCP within a reasonable time, as the APA requires. *See* 5 U.S.C. § 555(b). The APA authorizes a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). An agency's unreasonable delay in finalizing a rule is an actionable failure. *See, e.g., In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992) (finding unreasonable delay in the Occupational Health and Safety Administration's failure to issue final cadmium standards); *In re Cmty. Voice*, 878 F.3d 779, 785 (9th Cir. 2017) (holding that by granting a petition for rulemaking, the EPA "came under a duty to conclude a rulemaking proceeding within a reasonable time").

While "[t]here is no *per se* rule as to how long is too long to wait for agency action, . . . a reasonable time . . . is typically counted in *weeks or months*, not years." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (finding agency delay of six years "nothing less than egregious") (emphasis added and internal citations omitted). Courts use a context-specific, multifactor balancing test to determine whether delay is "unreasonable." *In re*

---

[11] https://www.epa.gov/sites/production/ files/2015-09/documents/20130215-13-p-0152.pdf.

Plaintiffs' Notice of Motion, Motion for Summary Judgment, and Memorandum of Points and Authorities in Support, Case No. 3:20-cv-00670-WHO

14

*Int'l Chem. Workers Union*, 958 F.2d at 1149. The Ninth Circuit has adopted the six-factor test enunciated in *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC*).

The so-called "*TRAC* factors" are: (1) the time agencies take to make decisions must be governed by a "rule of reason;" (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude to hold that agency action is unreasonably delayed. *Id.*

Of the six *TRAC* factors, courts consider the first factor—the requirement that the agency's timeframe be guided by a "rule of reason"—to be the most important. *In re Core Commc'ns*, 531 F.3d 849, 855 (D.C. Cir. 2008). None of the factors are independently dispositive, however, and courts consider all six when determining whether an agency's delay is unreasonable. *See In re A Community Voice*, 878 F.3d at 786.

EPA's years-long delay in finalizing the NCP and taking final action on Plaintiffs' petitions is unreasonable. Notwithstanding evidence that the use of chemical dispersants authorized by the outdated NCP has harmed and will harm human health and the marine environment, EPA has stalled for more than six years on its rulemaking to update the NCP, and more than eight years on taking final action on Plaintiffs' original petition. At the same time, it has pursued deregulatory projects with alacrity. All six *TRAC* factors weigh in favor of this Court finding unreasonable agency delay.

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities
in Support, Case No. 3:20-cv-00670-WHO

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A.     *Factor One: EPA's Protracted Delay Violates the "Rule of Reason"*

Ninth Circuit precedent makes plain that EPA's delay is unreasonable. In *In re A Community Voice*, for example, the Ninth Circuit held that EPA had unreasonably delayed in failing to act on a rulemaking petition granted eight years prior. *Id.* at 782. Petitioners, a coalition of community and environmental health organizations, had petitioned EPA to lower its dust-lead and lead-paint hazard standards. *Id.* at 783. EPA granted the petition, but did not commit to a timeframe for rulemaking. *Id.* Five years later, the organizations filed a lawsuit against EPA, alleging unreasonable delay under both the Toxic Substances Control Act and the APA. *Id.* at 784.

The court held that "having chosen to grant the petition for rulemaking, EPA came under a duty to conclude a rulemaking proceeding within a reasonable time," not merely to "begin[] an appropriate proceeding." *Id.* at 785. By granting the petition for rulemaking, the court explained, EPA had begun the "matter" of rulemaking; to "conclude" that "matter," EPA had to "reach some final decision." *Id.* It could not, as EPA there argued, simply grant a petition but never finish the rulemaking process. *See id.*

Most recently, the Ninth Circuit held that EPA had unlawfully delayed response to a 2009 petition requesting that it end use of the household pesticide tetrachlorvinphos, based on severe health threats to children. *Nat. Res. Def. Council v. EPA*, 956 F.3d 1134, 1136–37 (9th Cir. 2020) (*NRDC*). The court relied on *In Re A Community Voice* in ruling that EPA's multi-year delay in responding to a petition in a case implicating serious health harms had "stretched the 'rule of reason' beyond its limits." *NRDC* at 1039–40 (internal citation omitted).[12] Here too,

---

[12] Cases in which the Ninth Circuit did not find an agency's delay unreasonable are readily distinguishable. In *Independence Mining Co. v. Babbitt*, for example, the Ninth Circuit held that a two- to three-year delay in responding to mining patent applications was not unreasonable because Congress had explicitly given defendant Department of Interior five years to make such determinations. 105 F.3d 502, 509 (9th Cir. 1997). Likewise, the Ninth Circuit

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities      16
in Support, Case No. 3:20-cv-00670-WHO

EPA has been petitioned to regulate a serious health threat, in the form of toxic chemical dispersants used in oil spill response. Where the agency has taken more than eight years since Plaintiffs' 2012 rulemaking petition, seven years since their follow-up petition, and six years since issuing a proposed rule, EPA has stretched the "rule of reason" beyond its elastic limits.

