JEAN E. WILLIAMS
Acting Assistant Attorney General
Environment & Natural Resources Division
MARK A. RIGAU (CA Bar Number 223610)
MARTHA C. MANN (FL Bar Number 155950)
Environment and Natural Resources Division
Environmental Defense Section
United States Department of Justice
450 Golden Gate Avenue
Suite 07-6714
San Francisco, California 94102
Tel: (415) 744-6487 (Rigau)
Tel: (415) 744-6476
E-mail: mark.rigau@usdoj.gov
        martha.mann@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALERT PROJECT/EARTH ISLAND INSTITUTE; ALASKA COMMUNITY ACTION ON TOXICS; COOK INLETKEEPER; CENTER FOR BIOLOGICAL DIVERSITY; ROSEMARY AHTUANGARUAK; AND KINDRA ARNESEN,<br><br>        Plaintiffs,<br>v.<br><br>Michael S. Regan,[1] in his official capacity as Acting Administrator of the United States Environmental Protection Agency; and the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>        Defendants. | Case No. 3:20-cv-00670-WHO<br><br>**EPA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing date: July 7, 2021<br>Time        : 2:00 PM<br>Dept        : Courtroom 2, 17th Floor<br>*Via Zoom unless otherwise indicated.*<br>Judge       : Hon. William H. Orrick |

---

[1] Administrator Michael S. Regan is substituted for his predecessor, Acting Administrator Jane Nishida, pursuant to Federal Rule of Civil Procedure 25(d).

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ iii-viii

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF ISSUES ........................................................................................................ 2

BACKGROUND ........................................................................................................................ 3

    I.       Legal Background ........................................................................................... 3

          A.    The National Contingency Plan ......................................................... 3

          B.    The CWA Citizen Suit Provision ...................................................... 5

          C.    The Administrative Procedure Act ................................................... 5

    II.    Factual Background and Procedural History ........................................... 6

          A.    EPA's Proposed Rule to Revise the NCP Subpart J ................................. 6

          B.    Procedural History ......................................................................... 7

STANDARD OF REVIEW ........................................................................................................ 8

ARGUMENT ............................................................................................................................... 9

    I.    EPA has fulfilled any nondiscretionary duty to revise or amend the NCP to "achieve the purpose of the NCP." .................................................................... 9

    II.    If EPA is under a nondiscretionary duty under 33 U.S.C. § 1321(d)(3) to revise or amend the NCP whenever there is "new information," EPA acknowledges that there has been new information since it last updated the NCP. ................................................................................................... 10

    III.    Plaintiffs' APA Claim Must Be Dismissed. ......................................... 14

    IV.    Plaintiffs' Belated Attempt to Assert a Mandamus Claim Should Also Be Rejected ................................................................................................. 16

    V.    In the Event the Court Finds EPA Has Failed to Perform a Mandatory Duty to Update the NCP, EPA's Proposed Remedy Represents the Most Expeditious Schedule that the Agency Can Reasonably Meet. ........................... 16

i

A.      EPA's Actions Have Been Reasonable....................................................18

B.      EPA's Proposed Schedule is the Most Appropriate Remedy. .................20

    1.      Final Action on the Monitoring Provisions ................................21

    2.      Final Action on the Listing and Authorization of
            Use Provisions .............................................................................21

C.      Plaintiffs Have Provided No Support for their Proposed Remedy. .........24

CONCLUSION..............................................................................................................25

# TABLE OF AUTHORITIES

CASES  **PAGE**

*Ala. Cmt'y Action on Toxics v. EPA*,
   943 F. Supp. 2d 96 (D.D.C. 2013) ................................................................. 5

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986) ..................................................................................... 8

*Bowen v. Mass.*,
   487 U.S. 879 (1988) ................................................................................... 15

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................................... 8

*Ctr. for Biological Diversity v. Brennan*,
   571 F. Supp. 2d 1105 (N.D. Cal. 2007) ..................................................... 24

*Citizens for Pa's Future v. Wheeler*,
   469 F. Supp. 3d 920 (N.D. Cal. 2020) ....................................................... 13

*Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*,
   531 F.3d 792 (9th Cir. 2008) ..................................................................... 15

*Cnty. of Maui v. Hawaii Wildlife Fund*,
   140 S. Ct. 1462 (2020) ................................................................. 11, 12, 13

*Cronin v. Browner*,
   90 F. Supp. 2d 364 (S.D.N.Y. 2000) .......................................................... 17

*Dep't of Energy v. Ohio*,
   503 U.S. 607 (1992) ................................................................................... 13

*Garcia v. McCarthy*,
   No. 13–cv–03939, 2014 WL 187386 (N.D. Cal., Jan. 16, 2014) ................... 15

*Garcia v. Vilsack*,
   563 F.3d 519 (D.C. Cir. 2009) ................................................................... 15

*In re Bozic*,
   888 F.3d 1048 (9th Cir. 2018) ................................................................... 16

*Kerr v. U.S. Dist. Court for the N. Dist. of Cal.*,
   426 U.S. 394 (1976) ................................................................................... 16

iii

*Me. Ass'n of Handicapped Persons v. Dole*,
    623 F. Supp. 920 (D. Me. 1985) ............................................................... 17

*Moore v. Jas. H. Matthews & Co.*,
    682 F.2d 830 (9th Cir. 1982) ................................................................... 11

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ..........................................................................6, 12-13

*NRDC v. Train*,
    510 F.2d 692 (D.C. Cir. 1975) ...............................................................16-17

*Pit River Home & Agric. Coop. Ass'n v. United States*,
    30 F.3d 1088 (9th Cir. 1994) ................................................................... 11

*Plantronics, Inc. v. Am. Home Assur. Co.*,
    No. 5:07-cv-06038, 2014 WL 2452577, (N.D. Cal. May 30, 2014)................ 11

*Sierra Club v. McCarthy*,
    No. C 08-01409, 2008 WL 3820385 (N.D. Cal. Aug. 8, 2008)..................... 15

*Sierra Club v. Thomas*,
    658 F. Supp. 165 (N.D. Cal. 1987) .......................................................... 17

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) ................................................................ 17

*Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l, LLC*,
    411 F. Supp. 3d 975 (N.D. Cal. 2019) ...................................................... 8

*Thornhill Publ'g Co., Inc. v. GT&E Corp.*,
    594 F.2d 730 (9th Cir. 1979) ................................................................ 8, 9

*United Steelworkers of Am. v. Rubber Mfrs. Ass'n*,
    783 F.2d 1117 (D.C. Cir. 1986) .............................................................. 17

*WildEarth Guardians v. McCarthy*,
    772 F.3d 1179 (9th Cir. 2014) ................................................................ 12

STATUTES

Administrative Procedure Act, 5 U.S.C. §§ 701-706:

    5 U.S.C. § 702................................................................................... 6

    5 U.S.C. § 704................................................................................... 6

iv

5 U.S.C. § 706(1) ................................................................ 12

All Writs Act, 28 U.S.C. § 1361 ................................................... 16

Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1388:

    Section 311, 33 U.S.C. § 1321 ............................................... 3

    Section 311(d), 33 U.S.C. § 1321(d) ......................................... 3

    Section 311(d)(1), 33 U.S.C. § 1321(d)(1) ............................ 1, 3, 10

    Section 311(d)(2), 33 U.S.C. § 1321(d)(2) ............................ 1, 3, 4

    Section 311(d)(2)(F), 33 U.S.C. § 1321(d)(2)(F) ............................. 4

    Section 311(d)(2)(G), 33 U.S.C. § 1321(d)(2)(G) ............................ 4

    Section 311(d)(3), 33 U.S.C. § 1321(d)(3) .................................. 5

    Section 505(a), 33 U.S.C. § 1365(a) .................................... 1, 16

    Section 505(a)(2), 33 U.S.C. § 1365(a)(2) ................................ 1, 5

Comprehensive Env't Response, Compensation and Liab. Act, 42 U.S.C. §§ 9601 to 9675:

    Section 505, 42 U.S.C. § 9605 .............................................. 3

    Section 505(a), 42 U.S.C. § 9605(a) .................................... 3, 10

RULES

Fed. R. Civ. P. 56(a) ............................................................ 8

REGULATIONS

40 C.F.R. § 131.22(b)(1) ........................................................ 14

40 C.F.R. pt. 300 ............................................................... 3

40 C.F.R. § 300.1 ............................................................... 3

40 C.F.R. § 300.105 ............................................................ 10

40 C.F.R. § 300.115 ............................................................. 4

40 C.F.R. § 300.205 ............................................................. 4

40 C.F.R. § 300.3(a) .................................................................................................. 3