B.   *Factor Two: The Clean Water Act Dictates Immediate Action*

The second *TRAC* factor (statutory guidance as to a reasonable timetable for agency action) also weighs in Plaintiffs' favor. This factor requires "an examination of any legislative mandate" and requires a court to consider whether "delay may be undermining the statutory scheme." *Cutler v. Hayes*, 818 F.2d 879, 897–98 (D.C. Cir. 1987). Here, EPA's delay clearly undermines the purpose of the CWA, which is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

C.   *Factors Three & Five: EPA's Delay Threatens Public Health and Welfare*

The third *TRAC* factor, requiring the Court to balance the economic harm of a regulation against the public health and welfare harm caused by delay, weighs overwhelmingly in favor of Plaintiffs. As the *TRAC* court explained: "[D]elays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *TRAC*, 750 F.2d at 80. Courts often analyze this factor in conjunction with the fifth factor—the nature and extent of the interests prejudiced by delay (*id*. at 80)—which also weighs in Plaintiffs' favor.

---

declined to find unreasonable delay in *In re California Power Exchange Corp.*, in which plaintiffs sought a final order regarding their outstanding refund requests to the Federal Energy Regulatory Commission (FERC). 245 F.3d 1110, 1125 (9th Cir. 2001). Fatal to plaintiffs' claim of unreasonable delay was that only four months had passed between their request for a refund and the claim of unreasonable delay. *Id.* Applying the first *TRAC* factor, the court noted that "the cases in which courts have afforded relief have involved delays of years, not months," and thus "*a fortiori*, FERC's four-month delay does not run afoul of any 'rule of reason.'" *Id.*

Plaintiffs explain profound effects of past and possible future use of chemical dispersants on their health, lives, and livelihoods. *See* Arnesen Decl., ¶¶ 10–15 (describing the severe health harms Ms. Arnesen's family experienced following dispersant use in the wake of the BP Deepwater Horizon oil spill); Ahtuangaruak Decl., ¶¶ 16–20 (describing Ms. Ahtuangaruak's concerns over continued dispersant use, and dispersants chemicals' impact on her Native community's health and food security); Miller Decl., ¶¶ 17–20 (describing cultural effects of potential dispersant use on ACAT board member Harriet Penayah, a Yupik Elder on Saint Lawrence Island in the Bering Sea, where she and her family rely on the harvest of fish and marine mammals for spiritual, physical, and cultural sustenance); Kopcho Decl., ¶ 10 (describing Mr. Kopcho's fear of an oil spill accompanied by dispersant use in the Santa Barbara Channel, whose whales and other creatures inspire him as he sails, surfs, and dives).

Plaintiffs have experienced first-hand the severity of dispersants' health effects:

- *I've always been relatively healthy, but after the spill I have dealt with severe migraines and chronic fatigue. For a number of years now, when the fatigue hits me, my body feels like it's attacking itself. I feel like someone's hit me with electricity in my hands and my feet and then my muscles and limbs begin to cramp really hard. It gets progressively worse. Within thirty to forty minutes, the leg cramps start, first at my ankles then they move though my whole body. The only thing that relieves the pain is going to sleep.* Arnesen Decl., ¶ 13.

- *I witnessed the impact of dispersant use related to the Exxon Valdez spill in my work as a community health aide. I worked with individuals that had been exposed to dispersants used in oil spill response. It was general knowledge handed down from elders and community health aides that those who worked with dispersants were first to die. One of my patients was a ship captain for a skimmer. He talked about how when people were using the dispersants, their gear would break down and they would get the substances on their bodies. They would complain of being very sick. People exposed during spill response got headaches, dizziness, had difficulty thinking. Those neurological effects stay with people for a long time, and can develop into long-term disabilities. Those exposed by the initial spill responses suffer re-exposure due to other events and develop chronic illnesses and chemical hypersensitivity.* Ahtuangaruak Decl., ¶¶ 25–27.

Plaintiffs' Notice of Motion, Motion for Summary Judgment, and Memorandum of Points and Authorities in Support, Case No. 3:20-cv-00670-WHO

18

- *From 2005-2010, my community was healthy. There were a couple of families that had a family member fighting cancer of some sort, but things really changed after the spill. I've witnessed my community experience an explosion of cancer cases. I know I went to twenty-two funerals in eighteen months. Then, I stopped counting.*
  Arnesen Decl., ¶ 24.