40 C.F.R. § 300.3(b) .................................................................................................. 9

40 C.F.R. § 300.4 ..................................................................................................... 10

40 C.F.R. § 300.415 ................................................................................................. 10

40 C.F.R. § 300.5 ..................................................................................................... 10

40 C.F.R. §§ 300.900-920 ......................................................................................... 4

     40 C.F.R. § 300.900(a) ........................................................................................ 4

     40 C.F.R. § 300.905 ............................................................................................ 5

     40 C.F.R. § 300.910 ............................................................................................ 4

     40 C.F.R. § 300.910(a) ........................................................................................ 4

     40 C.F.R. § 300.910(b) ........................................................................................ 5

     40 C.F.R. § 300.910(d) ........................................................................................ 5

     40 C.F.R. § 300.915 ............................................................................................ 4

     40 C.F.R. § 300.920 ............................................................................................ 4

FEDERAL REGISTER

55 Fed. Reg. 8666 (Mar. 8, 1990) .............................................................................. 3

56 Fed. Reg. 54,757 (Oct. 22, 1991) .......................................................................... 5

     56 Fed. Reg. 54,758 ........................................................................................... 5

58 Fed. Reg. 51,735 (Sep. 30, 1993) ..................................................................... 23-24

60 Fed. Reg. 16,053 (Mar. 29, 1995) ........................................................................ 10

     60 Fed. Reg. 16,054 .......................................................................................... 10

62 Fed. Reg. 34,602 (June 26, 1997) ........................................................................ 10

65 Fed. Reg. 47,323 (Aug. 2, 2000) .......................................................................... 10

     65 Fed. Reg. 47,325 .......................................................................................... 10

vi

72 Fed. Reg. 31,752 (June 8, 2007) ................................................................. 10

    72 Fed. Reg. 31,753 ....................................................................................... 10

78 Fed. Reg. 16,612 (Mar. 18, 2013) ............................................................... 10

79 Fed. Reg. 36,429 (June 27, 2014) ............................................................... 10

79 Fed. Reg. 65,589 (Nov. 5, 2014) ................................................................. 10

    79 Fed. Reg. 65,592 ....................................................................................... 10

80 Fed. Reg. 3380 (Jan. 22, 2015) ..................................................................... 6

    80 Fed. Reg. 3381 ..................................................................................... 7, 17

80 Fed. Reg. 17,703 (Apr. 2, 2015) .................................................................. 10

    80 Fed. Reg. 17,706 ....................................................................................... 10

80 Fed. Reg. 37,054 (June 29, 2015) ............................................................... 10

    80 Fed. Reg. 37,119 ....................................................................................... 10

    80 Fed. Reg. 37,121-23 ................................................................................. 10

83 Fed. Reg. 5209 (Feb. 6, 2018) .................................................................... 10

83 Fed. Reg. 24,850 (May 30, 2018) ............................................................... 18

83 Fed. Reg. 29,499 (June 25, 2018) ............................................................... 18

83 Fed. Reg. 37,444 (Aug. 1, 2018) ................................................................ 18

83 Fed. Reg. 56,791 (Nov. 14, 2018) ............................................................... 18

84 Fed. Reg. 4741 (Feb. 19, 2019) .................................................................. 18

84 Fed. Reg. 27,533 (June 13, 2019) ............................................................... 18

84 Fed. Reg. 46,100 (Sept. 3, 2019) ................................................................ 18

84 Fed. Reg. 56,626 (Oct. 22, 2019) ............................................................... 10

    84 Fed. Reg. 56,670 ....................................................................................... 10

84 Fed. Reg. 69,834 (Dec. 19, 2019) ............................................................... 18

85 Fed. Reg. 22,250 (Apr. 21, 2020) ............................................................................. 10

85 Fed. Reg. 22,341 ............................................................................. 10

**INTRODUCTION**

Under the Clean Water Act ("CWA"), Congress directed EPA to "prepare and publish a National Contingency Plan ("NCP") for removal of oil and hazardous substances pursuant to this section." 33 U.S.C. § 1321(d)(1). "It is undisputed that the EPA has discharged that duty." ECF 42, Order at 7. It is equally undisputed that as part of the last major overhaul of the NCP in 1994, EPA updated Subpart J, the portion of the NCP that Plaintiffs focus on in this litigation. As promulgated, the 1994 amendments, including Subpart J, "provide[d] for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges, including containment, dispersal, and removal of oil and hazardous substances." 33 U.S.C. § 1321(d)(2). The NCP has been revised multiple times.

On January 30, 2020, Plaintiffs filed this suit in an effort to compel EPA to complete a rulemaking on proposed amendments to Subpart J of the NCP. The complaint asserts claims under the CWA citizen suit provision, 33 U.S.C. § 1365(a), and under the Administrative Procedure Act (APA"), 5 U.S.C. § 704, alleging that EPA has unreasonably delayed issuing a final rule and taking final action on their administrative petitions. ECF 1 at 27-28.

EPA moved to dismiss Plaintiffs' CWA citizen suit claim for lack of jurisdiction. ECF 16. The Court denied EPA's motion, determining that CWA section 1321(d)(3), which states "[t]he [EPA] may, from time to time, as the [EPA] deems advisable, revise or otherwise amend the [NCP]," imposes a nondiscretionary duty on EPA to amend the NCP "in light of new information." ECF 42, Order at 10. As a result, the Court found it has jurisdiction to hear Plaintiffs' claim brought under the CWA citizen suit provision, which authorizes a citizen to bring a civil action "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2). EPA moved for leave to file a motion for reconsideration, ECF 47, but that motion was denied, ECF 53.

In their motion for summary judgment, Plaintiffs move for summary judgment under both their citizen suit claim and their APA unreasonable delay claim. However, the APA does not provide a waiver of sovereign immunity or a cause of action where a plaintiff seeks similar

1

relief under the APA as it seeks in a citizen suit to compel agency action.  Plaintiffs cannot have it both ways.  Where the Court has found it has jurisdiction to hear Plaintiffs' citizen suit claim, their APA claim must be dismissed.

The Court should also reject Plaintiffs' requested relief, which Plaintiffs claim is based on the Administrative Procedure Act and the All Writs Act.  Plaintiffs' request for relief has evolved from the Complaint, which seeks an order requiring EPA to "issue a final rule to update the NCP on an expeditious schedule to be established by this Court," to a much broader demand regarding the substance of EPA's rulemaking, in which Plaintiffs seek to discard the prior proposal by requesting an order requiring EPA to draft a new proposed rule and complete action on that new proposal in one year.  *Compare* Complaint [ECF 1] at 27-28 *with* Plaintiffs' Proposed Order [ECF 63-8]; *see also*, Order [ECF 42] at 10 ("plaintiffs challenge the agency's procedure and not its substantive decision").

As explained below, EPA has acted reasonably in connection with the proposed rule to amend or revise Subpart J of the NCP.  The facts associated with the time it has taken EPA to move various portions of the proposed rule through the rulemaking process are undisputed.  In the event the Court finds EPA to be liable under either the citizen suit claim or the APA claim, the length of time necessary for EPA to take final action on its proposed rule, which is described in the attached declaration, is reasonable under the circumstances.

## STATEMENT OF ISSUES

The issues to be resolved through summary judgment are:  (1) whether EPA is liable with respect to Plaintiffs' first claim, which asserts a failure on the part of EPA to perform a nondiscretionary duty under the Clean Water Act, i.e., "to update the NCP, as required by 33 U.S.C. § 1321(d)(3)" (ECF 1 ¶ 129); (2) whether EPA is liable with respect to Plaintiffs' second claim, which asserts unreasonable delay on the part of EPA to complete a rulemaking to update the NCP; and (3) if the Court finds in favor of Plaintiffs as to either claim, the appropriate remedy.