Stakeholders not parties to this proceeding confirmed the health urgency of an NCP update in

their comments on EPA's Proposed Rule:

- *A report by Earthjustice found that, of the 57 ingredients in [the chemical dispersant] Corexit, five of the chemicals are associated with cancer; 33 are associated with skin irritation from rashes to burns; 33 are linked to eye irritation; 11 are or are suspected of being potential respiratory toxins or irritants; and 10 are suspected kidney toxins. The toxin 2-butoxyethanol, found in the blood samples taken from BP offshore and near shore workers, was linked to severe health problems with cleanup workers on the Exxon Valdez oil spill, including respiratory, nervous system, liver, kidney, and blood disorders. Many of those workers suffered long-lasting neurological problems.*
  [AR] Government Accountability Project (GAP), Comment on Proposed NCP Rule (Apr. 23, 2015), Addendum: GAP, *Deadly Dispersants in the Gulf: Are Public Health and Environmental Tragedies the New Norm for Oil Spill Cleanups?* (2013), at 32; *see also* [AR] Earthjustice, *Comment Letter on Proposed Revisions to National Oil and Hazardous Substances Pollution Contingency Plan* (Apr. 22, 2015), at 198.

Further, as in *NRDC*, where EPA acknowledged that the chemical at issue posed a

serious toxic risks (956 F.3d at 1141), here too, EPA has acknowledged the inadequacy of the

NCP's approach to evaluating dispersity toxicity. *2011 EPA-OIG Report*; *see also In re A*

*Community Voice*, 878 F.3d at 787 (concluding that the third factor weighed in plaintiff's favor

because of the clear threat to human welfare that EPA itself had acknowledged).

   D. *Factor Four: No Higher, Competing Priorities Justify EPA's Delay*

Given the severity of health and ecological harms attributable to ongoing use of chemical

dispersants, EPA's delay cannot be justified by actions of a competing or higher priority—the

balancing required by the fourth *TRAC* factor. As the *NRDC* court noted, EPA does not "[get] a

free pass" on this factor "simply because all its activities to some extent touch on human

health, such that prioritization of one goal will necessarily detract from competing priorities."

Plaintiffs' Notice of Motion, Motion for Summary Judgment, and Memorandum of Points and Authorities in Support, Case No. 3:20-cv-00670-WHO

19

956 F.3d at 1141.

Rather, the *NRDC* court held that EPA was still required to prioritize issuing a final rule because of the agency's own recognition of the threat the pesticide posed to children, such that "'more stringent regulatory restrictions are necessary to protect public health.'" *Id.* at 1142; *see also In re Pesticide Action Network N. Am.,* 798 F.3d 809, 814 (9th Cir. 2015) (explaining that EPA should prioritize regulation of chlorpyrifos notwithstanding competing health-regulatory matters, because of EPA's own assessment of the pesticide's dangers). So too here: EPA has repeatedly acknowledged that the existing NCP is insufficiently protective of public health and the environment, and does not reflect the best available science. And EPA has provided nothing in its administrative record to suggest that to advance the agency's mission, other actions must take priority over the NCP update.

E.    *Factor Six: EPA's Delay Coincides with Numerous Deregulatory Actions*

This Court "need not find any impropriety lurking behind agency lassitude to hold that agency action is unreasonably delayed" (*TRAC*, 750 F.2d at 80), and Plaintiffs have no evidence of impropriety specific to the NCP rulemaking. However, EPA's abrupt pivot away from issuance of health-protective rules and towards deregulatory actions from 2016 until the recent change in administration, in the period when EPA would logically have been finalizing its NCP rule, is striking. In light of the agency's mission "to protect human health and the environment" (*see* EPA, *About EPA,* https://www.epa.gov/aboutepa/our-mission-and-what-we-do), EPA's prioritization of deregulation in this period arguably represents wholesale- rather than retail-level impropriety in its regulatory task sequencing.