**BACKGROUND**

**I.      Legal Background**

      A.      <u>The National Contingency Plan</u>

      The National Oil and Hazardous Substances Pollution Contingency Plan ("NCP") is a nationwide plan that provides "organizational structure and procedures for preparing for and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants." 40 C.F.R. § 300.1.  Congress directed that "[t]he President shall prepare and publish a National Contingency Plan for removal of oil and hazardous substances pursuant to this section." 33 U.S.C. § 1321(d)(1).  The NCP is required by section 311(d) of the Clean Water Act, 33 U.S.C. § 1321(d), and by section 105 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9605.  Section 311 of the CWA, as amended by the Oil Pollution Act of 1990, focuses on the prevention of and response to oil discharges and CWA listed hazardous substances. *See* 33 U.S.C. § 1321. Section 105 of CERCLA directed the President to "revise and republish the [NCP] for the removal of oil and hazardous substances, originally prepared and published pursuant to [CWA section 311]" to also provide procedures and standards for response actions undertaken pursuant to CERCLA.  42 U.S.C. § 9605(a); *see* NCP, 55 Fed. Reg. 8666 (Mar. 8, 1990).

      The purpose of the NCP is to "provide for efficient, coordinated, and effective action to minimize damage from oil and hazardous substance discharges, including containment, dispersal, and removal of oil and hazardous substances." 33 U.S.C. § 1321(d)(2).  The NCP applies to discharges of oil into or on the navigable waters of the United States and releases of hazardous substances into the environment.  40 C.F.R. § 300.3(a).  The NCP is comprised of twelve subparts, some of which have general applicability (e.g., Subpart A (Introduction, which includes Definitions), Subpart B (Responsibility and Organization for Response), and Subpart C (Planning and Preparedness)), and some of which are specific to either discharges of oil or releases of hazardous substances. *See id.* Part 300.

      Plaintiffs' Complaint focuses on Subpart J, which sets forth "[p]rocedures and techniques to be employed in identifying, containing, dispersing, and removing oil and

3

hazardous substances" and a schedule for identifying and evaluating dispersants, other

chemicals, and other spill mitigating devices and substances" which may be used in response to

oil discharges.  33 U.S.C. § 1321(d)(2)(F), (G).  *See* 40 C.F.R. §§ 300.900-920 ("Use of

Dispersants and Other Chemicals").  The Subpart J regulations implement 33 U.S.C.

§ 1321(d)(2)(G), and set forth the procedure for adding chemical agents, including dispersants,

to the NCP Product Schedule and for authorizing their use.  *See id.* §§ 300.900(a), 300.910,

300.920.  For a product to be added to the schedule, the manufacturer of the product must

submit technical product data specified in 40 C.F.R. § 300.915 to EPA.  *Id.* § 300.920.

Among other things, Subpart J set a threshold for effectiveness that must be met for a

dispersant to be included on the NCP Product Schedule and requires the manufacturer to

provide the results of effectiveness and toxicity testing using defined procedures, as well as

other specific information.  40 C.F.R. § 300.915.  EPA makes this information available to

planning entities, including the Regional Response Teams and Area Committees.  *See id.* §§

300.115, 300.205.  Regional Response Teams and Area Committees are required to address, as

part of their planning activities, the desirability of using appropriate dispersants and other

chemical agents to address oil discharges.  *Id.* § 300.910(a).  They may develop

"preauthorization plans" which address the specific context in which products may be

authorized for use by the On-Scene Coordinators and used under their oversight or direction.

These plans should address the specific contexts in which such products should and should not

be used.  "In meeting the provisions of this paragraph, preauthorization plans may address

factors such as the potential sources and types of oil that might be spilled, the existence and

location of environmentally sensitive resources that might be impacted by spilled oil, available

product and storage locations, available equipment and adequately trained operators, and the

available means to monitor product application and effectiveness."  *Id.*

Preauthorization plans are approved, disapproved, or approved with modifications by

representatives from EPA, the Department of Interior, the Department of Commerce, and the

state(s) with jurisdiction over the water to the area which they apply.  *Id.*  When a

preauthorization plan approves in advance the use of certain products under specified

4

circumstances, the On-Scene Coordinator may authorize the use of the products listed on the Schedule in response to a spill without further NCP Subpart J consultation or concurrence, subject to any limitations within the applicable preauthorization plan and any other applicable legal requirements. *Id.* For specific discharge situations not covered by preauthorization plans, the On-Scene Coordinator may authorize the use the products listed on the NCP Product Schedule with the appropriate consultations and concurrences. *Id.* § 300.910(b). An exception is provided where the On-Scene Coordinator may authorize the use of any product, whether or not it is listed on the Schedule and without obtaining any concurrences, if it is the judgment of the On-Scene Coordinator that the use of the product is necessary to prevent or substantially reduce a hazard to human life. *Id.* § 300.910(d).

EPA has promulgated the schedule of dispersants and other chemical or bioremediation products that may be authorized for use on oil discharges as required by section 311(d)(2)(G), known as the NCP Product Schedule, *see* 40 C.F.R. § 300.905. *Ala. Cmt'y Action on Toxics v. EPA*, 943 F. Supp. 2d 96, 98 (D.D.C. 2013) (describing the NCP Product Schedule). The NCP Product Schedule works in conjunction with the Subpart J testing requirements and authorization of use procedures to address the types of waters and the quantities of listed agents that may be used in response to oil discharges.

"The President may, from time to time, as the President deems advisable, revise or otherwise amend the National Contingency Plan." 33 U.S.C. § 1321(d)(3). The President's authority under section 311(d) has been delegated to the Administrator of EPA. *See* Executive Order 12,777, 56 Fed. Reg. 54,757, 54,758 (Oct. 22, 1991).

### B.     The CWA Citizen Suit Provision

The Clean Water Act provides a limited waiver of sovereign immunity for any person to bring a citizen suit against the Administrator "where there is alleged a failure of the Administrator to perform any act or duty under [the CWA] which is not discretionary." 33 U.S.C. § 1365(a)(2).

### C.     The Administrative Procedure Act

The Administrative Procedure Act ("APA") provides a right of review for a "person

5

suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.  Judicial review is limited to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  *Id.* § 704.  The APA identifies the specific forms of relief available.  *Id.* § 706.  At issue here is section 706(1), which provides that "[t]he reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."  The Court may only review and compel agency action that is discrete and required.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 n.1, 64 (2004).

## II.     Factual Background and Procedural History

### A.     EPA's Proposed Rule to Revise the NCP Subpart J

In the aftermath of the Deepwater Horizon Oil Spill in 2010, EPA began reevaluating the role of dispersants in oil spill response to mitigate the environmental impacts of oil discharges.  Although Plaintiffs now contend in the Complaint that the Clean Water Act placed a mandatory duty on EPA to update the NCP, in November 2012 several of the Plaintiffs submitted a petition requesting that EPA exercise its authority under the CWA and amend the NCP.  ECF 1 ¶ 113.  In January 2013, EPA responded, informing the petitioners that it was already working on a proposed rule and encouraged petitioners to participate in the public comment process.  *See* Ex. 1, EPA Letter, Jan. 3, 2013.  In June 2014, Plaintiff ALERT filed a supplemental petition and sought a "complete overhaul of the NCP."  ECF 1 ¶ 115.  EPA responded, informing ALERT of the status of the proposed rule and seeking appropriately formatted copies of the 2012 petition and 2014 supplemental petition for use in the rulemaking docket.  *See* Ex. 2, EPA Letter, July 23, 2014.

In 2015, EPA proposed amendments to Subpart J.  NCP Proposed Rule, 80 Fed. Reg. 3380 (Jan. 22, 2015).  EPA's proposed rule seeks to ensure, among other things, that chemical and biological agents used to address oil discharges, such as dispersants, have met applicable efficacy and toxicity requirements and that the response communities are equipped with the proper information to authorize and use products in a judicious and effective manner.  More specifically, the proposed rule addressed three primary components:  (1) establishing new

6

1  monitoring requirements for certain atypical dispersant use situations; (2) revising the data and

2  information requirements for chemical agent products to be listed on the Subpart J Product

3  Schedule, and (3) revising the authorization of use of procedures for chemical agents in

4  response to an oil discharge to waters of the United States.  Comments to the proposed rule

5  closed on April 22, 2015.  *Id.* at 3381.

6       EPA received 81,973 comments on the proposed rule during the public comment

7  period.  The comments included submissions from industry, academia, state and local

8  governments, environmental groups, and individuals.  The comments provided a wide range of

9  both support for, and opposition to, the provisions of the proposed rule.  EPA received

10  comments on all three major components of the proposed action: the authorization of use

11  requirements for chemical agents, the toxicity and efficacy testing protocols and data

12  requirements for listing products on the NCP Product Schedule, and the new monitoring

13  requirements for atypical dispersant use situations.  In addition to the broad range of comments

14  offered on the policy approach for the proposed action, many of the comments are highly

15  technical in nature.