Many complex rulemakings from 2016–2020 that reduced health and environmental

protections took less than two years.[13] And yet, rulemakings tremendously consequential for

EPA's mission, including the NCP rulemaking, have languished on EPA desks for far longer:

| Action | Comments | Time from Proposed to Final Rule |
|---|---|---|
| Resource Conservation and Recovery Act: revising current rules to allow coal ash pond operators to use alternate liners[14] | 42,000 | 0 years, 9 months |
| Clean Air Act (CAA): regulatory amendments to the new source performance standards for volatile organic compound (VOC) emissions from the oil and natural gas sector and rescinding the new source performance standards for methane emissions[15] | 509,000 | 1 year, 11 months |
| CAA: regulatory amendments to the Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule setting revised standards for corporate average fuel economy and tailpipe carbon dioxide emissions for passenger vehicles and light-duty trucks for model years 2021–2026.[16] | 619,000 | 1 year, 9 months |
| CAA: regulatory amendments to the Affordable Clean Energy Rule (ACE).[17] | 500,000 | 0 years, 11 months |
| CWA: National Contingency Plan update for the use of dispersants in oil spills[18] | 81,000 | Incomplete at 6 years, 5 months (Jan. 2015 to Apr. 2021) |

---

[13] *See generally* Sabin Center for Climate Change Law, *Climate Deregulation Tracker*, Columbia Law School, https://climate.law.columbia.edu/climate-deregulation-tracker.

[14] https://climate.law.columbia.edu/content/epa-further-weakens-coal-ash-protections; https://www.epa.gov/sites/production/files/2020-10/documents/ccr_part_b_frn_rin_2050-ah11_op_for_signature_10_15_20_admin_0.pdf.

[15] https://climate.law.columbia.edu/content/epa-weakens-voc-controls-oil-and-gas-facilities; https://www.epa.gov/sites/production/files/2020-08/documents/frn_og_reconsideration_2060-at54_final_rule_20200812_admin_web.pdf; https://climate.law.columbia.edu/content/epa-rescinds-methane-standards-oil-and-gas-facilities; https://www.epa.gov/sites/production/files/2020-08/documents/frn_oil_and_gas_review_2060-at90_final_20200812_admin_web.pdf; https://beta.regulations.gov/document/EPA-HQ-OAR-2017-0483-2291.

[16] https://climate.law.columbia.edu/content/epa-and-nhtsa-finalize-rollback-federal-clean-car-standards; https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/documents/final_safe_preamble_web_version_200330.pdf; https://beta.regulations.gov/docket/EPA-HQ-OAR-2018-0283.

[17] https://climate.law.columbia.edu/content/epa-publishes-final-rule-repeal-and-replace-clean-power-plan; https://www.federalregister.gov/documents/2019/07/08/2019-13507/repeal-of-the-clean-power-plan-emission-guidelines-for-greenhouse-gas-emissions-from-existing; https://beta.regulations.gov/docket/EPA-HQ-OAR-2017-0355.

[18] https://www.epa.gov/emergency-response/revisions-national-oil-and-hazardous-substances-pollution-contingency-plan.

Although a finding of agency impropriety is not necessary to a determination that an agency's delay is unreasonable, EPA's general de-prioritization of actions that protect human health during its period of protracted delay in NCP rulemaking tips this factor in Plaintiffs' favor.

### III. The Proper Remedy is for the Court To Impose Near-Term Deadlines for EPA to Update and Reissue its Proposed Rule, and Then to Promulgate a Final Rule.

This Court has broad discretion under the APA and the All Writs Act to fashion equitable relief that redresses Plaintiffs' substantive and procedural injuries. The proper remedy is for the Court to issue an injunction that compels EPA by Court-specified dates to (1) update and reissue its proposed rule, and then (2) promulgate a final rule.

An order requiring EPA to update and reissue its proposed rule is appropriate where EPA's proposed rule is nearly six years old; where key data from long-term studies of the effects of the BP Deepwater Horizon spill and dispersant-reliant response have in that time become available; and where the CWA requires the agency to maintain an NCP that reflects current science and technology. An order that further requires EPA to proceed to a final rule by a date certain, and to provide a status report to the Court between the proposed and final rules stages, is appropriate because EPA has long delayed completing this rulemaking, and has not adhered to self-imposed deadlines.

As a threshold matter, the APA requires a court to order an agency to act in response to an agency's unlawful failure to act. When a court finds that agency action has been unlawfully withheld or unreasonably delayed, a court "shall . . . compel agency action." 5 U.S.C. § 706(1); *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1187 (10th Cir. 1999) ("Through § 706 Congress has stated unequivocally that courts must compel agency action unlawfully withheld or unreasonably delayed."); *see also Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1081 (9th Cir. 2016) ("The word 'shall' requires a court to compel agency action when, as here, there is a 'specific, unequivocal command' that the agency must act."). Additionally, the CWA vests

courts with the authority to compel EPA to take a legally required action that it has failed to take. *See* 33 U.S.C. § 1365(a).