16       As explained in detail below, since 2015 EPA has continued to conduct the steps

17  necessary to conclude the rule but the process has been delayed for different reasons.

18       B.    Procedural History

19       In January 2020, Plaintiffs filed a Complaint asserting two causes of action.  ECF 1.

20  The First Cause of Action asserted under the CWA's citizen suit provision, alleges that EPA's

21  Administrator has failed to perform a nondiscretionary duty to update the NCP.  *Id.* ¶ 129.

22  Plaintiffs cite as the basis for the duty 33 U.S.C. § 1321(d)(3), which provides that "[t]he

23  President may, from time to time, as the President deems advisable, revise or otherwise amend

24  the National Contingency Plan."  *Id.*  The Second Cause of Action asserted under the APA,

25  asserts that EPA has unreasonably delayed taking final action on the 2015 proposed rule and

26  Plaintiffs' petitions for rulemaking.  *Id.* ¶¶ 134-35.

27       EPA moved to dismiss Plaintiffs' citizen suit claim under Rule 12(b)(1) and (6) for

28  failure to identify a discrete, nondiscretionary duty on the part of EPA's Administrator as the

EPA's Memorandum of Points and Authorities
| Case: 3:20-cv-00670-WHO

basis for the claim.  ECF 16.  Because of section 1321(d)(3)'s clear and unequivocal language, EPA has never viewed section 1321(d)(3) as imposing a nondiscretionary duty on EPA's Administrator.[2]  The Court denied EPA's motion and found that Plaintiffs "may bring a CWA claim" to compel agency action because EPA's Administrator is under a nondiscretionary duty pursuant to section 1321(d)(3) "in order to achieve the purpose of the CWA and the purpose of the NCP" and "to revise or amend the NCP in light of new information."  ECF 42 at 4, 9, 10. EPA moved for leave to seek reconsideration of the Court's Order on the grounds that the Court did not address EPA's arguments on the express language of the statute pertaining to the Administrator as a decision-maker.  ECF 47 at 1.  The Court denied the motion, finding that "EPA's arguments amount to an improper repetition of the arguments that it made in its motion to dismiss, which I rejected."  ECF 53 at 2.

## STANDARD OF REVIEW

A motion for summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," on which the party bears the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In evaluating a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).  "However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment."  *Simpson Strong-Tie Company, Inc. v. Oz-Post International, LLC*, 411 F. Supp. 3d 975, 980 (N.D. Cal. 2019), citing *Thornhill Publ'g Co., Inc. v. GT&E Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

---

[2]  Indeed, Plaintiffs have called the Court's ruling on this issue a "game-changer."  *See* https://www.nola.com/news/environment/article_eb652ad6-a5d5-11ea-a678-cfba9addc42d.html (quoting Plaintiffs' counsel).  EPA agrees.

8

**ARGUMENT**

**I.     EPA has fulfilled any nondiscretionary duty to revise or amend the NCP to "achieve the purpose of the NCP."**

Count I of the Complaint alleges a CWA citizen suit claim and seeks to compel EPA's Administrator to perform a nondiscretionary duty alleged under 33 U.S.C. § 1321(d)(3), which provides that "[t]he President may, from time to time, as the President deems advisable, revise or otherwise amend the National Contingency Plan." ECF 1 at ¶ 129. As noted above, the Court previously found that Plaintiffs may bring a citizen suit under 33 U.S.C. § 1365(a)(2) based on the Court's finding that EPA's Administrator is under a nondiscretionary duty pursuant to section 1321(d)(3) to revise or amend the NCP "in order to achieve the purpose of the CWA and the purpose of the NCP." ECF 42 at 9.

Plaintiffs incorrectly assert in their motion that "[t]his Court has already determined that EPA has violated the Clean Water Act." ECF 63 at 11. While EPA respectfully disagrees with the Court's ruling on whether EPA has a nondiscretionary duty to amend the NCP, the Court found only that it has jurisdiction to hear Plaintiffs' citizen suit claim. The Court made no finding as to EPA's failure to perform any duty. The Court noted in its Order that "[o]verall, Section 1321(d) contemplates an ongoing duty that in turn strongly suggests that the duty to update and revise the NCP 'as advisable' is not discretionary, but required." ECF 42 at 8. Further, the Court observed that the "requirement of Subsection (d)(2) is particularly instructive as it provides for continuing operations and mandates an 'effective' and ['] efficient' response to oil and hazardous substance pollution." *Id.* Based on their apparent assumption that the Court's finding that there is a nondiscretionary duty means that EPA has failed to meet that duty, Plaintiffs make no attempt to demonstrate that the NCP is not effective and efficient.

The NCP is a complex set of regulations that provides the blueprint for oil and hazardous substance response. The scope of the NCP is governed by both the CWA and CERCLA and, as a whole, the NCP must provide for the "efficient, coordinated, and effective response to discharges of oil and releases of hazardous substances, pollutants, and contaminants in accordance with the authorities of CERCLA and the CWA." 40 C.F.R. § 300.3(b). Initially, the CWA required EPA to

9

"prepare and publish a National Contingency Plan for removal of oil and hazardous substances

pursuant to this section," 33 U.S.C. § 1321(d)(1), and then CERCLA required EPA to "revise and

republish the national contingency plan for the removal of oil and hazardous substances, originally

prepared and published pursuant to section 311." 42 U.S.C. § 9605(a). EPA amended the NCP

pursuant to the requirement in CERCLA in 1990, and since then, has further amended the

NCP. Since the last major overhaul in 1994, EPA has amended the NCP several times.[3]

Thus, to the extent EPA is under a general nondiscretionary duty to revise or amend the

NCP "from time to time" to achieve the purpose of the NCP, Plaintiffs have not shown that

EPA has failed to perform that duty.

## II. If EPA is under a nondiscretionary duty under 33 U.S.C. § 1321(d)(3) to revise or amend the NCP whenever there is "new information," EPA acknowledges that there has been new information since it last updated the NCP.

In their motion, Plaintiffs request an order declaring that EPA's Administrator has

failed to perform the nondiscretionary duty to update the NCP "to reflect improvements in

scientific and technological knowledge." ECF 63 at 1. As noted above, the Court previously

held that Plaintiffs may bring a citizen suit under 33 U.S.C. § 1365(a)(2), finding that EPA's

Administrator is under a nondiscretionary duty pursuant to section 1321(d)(3) "to revise or

---

[3] *See, e.g.,* 60 Fed. Reg. 16,053, 16,054 (Mar. 29, 1995) (revised definitions and text associated with remedial site evaluation); 62 Fed. Reg. 34,602 (June 26, 1997) (revised Federal Facilities Subpart L – NCP; involuntary acquisition of property by the government); 65 Fed. Reg. 47,323, 47,325, (Aug. 2, 2000) (technical amendments); 72 Fed. Reg. 31,752, 31,753 (June 8, 2007) (amended 40 C.F.R. § 300.105); 78 Fed. Reg. 16,612 (Mar. 18, 2013) (amended 40 C.F.R. § 300.805 – location of administrative record file); 79 Fed. Reg. 36,429 (June 27, 2014) (revised Subpart G, 40 C.F.R.   § 300.600 – designation of federal trustees); 79 Fed. Reg. 65,589, 65,592 (Nov. 5, 2014) (amended 40 C.F.R. § 300.4, 300.5, and 300.420 – remedial site evaluations); 80 Fed. Reg. 17,703, 17,706 (Apr. 2, 2015) (amended public notification provisions for Superfund activities in 40 C.F.R. § 300.415 removal actions, § 300.425 remedial priorities, § 300.815 administrative record for remedial action); 80 Fed. Reg. 37,054, 37,119 (June 29, 2015) (amended definitions – 40 C.F.R. § 300.5); 37,121-23 (amended Appendix E – navigable waters); 83 Fed. Reg. 5209 (Feb. 6, 2018) (amended Appendix B National Priorities List); 84 Fed. Reg. 56,626, 56,670 (Oct. 22, 2019) (amended definitions and Appendix E); and 85 Fed. Reg. 22,250, 22,341 (Apr. 21, 2020) (amended definitions – 40 C.F.R. § 300.5 and Appendix E).

amend the NCP in light of new information." ECF 42 at 4, 10. As noted above, EPA respectfully disagrees with the Court's ruling on whether EPA has a nondiscretionary duty to revise or amend the NCP, but that ruling is the law of the case.[4]

To the extent the Court has found that EPA is under a nondiscretionary duty under 33 U.S.C. § 1321(d)(3) to revise or amend the NCP whenever there is "new information," ECF 42 at 10, EPA respectfully disagrees with the Court's ruling, but acknowledges that there has been "new information" since it last updated the NCP. Thus, EPA's liability cannot be seriously disputed under the Court's prior ruling, as it is clear that "new information" has become available to EPA, including new information since EPA last updated Subpart J. Indeed, EPA proposed amendments to Subpart J partly on that basis.