Here, the Court has clear authority to impose deadlines and to compel EPA to act by dates certain. *See In re A Community Voice*, 878 F.3d at 779, 788 ("[W]hen there has been an unreasonable delay in rulemaking, courts have power and discretion to enforce compliance within some form of timeline."); James T. O'Reilly, *Administrative Rulemaking* § 14.4 (2021) ("[A] district court possesses broad discretion to set deadlines for compliance.").

The All Writs Act (AWA) further provides this Court with authority to craft tailored relief that redresses Plaintiffs' injuries. The AWA states that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). Courts derive authority from the AWA to issue varied equitable relief. Samuel I. Ferenc, *Clear Rights and Worthy Claimants: Judicial Intervention in Administrative Action Under the All Writs Act*, 118 Colum. L. Rev. 127, 140 (2018).

The AWA gives a federal court considerable flexibility to "achieve the ends of justice entrusted to it." *United States v. N.Y. Tel. Co*., 434 U.S. 159, 172–73 (1977). The Ninth Circuit has invoked the AWA, for example, to enjoin litigants from filing repeated, frivolous suits, and to appoint counsel. *See Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007); *Perez v. Barr*, 957 F.3d 958, 965 (9th Cir. 2020). Federal district courts have also relied on AWA authority to direct agency action appropriate to resolving matters in judicial controversy. *See, e.g.*, *Astrazeneca Pharms. LP v. Burwell*, 197 F. Supp. 3d 53 (D.D.C. 2016) (invoking the AWA to order the Food and Drug Administration not to approve or deny pending applications by generic drug manufacturers to sell their versions of a leading cholesterol drug); *S.C. Coastal Conservation League v. Ross*, No. 2:18-CV-03326-RMG, 2019 WL 259116 (D.S.C. Jan. 18, 2019) (enjoining Department of Commerce defendants and non-party federal agencies from

taking action to promulgate, approve, or take any other official action regarding pending permit applications).

This Court thus has discretion to provide the precise relief that Plaintiffs seek: an order to EPA to update and reissue its proposed rule for public comment before finalizing the rule, particularly in light of new data highly salient to the rule's content. Here, revising the rule would also serve judicial economy, by making the final rule more likely to comport with the CWA's command, and thus less susceptible to substantive challenge (or at least, fruitful challenge) by stakeholders. This remedy is indeed similar to that imposed to redress agency delay in *Center for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1134 (N.D. Cal. 2007).

In *Brennan*, the Global Change Research Council (the Council)—a federal body that analyzes global environmental conditions—had failed to comply with task timelines and procedures mandated by its organic act, the Global Change Research Act of 1990. *Id.* at 1136. The Council's mandatory Scientific Assessment was more than two and a half years overdue; its required Research Plan was more than a year overdue; and the Council had failed to publish a summary of its proposed Research Plan for public comment as required. *Id.* at 1112–13. As remedy, the court ordered the Council to both: (1) publish a summary of the Research Plan in the Federal Register, and (2) issue an *updated* Research Plan and Scientific Assessment. *Id.* at 1132. These steps ensured that up-to-date public comment could inform the final Research Plan, thus avoiding "[p]laintiffs' participation [being] rendered meaningless." *Id.* at 1133.

Here, requiring EPA to update and reissue its proposed rule, so that Plaintiffs (and other stakeholders) can supplement or modify their prior public comments to reflect changes in scientific knowledge since the 2015 proposed rule was issued, will likewise vindicate Plaintiffs' right to participate in a meaningful public comment process aimed at achieving a CWA-compliant final rule.

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities
in Support, Case No. 3:20-cv-00670-WHO

24

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment; declare that EPA's ongoing delay in updating the National Contingency Plan violates the Clean Water Act and the Administrative Procedure Act; establish a schedule for EPA's rulemaking actions, through final rule promulgation; and retain jurisdiction to ensure the agency's compliance with court-imposed deadlines.

DATED: April 20, 2021                      Respectfully submitted,


/s/ *Claudia Polsky*
Claudia Polsky (CA Bar No. 185505)
Environmental Law Clinic
UC Berkeley School of Law
*Counsel for Plaintiffs ALERT Project/Earth*
*Island Institute, Alaska Community*
*Action on Toxics, Cook Inletkeeper,*
*Rosemary Ahtuangaruak, and Kindra*
*Arnesen*


/s/ *Kristen Monsell*
Kristen Monsell (CA Bar No. 304793)
Center for Biological Diversity
*Counsel for Plaintiff Center for*
*Biological Diversity*

Plaintiffs' Notice of Motion, Motion for Summary
Judgment, and Memorandum of Points and Authorities    25
in Support, Case No. 3:20-cv-00670-WHO