In an effort to bolster the "correctness" of the Court's prior ruling, Plaintiffs revisit the Court's analysis of EPA's motion to dismiss in their motion for summary judgment and present new arguments. ECF 63 at 12. The case law, statutory text, and factual assertions upon which Plaintiffs rely, *see id*. at 12-13, were all in existence at the time the Court decided EPA's motion to dismiss (and EPA's motion for leave to seek reconsideration).[5] Thus, Plaintiffs' motion provides supplemental arguments, which could have been provided at the time the Court decided EPA's motion, on a decided issue. Based on the doctrine of the law of the case, and the Court's rejection of EPA's request to seek reconsideration of this issue, Plaintiffs'

---

[4] The "law of the case" rule generally precludes a court from re-examining an issue previously decided by that court in the same case. *Pit River Home & Agric. Coop. Ass'n v. United States*, 30 F.3d 1088, 1096 (9th Cir. 1994) (citing *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 833 (9th Cir. 1982). Under the rule, a decision on a factual or legal issue "must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *Moore*, 682 F.2d at 834 (internal quotation and citation omitted); *see also Plantronics, Inc. v. Am. Home Assur. Co.*, Case No. 5:07-cv-06038, 2014 WL 2452577 *3, (N.D. Cal. May 30, 2014) (internal citations omitted).

[5] Plaintiffs incorrectly state that *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020) was decided after the Court ruled on EPA's motion to dismiss. ECF No. 63 at 12. The Supreme Court's opinion was issued on April 23, 2020, at least five weeks before this Court ruled on EPA's motion on June 2, 2020.

11

1   attempt to revisit the basis for the Court's earlier ruling is wholly improper.  If the Court

2   believes it necessary to reconsider whether there is a nondiscretionary duty on the part of the

3   Administrator to update the NCP under 33 U.S.C. § 1321(d)(3), then the Court should allow

4   further briefing from all parties as to the "correctness" of the Court's earlier ruling.

5          In any event, Plaintiffs' reliance on *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct.

6   1462 (2020), is misplaced.  *County of Maui* does not inform the question of whether there is a

7   nondiscretionary duty on the part of the Administrator to update the NCP.  In that case, the

8   Supreme Court addressed a different question of statutory interpretation, *i.e.*, whether the

9   CWA "requires a permit when pollutants originate from a point source but are conveyed to

10   navigable waters by a nonpoint source." *Id.* at 1468.  In addition to the statutory text, the Court

11   looked to the overall purpose of the CWA, the legislative history, and regulatory practice in

12   deciding the meaning of the statutory provision at issue there.  Such an analysis has no place in

13   deciding whether a statute imposes a nondiscretionary duty on the Administrator, a prerequisite

14   to finding a clear and unequivocal waiver of sovereign immunity.  Rather, in the Ninth Circuit,

15   a "clear statement rule" applies to citizen suits brought against the EPA Administrator.

16   *WildEarth Guardians v. McCarthy,* 772 F.3d 1179, 1182 (9th Cir. 2014).  That clear-statement

17   rule recognizes a duty as non-discretionary only when the duty takes the form of a "'specific,

18   unequivocal command' from the text of the statute at issue using traditional tools of statutory

19   interpretation." *Id*.  Courts may not interpret statutes as imposing mandatory duties on

20   agencies unless the mandate is clear and unequivocal.

21          In *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. at 55, the Supreme Court

22   reviewed a claim under the APA, specifically 5 U.S.C. § 706(1), which is analogous to the

23   CWA's citizen suit provision in that it allows a person to challenge an agency's failure to

24   perform an action unreasonably delayed or unlawfully withheld.  In *Norton*, the plaintiffs

25   asserted that the Bureau of Land Management failed to perform a nondiscretionary duty under

26   the Federal Land Policy and Management Act to manage wilderness study areas "in a manner

27   so as not to impair the suitability of such areas for preservation as wilderness."  542 U.S. at 65

28   (citing 43 U.S.C. § 1782(c)).

The Supreme Court affirmed the dismissal of the plaintiffs' claim, finding that the purpose of section 706(1) of the APA is to order agencies to act only where the agency fails to carry out a discrete nondiscretionary duty. *Id.* at 62-64. The Court further recognized that the purpose of this limitation in failure to act claims is to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.* at 66. As stated by the Supreme Court:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved--which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*Id.* at 66-67. Thus, a plaintiff cannot rely on broad statutory mandates – as Plaintiffs attempt to do here in citing *County of Maui* – as the basis for a waiver of sovereign immunity to bring a citizen suit against the Administrator. *Cf. Citizens for Pa's Future v. Wheeler*, 469 F. Supp. 3d 920, 932 (N.D. Cal. 2020) (finding that citizen suit provisions operate in the context of federal sovereign immunity), citing *Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992) (waivers of sovereign immunity must be strictly construed in favor of the sovereign).

Plaintiffs appear to assert that *County of Maui* supports jurisdiction over their citizen suit claim because the Supreme Court disagreed with EPA's interpretation of an ambiguous statutory term that would be inconsistent with the purpose of a statutory provision. ECF 63 at 12. Notably, the majority in *County of Maui* recognized that the courts "often pay particular attention to an agency's view in light of the agency's expertise in a given area, its knowledge gained through practical experience, and its familiarity with the interpretive demands of administrative need." *Id.* at 1474 (Breyer, J.). However, the Court rejected EPA's interpretation of the statutory provision at issue, which was contained in EPA's amicus brief, because it was "new" and could not be reconciled with other provisions in the statute or EPA's own prior interpretation of the statute. 140 S. Ct. at 1473-1475. Here, EPA has never viewed the language in 33 U.S.C. § 1321(d)(3) as non-discretionary. *See* Ex. 3, Declaration of Donna

13

Salyer ("Salyer Decl.") at ¶ 22.

Plaintiffs' belated attempts to provide supplemental briefing regarding recommendations by EPA's Office of Inspector General and responses from those within the agency are also unavailing, as none of those documents constitutes a determination by the Administrator as to when it is advisable to promulgate revisions or amendments to the NCP.[6] *See* ECF 63 at 13 (claiming that "the agency" has twice agreed that it is advisable to update Subpart J). Where the Administrator has not delegated their authority, *see, e.g.*, 40 C.F.R. 131.22(b)(1), decisions by others within the agency are not determinations by "the Administrator" as to when it is advisable to promulgate a final rule to update the NCP.

In sum, unless the Court wishes to allow further briefing on the issue of whether 33 U.S.C. § 1321(d)(3) imposes a mandatory duty on the Administrator, under the law of the case EPA acknowledges that it has received "new information" since the last update of the NCP.

### III.   Plaintiffs' APA Claim Must Be Dismissed.

Count II of the Complaint, asserted under the Administrative Procedure Act, asserts that EPA has unreasonably delayed taking final action on the 2015 proposed rule and Plaintiffs' petitions for rulemaking. ECF 1 ¶¶ 134-35. Based on the Court's Order that there is a nondiscretionary duty to update the NCP, Plaintiffs cannot maintain a separate claim to compel EPA to update the NCP under the APA.[7]

---

[6] With respect to EPA's assertion that the language of the statute expressly confers discretion to EPA's Administrator, "as the Administrator deems advisable," Plaintiffs did not dispute that the statute confers discretion to the Administrator. Rather, Plaintiffs avoided the argument, and wrongly asserted that "EPA's Administrator" had in fact made a determination that the NCP should be amended based on recommendations in an EPA Inspector General report. *See* Plfs' Opp'n to Motion to Dismiss, ECF 26 at 13.

[7] Although their Complaint alleges unreasonable delay in acting on their administrative petitions, Plaintiffs' Complaint seeks no relief with respect to action on their petitions. ECF 1 at 29. Plaintiffs' motion for summary judgment likewise seeks no such relief, and presents no argument regarding reasonableness of any delay in acting on their petitions. ECF 63 at 1; *id.* at 24 (describing "the precise relief that Plaintiffs seek: an order to EPA to update and reissue its proposed rule for public comment before finalizing the rule"). Thus, Plaintiffs have abandoned any claim for relief as to their administrative petitions.

A claim to compel action asserted to be unlawfully withheld or unreasonably delayed under APA section 706(1) may not be brought where there is an alternative adequate remedy, such as under a citizen suit.  The APA states that only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.  Thus, the APA "premises jurisdiction on the absence of an adequate alternative remedy in court."  *Garcia v. McCarthy*, No. 13–cv–03939–WHO, 2014 WL 187386, at \*11 (N.D. Cal., Jan. 16, 2014) (citing 5 U.S.C. §§ 702, 704).  If Plaintiffs have a cognizable claim against EPA under the CWA citizen suit provision for the failure to update Subpart J of the NCP, that precludes an additional claim under the APA that seeks similar relief.  *See Bowen v. Mass.*, 487 U.S. 879, 903 (1988); *Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 810 (9th Cir. 2008).  *Cf. Sierra Club v. McCarthy*, No. C 08-01409 WHA, 2008 WL 3820385, at \*2, (N.D. Cal. Aug. 8, 2008) (holding that "the 'unlawfully withheld' portion of plaintiffs' APA claim is duplicative of their CERCLA citizen suit and must be dismissed without prejudice") (citing *Coos Cnty.*, 531 F.3d at 810 and *Brem-Air Disposal v. Cohen,* 156 F.3d 1002, 1005 (9th Cir. 1998)).

Moreover, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.' "  *Garcia*, 2014 WL 187386, at \*11 (citing *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009)).  Plaintiffs do not seek an order compelling EPA to simply take final action on the 2015 proposal to update Subpart J of the NCP.  *See* ECF 63 at 1; *id.* at 24 (seeking "an order to EPA to update and reissue its proposed rule for public comment before finalizing the rule").  But even if they did, that would be relief "of the same genre" as that sought under the Complaint and in Plaintiffs' motion for summary judgment.

Here, the Court found that Plaintiffs may bring a citizen suit to compel EPA to promulgate a rule to revise the NCP.  ECF 42 at 4, 9, 10.  That is an adequate remedy at law with respect to the claim of unreasonable delay in completing the rulemaking.  Because there is an adequate remedy provided by this Court's ruling that Plaintiffs may bring a CWA citizen suit claim, Plaintiffs' APA claim must be dismissed and summary judgment be granted in favor

1    of EPA as to Count II of the Complaint.

2    **IV.    Plaintiffs' Belated Attempt to Assert a Mandamus Claim Should Also Be Rejected.**

3         Plaintiffs assert for the first time in their motion for summary judgment that this Court

4    "has broad discretion . . . under the All Writs Act to fashion equitable relief that redresses

5    Plaintiffs' substantive and procedural injuries."  ECF 63 at 22, 23-24.  Plaintiffs' Complaint

6    does not assert a mandamus claim or cite the All Writs Act as a basis for this Court's

7    jurisdiction.  There should be no dispute that this Court lacks jurisdiction to consider a claim

8    for a writ of mandamus in this matter.

9         Under the All Writs Act, the district courts have jurisdiction "to compel an officer or

10   employee of the United States or any agency thereof to perform a duty owed to the plaintiff"—

11   that is, to issue a writ of mandamus.  28 U.S.C. § 1361.  For a court to entertain a petition for a

12   writ of mandamus, among other things the plaintiff must have "no other adequate means to

13   attain the relief" sought.  *Kerr v. U.S. Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 403

14   (1976); *see also In re Bozic*, 888 F.3d 1048, 1052 (9th Cir. 2018).  Plaintiffs do not explain

15   how in light of the Court's ruling the CWA's citizen suit provision (or the APA) does not

16   provide an adequate remedy.  The All Writs Act cannot serve as a basis for this Court's

17   jurisdiction, nor could it provide the basis for any appropriate remedy in this case.

18   **V.    In the Event the Court Finds EPA Has Failed to Perform a Mandatory Duty to**
19   **Update the NCP, EPA's Proposed Remedy Represents the Most Expeditious**
     **Schedule that the Agency Can Reasonably Meet.**
20
21        Contrary to Plaintiffs' motion, ECF 63 at 22-23, the appropriate remedy where there is

22   a finding of a failure on the part of the Administrator to perform a nondiscretionary duty under

23   the Clean Water Act is not found in the APA or the All Writs Act.  Instead, the remedy is

24   expressly provided for in the CWA's citizen suit provision:  a court is authorized "to order the

25   Administrator to perform [a nondiscretionary] act or duty under the Act."  33 U.S.C. § 1365(a).

26   In a suit alleging violation of a congressionally mandated duty, the district court exercises its

27   discretion to fashion a remedy by considering whether "the official involved . . . has in good

28   faith employed the utmost diligence in discharging his statutory responsibilities."  *NRDC v.*

                                         16

1   *Train*, 510 F.2d 692, 713 (D.C. Cir. 1974).  "The sound discretion of [a] court does not

2   embrace enforcement . . . of a party's duty to comply with an order that calls [on] him 'to do an

3   impossibility.' "  *Id.*  Indeed, "it would be inappropriate to set an infeasible schedule in order to

4   punish a delinquent agency."  *Sierra Club v. Thomas,* 658 F. Supp. 165, 172 (N.D. Cal. 1987).

5        In *Train*, the leading case on the subject of an agency's failure to meet statutory

6   deadlines, the D.C. Circuit recognized two types of circumstances that might necessarily delay

7   agency action and make it infeasible to comply with a particular deadline: (1) budgetary and

8   manpower constraints, and (2) the need for an agency to have more time to sufficiently

9   evaluate complex technical issues.  510 F.2d at 712-13.  With respect to the latter, "[t]he public

10  has a significant interest in ensuring that the government does not [act] via a process that

11  emphasizes expediency over quality and accuracy."  *Cronin v. Browner*, 90 F. Supp. 2d 364,

12  373 (S.D.N.Y. 2000).  In setting deadlines for agency action, courts have considered the

13  agency's need for time to act in a manner that would withstand the scrutiny of subsequent

14  challenge.  *See Sierra Club v. Thomas*, 828 F.2d 783, 798-99 (D.C. Cir. 1987); *United*

15  *Steelworkers of Am. v. Rubber Mfrs. Ass'n,* 783 F.2d 1117, 1120 (D.C. Cir. 1986) (holding

16  judicial imposition of an overly hasty timetable on agency would ill serve the public interes*t);*

17  *Me. Ass'n of Handicapped Persons v. Dole*, 623 F. Supp. 920, 926 (D. Me. 1985) (recognizing

18  "the need to implement clear and effective regulations capable of withstanding the scrutiny of

19  challenges following enactment.").  In short, when an agency has failed to complete a non-

20  discretionary duty, a court should examine the relevant facts and circumstances and evaluate

21  the time needed by the agency to make well-reasoned, scientifically supportable, and

22  defensible decisions.

23        The Court has found that the Administrator is under a nondiscretionary duty pursuant to

24  33 U.S.C. § 1321(d)(3) "to revise or amend the NCP in light of new information."  ECF 42 at

25  4, 10.  EPA does not dispute that there is new information, which was the basis for its 2015

26  proposed rule.  80 Fed. Reg. at 3381.  Therefore, the remedy determination for the court is the

27  amount of time EPA needs to take final action on the 2015 Proposed Rule.

28

17

1

A.   <u>EPA's Actions Have Been Reasonable.</u>

2

Contrary to Plaintiffs' claims, EPA has acted reasonably in the proposed Subpart J rule

3

process.  EPA has never interpreted 33 U.S.C. § 1321(d)(3) to impose a mandatory duty on the

4

part of the Administrator.  Salyer Decl. ¶ ¶ 4, 22.  Regardless, EPA has diligently continued to

5

work on the rulemaking while balancing changing and competing priorities within the agency

6

and working to resolve technical issues that have delayed EPA's efforts.  *Id.* ¶¶ 14-34.

7

For example, EPA has faced competing priorities since the comment period on the

8

proposed rule closed in 2015.  *Id.* ¶¶ 14-17, 20.  In 2017, EPA re-prioritized its rulemaking

9

actions relative to other EPA Office of Land and Emergency Management ("OLEM") actions

10

under the belief that the 2015 Proposed Rule was a discretionary rulemaking in keeping with

11

the clear language of section 1321(d)(3).  *Id.* ¶¶ 22-23.  During this time, EPA prioritized the

12

Risk Management Program ("RMP") Rule, which addresses the development of risk

13

management plans at facilities that use extremely hazardous substances, by proposing and

14

finalizing a reconsideration of the RMP Rule (83 Fed. Reg. 24,850 (May 30, 2018); 84 Fed.

15

Reg. 69,834 (Dec. 19, 2019)).  *Id.* ¶¶ 14-15, 23.  OLEM also developed EPA's proposed and

16

final actions regarding Clean Water Act Hazardous Substances Spill Prevention, including a

17

Notification of Data Availability, as per the terms of a Consent Decree resolving litigation in

18

that matter (83 Fed. Reg. 29,499 (June 25, 2018); 84 Fed. Reg. 4,741 (Feb. 19, 2019); 84 Fed.

19

Reg. 46,100 (Sept. 3, 2019)), and developed EPA's proposed and final action on the EPCRA

20

and CERCLA animal waste rule in response to the Fair Agricultural Reporting Method Act

21

(FARM Act) (83 Fed. Reg. 37,444 (Aug. 1, 2018); 83 Fed. Reg. 56,791 (Nov. 14, 2018); 84

22

Fed. Reg. 27,533 (June 13, 2019)).  *See* Salyer Decl. ¶¶ 16, 17.

23

In addition, technical issues have delayed EPA in completing the work necessary to

24

take final action on the 2015 proposal.  For example, reference oils are necessary for a product

25

manufacturer to conduct the product effectiveness and toxicity testing prescribed in Appendix

26

C of Subpart J that must be submitted, along with the technical product data specified in 40

27

C.F.R. § 300.915, to EPA for listing on the NCP Product Schedule.  *Id.* ¶ 25-34.  Once listed,

28

the products are available to be authorized for use following the procedures under 40 C.F.R.

EPA's Memorandum of Points and Authorities
| Case: 3:20-cv-00670-WHO

§ 300.910.  Reference oils provide a standard reference point for comparison of efficacy and toxicity requirements between products where required for product listing.  This relative comparison between products, as well as the product technical data, provide the On-Scene Coordinator with information when evaluating whether to authorize the use of a product in response to a discharge or threatened discharge under the CWA.  Multiple reference oils allows for products to be tested on oils with differing characteristics, providing the On-Scene Coordinator more detailed information when determining which available product or products may be appropriate for use in a response, as well as what limitations to place on any such authorization for use.  EPA took numerous steps to identify possible reference oils, but faced challenges along the way that have significantly impacted its ability to take final action on the proposed rule.  The Proposed Rule included amendments to product testing protocols and listing requirements, but EPA's ability to take final action on those amendments is contingent upon its ability to test the proposed protocols on reference oils and its ability to maintain a supply of reference oil to distribute for testing purposes if the new oils are included in the final action.

EPA has faced obstacles obtaining reference oils needed in order to conduct necessary testing.  *Id.* ¶¶ 27-30.  While developing the 2015 proposal, EPA identified certain prospective reference oils in the possession of a sister federal agency that could be made available to EPA, appeared to meet the technical needs for use as reference oils, and appeared to serve the purposes identified for use for such reference oils within the 2015 proposal.  *Id.*  While EPA had tested those reference oils as part of its quality control process, the oil supply was compromised when the facility in which they were stored was damaged during Hurricane Sandy.  *Id.*  EPA moved forward with the 2015 proposal while at the same time working to secure similarly suitable reference oils on a parallel track to rule development.

Since Hurricane Sandy, EPA has contacted numerous potential sources in an effort to address the need for new reference oils, discussing options with various oil companies, non-governmental organizations, foreign countries, and sister federal agencies, again to no avail.  *Id.* ¶¶ 31-32.  In August 2016, EPA put out an initial public notice for a proposal ("Request for

19

Quotation") for interested parties to sell EPA similarly suitable reference oils via the federal government acquisition and grants internet portal.  In September 2016, after receiving no proposals in response to the first public notice, EPA reissued the Request for Quotation, again receiving no proposals in response.  *Id.* ¶ 30.

In 2021, Congress promulgated the National Defense Authorization Act of 2021 and amended the Oil Pollution Act of 1990, which itself had amended the Federal Water Protection Act, in a manner to provide certain gift receipt authority to EPA to allow EPA to receive donations of oil for research and other purposes, addressing potential augmentation issues that could have arisen had EPA taken such donations absent that authority.  *Id.* ¶ 32.  However, the Act did not grant any enforcement authority requiring the production of such oils.  *Id.*

Since the loss of the original potential reference oils, EPA has continued outreach and, in November of 2020, tentatively identified a potential source for one potential reference oil, subject to agreement and a determination by EPA that the oil is of sufficient type and quality to serve as reference oil for purposes of the 2015 proposal.  *Id.*  In April 2015, EPA secured a contract to store any reference oils once acquired.  *Id.* ¶ 33.  EPA renewed the oil storage contract in April 2020.  *Id.*  EPA is currently considering its options to address the potential lack of availability of reference oils in relation to the 2015 Proposed Rule.  *Id.* ¶ 32.

Notwithstanding the issues it encountered, EPA continued to work towards final action on the 2015 Proposed Rule.  *Id.* ¶¶ 32-56.

B.      EPA's Proposed Schedule is the Most Appropriate Remedy.

For the reasons set forth below, EPA proposes a schedule that would provide it adequate time to take final action on the 2015 Proposed Rule.  There are three main components of the 2015 proposal: (1) monitoring certain dispersant use; (2) authorization of chemical agent use in response to oil discharges; and (3) listing provisions for chemical agent products on the NCP Product Schedule.  *Id.* ¶ 24.  In 2020, EPA proceeded with drafting the final monitoring-related provisions.  The draft final rule for those provisions has been submitted to the Office of Management and Budget for interagency review, and EPA anticipates taking final action on the proposed monitoring rule in August 2021.  The

20

authorization and listing provisions to the proposed rule require further work on the part of agency staff.  Accordingly, EPA proposes the following schedule:

- *Proposed Date for EPA to take final action on Part 1 of the 2015 Proposed Rule (Monitoring Provisions):  August 31, 2021.*

- *Proposed Date for EPA to take final action on Part 2 of the 2015 Proposed Rule (Listing and Authorization of Use Provisions):  May 31, 2023.*

    1.   <u>Final Action on the Monitoring Provisions</u>

As explained in the declaration, EPA has advanced its efforts to take final action on part of the 2015 proposal.  In 2019, EPA reviewed the 2015 Proposed Rule to determine what portions, if any, could move forward.  *Id.* ¶ 34.  EPA determined that it could move forward more expeditiously by taking final action on the monitoring provisions in the 2015 Proposed Rule, as these are based on and share similar provisions with existing National Response Team interagency guidance.  *Id.*  Additionally, EPA determined that prioritizing taking final action on the monitoring provisions would address an area where, unlike listing and authorization of use requirements, there are currently no regulatory requirements specifically targeted to certain dispersant use operations in the NCP to address monitoring.  *Id.*  EPA therefore took action to split the rulemaking into two parts for separate final actions, with the first part addressing the dispersant monitoring provisions in the proposal, and the other part addressing the remaining provisions, including proposed authorization and listing requirements.  *Id.*

EPA has completed the majority of steps necessary to take final action on the monitoring provisions of the proposal.  Interagency review must be finalized to ensure comments from the Office of Management and Budget ("OMB") and sister federal agencies, including but not limited to the United States Coast Guard, are addressed and resolved appropriately.  *Id.* ¶¶ 36, 40, 52.  EPA estimates that it will take until August 31, 2021 to take final action on the monitoring portion of the rule.  *Id.* ¶ 35.  Final actions revising the NCP are published in the Federal Register and become effective after an additional time period.

    2.   <u>Final Action on the Listing and Authorization of Use Provisions</u>

The remaining portions of the 2015 Proposed Rule address authorization of chemical

agent use in response to oil discharges and listing provisions for chemical agent products on the NCP Product Schedule.  *Id.* ¶¶ 34-35.  EPA has further work to do to take final action on these portions of the rulemaking.  As with the monitoring provisions of the proposed rule, EPA is following its established Action Development Process ("ADP") and Executive Orders 12,777 and 12,866 for the Listing and Authorization of Use phase of the rulemaking.  *Id.* ¶ 36, 38-39.  The ADP brings together a group with broad perspectives and expertise from programmatic areas across EPA.  *Id.* ¶ 38.  Consistent with the ADP, the following steps must be completed to take final action on the Listing and Authorization of Use provisions of the Proposed Rule.

(a) <u>Programmatic Analysis</u>:  OEM conducted a preliminary review of the public comments received in order to organize them into topic areas.  In preparation for Early Guidance and Workgroup Engagement, OEM further summarized the comments and identified issue areas and new relevant information for consideration.  *Id.* ¶ 44.  EPA believes that the currently ongoing programmatic analysis has generally been completed, and notes that it has cumulatively spent approximately twelve months on these underlying actions to advance towards final action on the entirety of the 2015 Proposed Rule.  *Id.*

(b) <u>Early Guidance</u>:  EPA anticipates addressing Early Guidance concurrently within the Workgroup Engagement process described below.  *Id.* ¶ 45.

(c ) <u>Workgroup Engagement and Options Development</u>:  The Workgroup Engagement reviews and considers the comments, along with other relevant new information received during the comment period.  The Workgroup consults internally and develops recommendations on how to proceed, including whether to reconsider the options published in the proposed rule, or analyze new options based on its assessment of the comments and other information not previously available to the Agency.  *Id.* ¶ 46.  This phase of the rulemaking schedule provides for the Workgroup to reconvene and meet weekly to review and consider comments on the individual topics outlined in the proposed rule.  EPA initiated this process in March 2021 and anticipates that, given the breadth and depth of the issues, completing the analysis and consultation will extend through the end of November, 2021.  *Id.* ¶ 47.

1     (d) <u>Options Selection</u>: The Workgroup presents option recommendations to senior

2 leadership for option selection.  EPA anticipates it will take a month for preparation,

3 distribution and consideration of the option selection materials, and a final senior leadership

4 decision.  EPA expects to finalize options selection in approximately January 2022.  *Id.* ¶ 48.

5     (e) <u>Rule Drafting and Workgroup Review</u>:  Based on option selection, the lead office

6 (OEM) prepares Responses to Comments ("RtC") for Workgroup member input and review.

7 The RtC document is expected to go through several review cycles to incorporate Workgroup

8 input.  Following the review cycle, the Workgroup expects to require at least three weeks to

9 review and comment on drafts of the RtC document(s).  OEM reviews and incorporates

10 Workgroup comments into a revised RtC document(s).  *Id.* ¶ 49.

11     OEM also develops any Federal Register notice and drafts the final Regulatory Impact

12 Analysis document ("RIA") for Workgroup member input and review.  These documents are

13 sent out for Workgroup review following an iterative process similar to the RtC review cycle.

14 *Id.* ¶ 50.  EPA is scheduled to begin this process in January 2022 and anticipates that the

15 analysis and consultation will conclude by approximately November 2022.   This timeframe

16 accounts for the complexity of the rulemaking, the wide perspective of views in the comments,

17 and that other federal agencies have equities and interests in their application.  *Id.* ¶ 42.

18     (f) <u>Final Agency Review ("FAR")</u>:  An FAR meeting is scheduled at the conclusion of

19 the Rule Drafting and Workgroup Review.  Any final action package is prepared and

20 distributed to Workgroup member program offices for a minimum a three-week period prior to

21 the FAR meeting.  This allows Workgroup members to brief Senior Leadership on the

22 proposed rule.  Any final action package that revises an existing regulation includes the Federal

23 Register preamble and regulatory text for the Listing and Authorization of Use provisions, the

24 associated Summary & Response to Comment document, Regulatory Impact Analysis,

25 Information Collection Request, Communications Materials, and Agency Action Memo.  *Id.* ¶

26 51.  EPA expects FAR meeting to conclude by January 2023.  *Id.*

27     (g) <u>Office of Management and Budget Interagency Review</u>:  This proposed action has

28 been determined to be significant per Executive Order 12,866, 58 Fed. Reg. 51,735 (Sep. 30,

23

1993).  OEM incorporates any comments received from the FAR meeting and submits any final Listing and Authorization of Use rule package to EPA Office of Policy for transmittal to OMB.  The Agency estimates that the Office of Policy would submit any final action to OMB for interagency review by approximately February 2023.  *Id.* ¶ 52.  Given the OMB standard review timeframe of 90 days, EPA expects conclusion of any federal interagency review by May 2023.  *Id.*

(h) <u>Administrator Review and Final Action</u>:  Following OMB review, the rule package is returned to EPA for the Administrator's review and approval, as appropriate.  EPA anticipates the Administrator taking final action on the final rule by May 31, 2023.  *Id.* ¶ 53.

(i) <u>Federal Register Publication</u>:  Final Rules are sent to the Office of Federal Register for publication in the Federal Register.  EPA does not control this process.

In sum, the timeline and steps are necessary to take final action on the 2015 Proposed Rule are reasonable in order for EPA to promulgate defensible final rules.  Accordingly, summary judgment on EPA's proposed remedy should be granted.

C.     <u>Plaintiffs Have Provided No Support for their Proposed Remedy.</u>

Plaintiffs request that this Court order EPA to "(1) issue a new proposed rule to amend the NCP within 90 days of the Court's decision; (2) issue a final rule within one year of the Court's decision; and (3) provide the Court with a status report 180 days from the date of the Court's decision."  ECF No. 63 at 1.  Although Plaintiffs baldly claim that this Court has the authority to require EPA to issue a new proposed rule, and that it would "serve judicial economy" to do so, *id.* at 24, Plaintiffs provide no support for their position.  EPA is not aware of any instance in which an agency initiated rulemaking was found to be a nondiscretionary action and a court required the agency to revise and re-propose the proposed rule.  Plaintiffs' reliance on *Center for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1134 (N.D. Cal. 2007), is misplaced, as that case involved a requirement that federal officials produce an "updated" National Global Research Plan at least every three years.  *Id.* at 1131.

Plaintiffs also do not explain how taking final action on the proposed rule would not comply with the nondiscretionary duty recognized by the Court – to amend the NCP "in light

24

of new information." ECF 42, Order at 10.  Plaintiffs provide no details as to how the
proposed rule is insufficient.[8]  Nor do Plaintiffs identify any specific information made
available since the proposal that would trigger anew EPA's mandatory duty to update the NCP
under section 1321(d)(3).  Ordering EPA to propose a new rule would put Plaintiffs in the role
of the Administrator because it would allow Plaintiffs, with nothing more than their subjective
assertion, to decide when and how it is advisable to propose amendments to the NCP.

Even if the Court found that it has authority to order EPA to revise and re-propose an
update to Subpart J of the NCP, it is unreasonable to expect the agency to be in a position to do
so in 90 days.  As noted above, EPA's delegated authority to revise the NCP is subject to
OMB's review of any proposed revisions to the NCP.  Similarly, it would be unreasonable to
expect the agency to be in a position to take final action on a new proposal, which would
trigger a new comment period that would likely leave the agency with less than six months to
take final action on the new proposal. *See, e.g.,* Salyer Decl. ¶ 58.

## CONCLUSION

With respect to Plaintiffs' citizen suit claim, EPA has fulfilled any nondiscretionary
duty to revise or amend the NCP to achieve the purpose of the NCP.  However, there is no
dispute that there is "new information" since EPA last updated Subpart J of the NCP.  With
respect to Plaintiffs' APA claim, because the Court has held that Plaintiffs may bring a citizen
suit, the Court must dismiss Plaintiffs' APA claim which seeks similar relief as Plaintiffs'
citizen suit claim.  In the event the Court finds EPA liable, the Court should provide EPA until
August 31, 2021 to take final action on the monitoring provisions of the 2015 Proposed Rule,
and until May 31, 2023 to take final action on the remaining provisions of the 2015 Proposed
Rule.

---

[8]  For example, it is unclear why EPA should not be allowed to take final actions on the
monitoring provisions of the proposal, which are currently in the final stages of the rulemaking
process.

25

Dated:  May 20, 2021                    Respectfully submitted,

                                By:    /s/ *Mark A. Rigau*
                                       MARK A. RIGAU
                                       MARTHA C. MANN
                                       Environmental Defense Section
                                       Environment and Natural Res. Division
                                       United States Department of Justice
                                       *Counsel for Defendants*

EPA's Memorandum of Points and Authorities
| Case: 3:20-cv-00670-WHO