CLAUDIA POLSKY (CA Bar No. 185505)
Environmental Law Clinic
UC Berkeley School of Law
434 Law Building (North Addition)
Berkeley, CA 94720-7200
Phone: (510) 642-5398
Fax: (510) 643-4625
Email: cpolsky@law.berkeley.edu

*Counsel for Plaintiffs ALERT Project/Earth Island Institute, Alaska Community Action on Toxics, Cook Inletkeeper, Rosemary Ahtuangaruak, and Kindra Arnesen*

KRISTEN MONSELL (CA Bar No. 304793)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612-1810
Phone: (510) 844-7137
Fax: (510) 844-7150
Email: kmonsell@biologicaldiversity.org

*Counsel for Plaintiff Center for Biological Diversity*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EARTH ISLAND INSTITUTE/ALERT PROJECT; ALASKA COMMUNITY ACTION ON TOXICS; COOK INLETKEEPER; CENTER FOR BIOLOGICAL DIVERSITY; ROSEMARY AHTUANGARUAK; AND KINDRA ARNESEN, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL REGAN, in his official capacity as Administrator of the United States Environmental Protection Agency; and the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br> Defendants. | Case No.: 3:20-cv-00670-WHO <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO EPA'S CROSS-MOTION FOR SUMMARY** <br><br> Hearing date: July 7, 2021 <br> Time: 2:00 pm <br> Dept: [Courtroom 2, 17th floor <br> San Francisco Courthouse] <br> *Via Zoom unless otherwise indicated* <br> Judge: Hon. William H. Orrick |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

    I.      EPA Concedes Liability on Plaintiffs' Clean Water Act Claim ........................... 2

           A.      EPA Acknowledges It Is Liable Under This Court's Prior Ruling............ 2

           B.      EPA's Citation to Irrelevant NCP Revisions Is a Red Herring ................ 3

           C.      The NCP's Ineffectiveness Is Manifest in EPA's Own
                 Documents, and Beyond ........................................................................... 4

    II.     EPA's Delay in Resolving Plaintiffs' Petitions Violates the APA ...................... 5

           A.      The APA Relief Plaintiffs Seek, Predicated on Their
                 Petitions, Is Nonduplicative ..................................................................... 5

           B.      Plaintiffs' APA Claim Is Based on EPA's Failure to Take
                 Final Action on Petitions .......................................................................... 9

           C.      EPA's Delay in Resolving Plaintiffs' Petitions Is Unreasonable ............ 11

    III.    This Court Has Broad Discretion to Fashion an Equitable Remedy ................... 13

           A.      This Court Has Discretion to Order Relief Responsive to
                 Case Facts ................................................................................................. 13

           B.      EPA's New Proposal for Bifurcated Rulemaking Is Illogical
                 and Unresponsive to the Critical Issues Motivating this Suit .................. 14

           C.      EPA's Proposed Timeline for Rule Completion Is Too Long ................. 15

CONCLUSION.......................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*BE&K Constr. Co. v. Nat'l Labor Rel. Bd.*,
  536 U.S. 516 (2002) ....................................................................................................... 5

*Bennett v. Spear*,
  520 U.S. 154 (1997) ....................................................................................................... 7

*Cnty. of Maui v. Haw. Wildlife Fund*,
  140 S. Ct. 1462 (2020) .................................................................................................. 3

*Common Cause v. Fed. Election Comm'n*,
  692 F. Supp. 1397 (D.D.C. 1988) ............................................................................... 13

*Coos Cnty. Bd. of Comm'rs v. Kempthorne*,
  531 F.3d 792 (9th Cir. 2008) ...................................................................................... 7, 8

*Covington & Cincinnati Bridge Co. v. Hager*,
  203 U.S. 109 (1906) ....................................................................................................... 7

*Cutler v. Hayes*,
  818 F.2d 879 (D.C. Cir. 1987) ................................................................................... 7, 16

*Garcia v. McCarthy*,
  No. 13-cv-03939-WHO, 2014 WL 187386 (N.D. Cal. Jan. 16, 2014) ........................ 9

*Garcia v. Vilsack*,
  563 F.3d 519 (D.C. Cir. 2009) ............................................................................... 10, 11

*In re Am. Rivers & Idaho Rivers United*,
  372 F.3d 413 (D.C. Cir. 2004) ................................................................................... 7, 16

*In re Community Voice*,
  878 F.3d 779 (9th Cir. 2017) ................................................................................. passim

*In re United Mine Workers of Am. Int'l Union*,
  190 F.3d 545 (D.C. Cir. 1999) ..................................................................................... 16

*Nat. Res. Def. Council v. Train*,
  510 F.2d 692 (D.C. Cir. 1974) ..................................................................................... 15

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  524 F.3d 917 (9th Cir. 2008) ....................................................................................... 16

*Sierra Club v. Johnson*,
  No. C 08-01409 WHA, 2008 WL 3820385 (N.D. Cal. Aug. 8, 2008) ...................... 7, 8

*Stern v. S. Chester Tube Co.*,
  390 U.S. 606 (1968) ....................................................................................................... 7

*Telecomms. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ............................................................................. 7, 12, 16

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................................ 5

**Statutes**

5 U.S.C. § 555(b) ................................................................................................... 6

5 U.S.C. § 555(e) ................................................................................................. 11

5 U.S.C. § 559 ........................................................................................................ 5

5 U.S.C. § 704 ........................................................................................................ 5

5 U.S.C. § 706(1) ............................................................................................. 8, 13

33 U.S.C. § 1321(d)(3) .................................................................................... 2, 3

42 U.S.C. § 9608(b) ............................................................................................... 8

**Federal Register Notices**

80 Fed. Reg. 3380 (Jan. 25, 2015) ................................................................ 4, 14

Final Rule, Review of the Dust-Lead Hazard Standards and the Definition of
  Lead-Based Paint, 84 Fed. Reg. 32,632 (July 9, 2019) .............................. 16

**Other Authorities**

Att'y Gen.'s Manual on the Admin. Proc. Act (1973) ............................................ 5

Campbell Robertson & Eric Lipton, *BP is Criticized Over Oil Spill, but U.S.
  Missed Chances to Act,* N.Y. Times (Apr. 30. 2010),
  https://www.nytimes.com/2010/05/01/us/01gulf.html. .................................... 1

Darryl Fears, *The U.S. Government Has Studied the Longest Oil Spill in History—
  14 Years After the Leak Began,* Wash. Post (June 24, 2019),
  https://www.washingtonpost.com/climate-environment/2019/06/24/fourteen-years-
  after-it-started-federal-government-has-studied-longest-oil-spill-history/ ............................. 12

*Petition for Rulemaking to Amend National Contingency Plan (NCP) Product
  Schedule* (Nov. 14, 2012)............................................................................... 4

*Supplement to Petition for Rulemaking to Amend National Contingency Plan (NCP)
  Product Schedule* (June 2, 2014) ................................................................... 5

U.S. EPA, Office of Inspector General, *Report: Revisions Needed to National
  Contingency Plan Based on Deepwater Horizon Oil Spill* (Aug. 2011) .................................. 4

**INTRODUCTION**

In the wake of a 2010 oil spill so immense and disastrous that it was declared the first-ever "Spill of National Significance,"[1] Plaintiffs used two legal avenues to press the Environmental Protection Agency (EPA) to better meet its spill response obligations under the Clean Water Act (CWA) in future. Plaintiffs in 2012 and 2014 filed rulemaking petitions with EPA under the Administrative Procedure Act (APA), urging an update of the National Contingency Plan (NCP) provisions governing oil spill response. APA petitions for rulemaking trigger an agency obligation to timely respond. However, petitions must often languish for years before ripening to a vintage that makes any agency inaction manifestly "unreasonable," and thus viably litigable, as is the regrettable situation here.

In light of EPA's multi-year delay in completing action on the petitions by finalizing a rule to update the NCP, and seeking to confirm that a more expeditious route exists for citizens to challenge EPA's failure to maintain an up-to-date NCP, Plaintiffs additionally issued a Notice of Intent to Sue EPA under the Clean Water Act's citizen suit provision. Plaintiffs thereafter sued EPA under both the CWA and the APA. Ruling on an issue of first impression as to the CWA claim, this Court agreed with Plaintiffs that where an existing NCP is scientifically outdated and EPA itself has acknowledged this fact, the agency has a nondiscretionary duty to update it. Order Re Mot. to Dismiss 8, ECF No. 42 [hereinafter, "Order"].

Plaintiffs pled and here prosecute both claims. One claim, on which EPA concedes liability, is a CWA claim predicated on the agency's freestanding statutory duty to maintain a scientifically current oil spill response plan. The other—which EPA wrongly asserts cannot be maintained, despite Ninth Circuit precedent demonstrating otherwise—is an APA claim for unreasonable delay. The APA claim is predicated on EPA's lack of final action on Plaintiffs' petitions, and thus is nonduplicative of their CWA claim. Plaintiffs seek declaratory relief pursuant to each statute, and an order mandating EPA act by a date-certain.

---

[1] Campbell Robertson & Eric Lipton, *BP is Criticized Over Oil Spill, but U.S. Missed Chances to Act,* N.Y. Times (Apr. 30. 2010), https://www.nytimes.com/2010/05/01/us/01gulf.html.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARGUMENT**

**I.      EPA Concedes Liability on Plaintiffs' Clean Water Act Claim**

      A.      <u>EPA Acknowledges It Is Liable Under This Court's Prior Ruling</u>

      EPA's summary judgment briefing forthrightly acknowledges the agency's liability under the CWA on the present facts. EPA's Mem. Supp. Summ. J. 11, ECF No. 64-1 [hereinafter, "EPA's Br."]. In denying EPA's motion to dismiss Plaintiffs' CWA claim, this Court ruled that "Earth Island may bring a cause of action under the CWA for a violation of 33 U.S.C. § 1321(d)(3)." Order 4. The Court stated that "EPA's duty here is quite clear: to revise or amend the NCP in light of new information," and this duty "is not discretionary." *Id.* at 10.

      As the basis for its ruling, the Court explained that Congress' purpose in Section 1321(d) would be frustrated if EPA could "fail to review, update, or amend the NCP for decades, despite [1] scientific advances, [2] the occurrence of incidences involving discharge of oil and hazardous substances, and [3] an internal report including that the NCP was outdated and inadequate." *Id.* at 8. In other words, EPA would be violating the CWA under the precise facts of this case—facts that EPA does not dispute.

      Specifically, it is "undisputed" EPA has not amended the relevant portion of the NCP in decades, as it has not since 1994 "updated Subpart J, the portion of the NCP that Plaintiffs focus on in this litigation." EPA's Br. 1. EPA also acknowledges that [1] "there has been 'new information' since it last updated the NCP." *Id.* at 11. There has additionally been a major incident involving discharge of oil since the 1994 NCP update, as [2] in 2010, "the Deepwater Horizon (DWH) underwater oil well blowout discharged significant quantities of oil into the Gulf of Mexico (Gulf)" and resulted in the discharge of 1.75 million gallons of dispersant use in the Gulf. Salyer Decl. ¶ 7, ECF No. 64-4 (describing dispersant used at the water surface and subsurface). There has further been [3] an internal report on the NCP's inadequacy in the BP Deepwater Horizon response, because "[t]his use of dispersants raised many questions about their efficacy, toxicity, environmental trade-offs, and monitoring challenges" that became the subject of recommendations in "[t]he EPA Inspector General (IG) report[,] *Revisions Needed to NCP Based on DWH Oil Spill* (August 21, 2011)." *Id.*

EPA prospectively conceded in briefing its motion to dismiss that "if the Court were to find that Plaintiffs have identified a nondiscretionary duty, EPA's liability would be clear since there is no dispute that EPA has not yet finalized a rulemaking process to amend the NCP." EPA's Reply Re Mot. to Dismiss 2, n.2, ECF No. 28.[2] Likewise, the agency now confirms that "EPA's liability cannot be seriously disputed under the Court's prior ruling." EPA's Br. 11. Thus, all that remains is to enter summary judgment on Plaintiffs' behalf as to their CWA claim.

B.    EPA's Citation to Irrelevant NCP Revisions Is a Red Herring

Despite admitting liability, EPA briefly makes a peculiar, contradictory argument: that a range of here-irrelevant revisions to the NCP since 1994 demonstrate that the agency has updated the NCP "from time to time," which constitutes technical compliance with CWA Section 1321(d)(3). EPA's Br. 9–10. This argument is a red herring, because the post-1994 revisions that EPA invokes have nothing to do with chemical dispersants and oil spill response,[3] and are thus unresponsive to the "new information" that this Court held triggers EPA's duty to update the NCP. *See* Order 10.

This Court's prior ruling requires EPA to do more than demonstrate the NCP is a living document *in toto*: it requires EPA to engage with the "new information" that makes plain the obsolescence of the dispersants portion of the NCP. The 2015 Proposed Rule at issue here was not a global overhaul of the NCP, but rather, a surgical intervention that specifically addressed Subpart J. As EPA notes, this portion of the NCP "set[s] forth the procedure for adding chemical

---

[2] EPA is correct that this Court's prior ruling did not resolve the merits of Plaintiffs' CWA claim, and thus Plaintiffs should have stated that the Court "necessarily implied" rather than "determined" the agency's liability. *See* Pls.' Mem. Supp. Summ. J. 11, ECF No. 63 [hereinafter, "Pls.' Br."]. Reciprocally and related, EPA errs in suggesting that Plaintiffs' discussion of a case decided after the parties briefed EPA's Motion to Dismiss is improper supplemental briefing, *see* EPA's Br. 11–14, because this Court's prior ruling was nondispositive. Plaintiffs further note that EPA misquotes their brief to manufacture needless controversy. *Compare* Plaintiffs' statement that *Cnty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462 (2020), was "decided after the Motion to Dismiss *was briefed*," Pls.' Br. 12 (emphasis added) *with* EPA's assertion that "Plaintiffs incorrectly state that *County of Maui* [. . .] was decided after the Court *ruled on* EPA's motion to dismiss." EPA's Br. 11, n.5, ECF No. 64-1 (emphasis added). In light of EPA's prospective and retrospective concession of liability, however, these issues have no practical import.
[3] Irrelevant NCP amendments to which EPA cites include, for example, public notification provisions for Superfund (a statute that expressly excludes petroleum products), involuntary acquisition of property by the government, and purely technical amendments. *See* EPA's Br. 10, n.3.

PLAINTIFFS' REPLY & OPPOSITION                                                                 3
CASE NO. 3:20-CV-00670-WHO

1   agents, including dispersants, to the NCP Product Schedule and authorizing their use." EPA's Br.

2   4. Therefore, in the context of this case and the pending rulemaking, "new information" most

3   obviously means new information *relevant to dispersant efficacy, toxicity, and terms of*

4   *authorization.* NCP revisions completely unrelated to oil spill dispersants cannot fulfill EPA's

5   duty to maintain an effective NCP as to this subject.

6          C.      The NCP's Ineffectiveness Is Manifest in EPA's Own Documents, and Beyond

7          EPA documents responsive to the BP Deepwater Horizon spill frankly acknowledge that

8   the existing NCP is inadequate to guide the nation's response to contemporary oil spill scenarios.

9   EPA's Office of the Inspector General (OIG) more than a decade ago stated that the massive BP

10  spill made plain that NCP revisions were "needed," not optional. [AR] U.S. EPA, Office of

11  Inspector General, *Report: Revisions Needed to National Contingency Plan Based on Deepwater*

12  *Horizon Oil Spill* 9–10 (Aug. 2011). EPA management concurred. *See* Pls.' Br. 13–15

13  (discussing EPA's response to OIG's critique).

14         In 2015, EPA issued a Notice of Proposed Rulemaking that announced its intention

15  to revise the decades-old NCP to "address[] the efficacy, toxicity, environmental monitoring of

16  dispersants, and other chemical and biological agents, as well as public, state, local, and federal

17  officials' concerns regarding their use." [AR] 80 Fed. Reg. 3380 (Jan. 25, 2015). This is an

18  unambiguous Administrator affirmation that the existing plan is not adequate. As such, EPA's

19  nondiscretionary duty under the CWA to complete a plan update is manifest.[4]

20         Plaintiffs' petitions, opening summary judgment brief, and declarations, as well as public

21  comments on EPA's proposed rule, further particularize aspects of the NCP's inadequacy. These

22  describe the health and ecological harms stemming from dispersant use permissible under that

23  Plan, and the general obsolescence of the NCP as an oil spill response plan. *See* [AR] *Petition for*

24  *Rulemaking to Amend National Contingency Plan (NCP) Product Schedule* 8–9 (Nov. 14, 2012)

---

25  [4] EPA's commencement of rulemaking to update the NCP negates any EPA argument that its
    "Administrator" never determined the existing NCP to be inadequate, as is necessary to trigger a
26  CWA duty. *See* EPA's Br. 14 (arguing that the actions of EPA senior managers cannot be
    imputed to the Administrator). However implausible it is that an Assistant Administrator could
27  acquiesce in an OIG's consequential and politically high-profile findings without Administrator
    sign-off, it is *impossible* for a subordinate to issue a proposed regulation through the Federal
28  Register without Administrator approval.

PLAINTIFFS' REPLY & OPPOSITION                                          4
CASE NO. 3:20-CV-00670-WHO

(describing evidence of harms to human health); [AR] *Supplement to Petition for Rulemaking to Amend National Contingency Plan (NCP) Product Schedule* 2 (June 2, 2014) (describing, *inter alia,* the inefficacy of dispersants when used to address spills in freshwater, and the NCP's outmoded focus on conventional crude oil (*i.e.,* its failure to consider now-prevalent unconventional oils in the form of tar sands and volatile, fracked shale oils)); Pls.' Mem. Supp. Summ. J. 18–19, ECF No. 63 [hereinafter, "Pls.' Br."] (excerpts from declarations and public comments regarding toxicity and health harm).

These circumstances trigger EPA's statutory obligation to update the NCP, irrespective of whether citizens petition the agency to request a rule revision.

## II.    EPA's Delay in Resolving Plaintiffs' Petitions Violates the APA

### A.    The APA Relief Plaintiffs Seek, Predicated on Their Petitions, Is Nonduplicative

The parties agree that the APA precludes Plaintiffs from using the APA simply to echo an existing or potential statutory claim, by specifying that federal courts may only review "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Here, however, as in *In re Community Voice*, 878 F.3d 779 (9th Cir. 2017) ("*Community Voice*"), Plaintiffs' statutory CWA claim and APA claim are distinct and nonduplicative, because they involve two separate EPA violations.

Plaintiffs' APA claim arises not from the substantive illegality of EPA's conduct under the CWA, but rather, from EPA's violation of the APA's *own* procedural guarantee of timely action on petitions. Because this APA claim does not simply mirror Plaintiffs' statutory claim, the Court may adjudicate both.

The First Amendment right to petition the government, U.S. Const. amend. I, is "one of the most precious of the liberties safeguarded by the Bill of Rights." *BE&K Constr. Co. v. Nat'l Labor Rel. Bd.,* 536 U.S. 516, 524 (2002) (citation omitted). In specifying agency obligations in response to petitions, the APA confirms the fundamental nature of the petitioning right, stating that a "[s]ubsequent statute may not be held to supersede or modify this subchapter . . . except to the extent that it does so expressly." 5 U.S.C. § 559; *see also* Att'y Gen.'s Manual on the Admin. Proc. Act 122, 139 (1973) ("Nothing in this Act shall be held to diminish the constitutional rights

of any person . . . . No subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly."). The APA right to petition would, of course, be illusory without a corresponding APA remedy.

In contrast to the instant case, cases that find APA claims insupportable because they mimic statutory claims involve a *single* agency activity that is alleged to violate both a substantive statute and the APA. In other words, APA claims held to be impermissible involve agency inaction that is alleged to be unlawful based on a subject-matter statute—not under the APA itself—where plaintiffs duplicatively assert that the agency's conduct is *also* "unlawfully withheld" or "unreasonably delayed" action under APA Section 555(b). Conversely, EPA here has committed an APA violation as well as a statutory violation: it has not only failed as an agency to maintain an up-to-date NCP (as the CWA requires), but it also has failed to complete action on Plaintiffs' petitions (as the APA requires). Again, this case is on all fours with *Community Voice*.

In *Community Voice,* the Ninth Circuit held that where EPA had (1) violated a statutory duty under the Toxic Substances Control Act (TSCA) and the Residential Lead Paint Hazard Reduction Act (which together required EPA to update its outdated standards for lead paint and dust in light of "obvious need," 878 F.3d at 785), *and* (2) delayed unreasonably in responding to petitioners' nominally "accepted" rulemaking petition (by failing to initiate rulemaking), petitioners could pursue both statutory and APA claims. 878 F.3d at 784. The court did not require petitioners to forfeit their APA claim to proceed on their statutory claim, but rather, determined that "EPA is under a duty stemming from the TSCA and the Paint Hazard Act to update lead-based paint and dust-lead hazard standards in light of the obvious need, *and* a duty under the APA to fully respond to Petitioners' rulemaking petition." *Id.* at 786 (emphasis added). The court then held that EPA had violated *both* duties, notwithstanding that they converged in the same remedy: the grant of a writ of mandamus and an order to EPA to issue proposed and final rules by specified deadlines. *Id.* at 788.[5]

---

[5] EPA's discussion and rejection of Plaintiffs' ostensible "belated attempt to assert a mandamus claim," EPA's Br. 16, is perplexing.  Although unreasonable delay cases filed in federal appellate courts are typically styled as petitions for writs of mandamus, here Plaintiffs simply

Cases in which courts have found that a statutory claim predicated on an agency's breach of statutory duty bars an APA claim for unreasonable delay involve, by contrast, scenarios in which plaintiffs did not independently petition an agency to demand action. Thus, these situations involve a single rather than dual agency violation, making APA claims redundant of statutory claims.

For example, in *Coos County Board of Commissioners v. Kempthorne*, 531 F.3d 792 (9th Cir. 2008), the Ninth Circuit considered plaintiff's claims that the Fish and Wildlife Service had violated the both the Endangered Species Act (ESA) and the APA by failing to delist a particular bird population. In holding that plaintiff could not predicate both legal theories on a single violative act, the court rejected plaintiff's APA claim, because it "exactly 'duplicates the one [it] brought under the [ESA].'" *Id.* at 810 (alterations in original) (citations omitted). In so holding, however, the court emphasized that plaintiffs were not required to elect a single theory of liability: "we acknowledge that '[n]othing in the ESA's citizen-suit provision expressly precludes review under the APA,' and that 'the causes of action against the Secretary set forth in the ESA's citizen-suit provision are [not] exclusive, [and do not] supplant[ ] those provided by the APA." *Id.* (alterations in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 175 (1997)).

Similarly, in *Sierra Club v. Johnson*, No. C 08-01409 WHA, 2008 WL 3820385 (N.D. Cal. Aug. 8, 2008),[6] the district court dismissed (only) one portion of plaintiff's APA claim on the basis that it wholly duplicated their statutory claim under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Plaintiffs had sued EPA under

---

seek the analogous district court remedy: a court order compelling EPA action. This is the ordinary remedy in any case demonstrating unreasonable delay. *See, e.g., In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004) (stating that although mandamus is a remedy for extraordinary circumstances, "[a]n administrative agency's unreasonable delay presents such a circumstance because it signals the 'breakdown of regulatory processes.'" (quoting *Cutler v. Hayes*, 818 F.2d 879, 897 n.156 (D.C. Cir. 1987).

Also perplexing is EPA's suggestion that Plaintiffs should have cited the All Writs Act as a basis for jurisdiction in their complaint. *See* EPA's Br. 16. As the D. C. Circuit has explained: "The All Writs Act is not an independent grant of jurisdiction to a court; it merely permits a court to issue writs in aid of jurisdiction acquired to grant some other form of relief." *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) (*"TRAC"*) (citing *Stern v. S. Chester Tube Co.*, 390 U.S. 606, 608 (1968); *Covington & Cincinnati Bridge Co. v. Hager*, 203 U.S. 109, 110 (1906)).
[6] EPA erroneously titled this case as *Sierra Club v. McCarthy*. *See* EPA's Br. 15.

1    CERCLA's citizen suit provision for failing to promulgate regulations ensuring that hazardous

2    waste facilities would be financially responsible for cleanup. *See* 42 U.S.C. § 9608(b) (requiring

3    EPA to issue such regulations according to a statutory timetable). In addition to asserting that

4    EPA had violated a nondiscretionary duty, plaintiffs asserted that EPA's failure to issue

5    regulations was action "unlawfully withheld" or "unreasonably delayed" under Section 706(1) of

6    the APA. Finding "that the 'unlawfully withheld' portion of plaintiffs' APA claim is duplicative

7    of their CERCLA citizen suit," the court dismissed that portion without prejudice. 2008 WL

8    3820385, at *2. This result is unsurprising, given that plaintiffs' claim was predicated simply on

9    EPA's two-decade failure to promulgate the regulation that CERCLA required.

10        Importantly, however, the court declined to hold that the portion of plaintiff's APA claim

11    alleging "unreasonably delayed" was barred by their CERCLA claim. Rather, the court noted

12    EPA's concession that "whether twenty years constitutes an unreasonable delay" raised *a*

13    *different question* than "whether defendants violated a nondiscretionary duty," such that

14    "plaintiffs' 'unreasonably delayed' claim is not 'identical in all relevant respects' to their

15    CERCLA claim, and it is thus not precluded by *Coos County*." *Id.* (quoting *Coos Cnty.*, 531 F.3d

16    at 810).[7]

17        Here, the question whether eight-plus years, seven-plus years, or six-plus years in

18    finalizing a proposed rule (depending on whether one counts from Plaintiffs' 2012 petition, their

19    2014 petition, or EPA's Proposed Rule issuance in 2015) represents "unreasonable delay" under

20    the APA is likewise different from the question whether EPA has a nondiscretionary duty to

21    update the NCP in light of new information. But more fundamentally, the question whether EPA

22    has unreasonably delayed *taking final action on Plaintiffs' Section 553(e) petitions* is wholly

23    different from the question whether EPA has a freestanding statutory obligation to update the

24    NCP in the absence of such a petition.

25        This distinction makes conceptual sense. In the present case, as in *Community Voice*, the

---

[7] The *Sierra Club* court ultimately dismissed the "unreasonable delay" portion of the APA claim, but on a wholly different basis that is irrelevant here: because of the statutory structure of CERCLA, unreasonable delay cases regarding CERCLA regulations must be brought in the D.C. Circuit. 2008 WL 3820385, at *3–4.

1  statutory violation claim is predicated on the existence of an objective factual condition: the
2  availability of new scientific information that demonstrates the obsolescence of plans that
3  Congress intended EPA to keep current. In contrast, an APA violation in the form of
4  unreasonable delay in completing action on a petition is a process violation that renders
5  meaningless the Section 553(e) right to petition. As such, each violation warrants distinct
6  declaratory relief, even if the violations may also both warrant an order commanding EPA to
7  complete rulemaking.

8        This Court's ruling in *Garcia v. McCarthy*, No. 13-cv-03939-WHO, 2014 WL 187386
9  (N.D. Cal. Jan. 16, 2014) ("*McCarthy*"), does not suggest a different result. In that case,
10  plaintiffs challenged as "arbitrary and capricious" EPA's actions in negotiating settlement of
11  plaintiffs' administrative complaint against a state agency under Title VI of the Civil Rights Act.
12  After finding that the agency's actions were discretionary and thus not judicially reviewable, the
13  Court held that regardless, the Court would be without authority to provide relief predicated on
14  the APA.  The Court reasoned that plaintiffs' APA claim was barred because plaintiffs had an
15  "alternative adequate remedy," in the form of state court litigation against the state agency
16  recipient of Title VI funds. *Id.* at *11. In the instant case, in contrast, there is no vehicle other
17  than the APA itself, and no forum other than federal court, through which Plaintiffs can vindicate
18  their right to complete and timely disposition of their *APA petitions* that EPA years ago accepted.

19        This case thus differs from all the cases EPA cites in which plaintiffs used an APA claim
20  to duplicate the claim of unlawfulness manifest in a substantive statutory claim, or, in the
21  *McCarthy* case, used an APA claim where relief could be obtained in a state forum. Here, because
22  EPA has violated the procedural guarantees of the APA itself, there is no alternative remedy that
23  would redress Plaintiffs' injuries.

24        B.    Plaintiffs' APA Claim Is Based on EPA's Failure to Take Final Action on Petitions
25        The APA claim that Plaintiffs pled in their complaint, and maintain in their motion for
26  summary judgment, is predicated on EPA's failure to take final action in response to Plaintiffs'
27  2012 and 2014 rulemaking petitions. It is *not* based on EPA's failure to comply with its
28  independent CWA obligation to maintain a scientifically current NCP. EPA elides this crucial

distinction in mistakenly asserting that "Plaintiffs' Complaint seeks no relief with respect to their petitions," and that in Plaintiffs' motion for summary judgment, they "have abandoned any claim for relief as to their administrative petitions." EPA's Br. 14, n.7.

Plaintiffs' complaint does, in fact, allege that EPA's failure to complete its 2015 rulemaking after accepting Plaintiffs' petitions constituted an unlawful delay. Compl. ¶¶ 134–135, ECF No. 1. This is wholly consistent with the Ninth Circuit's holding in *Community Voice*, that in accepting a rulemaking petition, an agency assumes "a duty to conclude a rulemaking proceeding within a reasonable time." 878 F.3d at 785.

Plaintiffs' complaint additionally requested relief with respect to action on their rulemaking petitions, seeking a declaration "that EPA has violated the APA by unlawfully withholding or unreasonably delaying issuance of a final rule to update the NCP." Compl. 29 (Requested Relief). Plaintiffs' summary judgment motion likewise premises its APA claim on EPA's failure, within a reasonable time, to take the final step encompassed in their petitions' request for rulemaking. Pls.' Br. 14.

For this reason, *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) ("*Vilsack*"), which addressed the availability of APA relief when statutory relief is also available, has no bearing on the viability of APA relief in this case. The *Vilsack*'s court's holding is inapposite because it rests on materially different facts that do not include any unresolved APA petition. The *Vilsack* plaintiffs alleged that the U.S. Department of Agriculture (USDA) had engaged in racial and gender discrimination in its programs, violating their civil rights. Importantly, Congress had enacted a remedial law to deal specifically with alleged USDA discrimination, *id.* at 521–22, providing a tailored statutory route for relief.

When plaintiffs pressed statutory claims against USDA for discrimination *and* an essentially duplicative claim under the APA that USDA had failed to investigate their discrimination complaints, the court held that the statutory relief available was of the "same genre" as potential relief under the APA, and that this "alternative remedy" barred their APA claim. *Id.* at 522. Because *Vilsack* did not involve (and the court did not opine on) the availability of APA relief for indefinitely stalled final action on APA Section 553(e) petitions, however, that

case's holding cannot support the broad proposition that a convergence in relief between a statutory and an APA claim necessarily defeats the APA claim.

Here, in marked contrast to *Vilsack*, EPA has failed to comply with a petition-response duty arising directly under the APA. Because this claim does not duplicate Plaintiffs' statutory claim, the availability of injunctive relief under Plaintiffs' CWA claim does not bar their claim for declaratory and injunctive relief under the APA.

C.    EPA's Delay in Resolving Plaintiffs' Petitions Is Unreasonable

EPA's years-long delay in taking final action on Plaintiffs' petitions is unreasonable. When Plaintiffs in 2012 first petitioned EPA to update the NCP, the agency acknowledged that Plaintiffs' substantive concerns were consistent with "concerns raised during the Deepwater Horizon spill and a result of recent research" that were already causing EPA to "consider[]" an NCP update. EPA's Br. Ex. 1, ECF No. 64-2 (2013 EPA letter). When no proposed rule or further response to their petition timely ensued, however, Plaintiffs filed a superseding petition with EPA in 2014. *See* EPA's Br. Ex. 2, at 1, ECF No. 64-3 (2014 EPA letter) (acknowledging receipt).

This time, although EPA likewise did not use express language of petition acceptance or rejection, it stated that rulemaking was imminent, and that it would include Plaintiffs' petitions in the rulemaking docket. EPA's Br. Ex. 2, at 1 (2014 EPA letter). EPA thus appears to have accepted Plaintiffs' petitions, especially insofar as it did not timely deny them. *See* 5 U.S.C. § 555(e) (requiring agencies to give petitioners "prompt notice" when denying a petition in whole or in part, along with "a brief statement of the grounds for denial"). Irrespective of whether the NCP update process began as an "agency initiated rulemaking," EPA's Br. 24, an agency may grant petitions addressing the same subject matter, and, as here, include them in the rulemaking docket as support for the agency's action.

EPA's legal obligation under the APA in response to Plaintiffs' petitions was not merely to commence, but to *conclude* rulemaking within a reasonable amount of time. *See Community Voice*, 878 F.3d at 785 (holding that in granting a rulemaking petition, an agency assumes "a duty to conclude a rulemaking proceeding within a reasonable time.").

EPA acknowledges that "the facts associated with the time it has taken EPA to move various portions of the proposed rule through the rulemaking process are undisputed." EPA's Br. 2. And those facts reveal unreasonable agency delay—whether the delay is measured as more than eight years (from the date of Plaintiffs' 2012 petition), seven years (from the date of Plaintiff's follow-up petition in 2014), or six years (from the date EPA issued its Proposed Rule in 2015).

EPA's multi-year delay in fulfilling the requests in Plaintiffs' petitions by issuing a final rule to update the NCP is manifestly unreasonable in light of the magnitude of health and environmental interests at stake. *See* Pls.' Br. 16–20 (describing relevant factors). The delay is also inexplicable in light of the agency's ability to finalize in the same time period numerous rules with far more voluminous public comment and controversy, *id*. at 21, which EPA's declarant does not explain.

Further, EPA ignores the applicable legal test—*i.e*., the so-called *TRAC* factors—in its brief. Instead, it substitutes for analysis the blanket statement that "EPA has acted reasonably in the proposed Subpart J rule process." EPA's Br. 18. EPA's support for this position ranges from implausible to self-contradictory.

For example, EPA's declarant cites as impediments to finalizing the NCP rule, *inter alia*, "emergencies . . . since the proposed rule, including hurricanes Harvey, Irma, and Maria in 2017, the 2017 and 2018 California wildfires, the 2018 Kilauea volcano eruption, the 2020 Western wildfires and the 2021 winter storm Uri, among others," Salyer Decl. ¶ 20—notwithstanding that these natural processes are familiar, perpetual, and implicate the core response functions of the Office of Emergency Management.[8] EPA also does not explain why neither hurricane, nor wildfire, nor volcanic eruption stayed EPA from swift completion of many complex deregulatory actions from 2015 to present. *See* Pls.' Br. 21.

---

[8] Indeed, if hurricanes have any logical relationship to the timing of an NCP update, their effect should be to accelerate it: the Taylor Oil Spill, which is the longest-running oil spill in U.S. history and is still ongoing, was precipitated by Hurricane Ivan in 2004. Darryl Fears, *The U.S. Government Has Studied the Longest Oil Spill in History—14 Years After the Leak Began,* Wash. Post (June 24, 2019), https://www.washingtonpost.com/climate-environment/2019/06/24/fourteen-years-after-it-started-federal-government-has-studied-longest-oil-spill-history/.

EPA also acknowledged that whereas it once intended to complete its rulemaking by 2016, it subsequently moved this rulemaking to "inactive" status, Salyer Decl. ¶¶ 22–23; whether or not the agency has "diligently continued to work on the rulemaking," EPA's Br. 18, removing any internal deadline does not bode well for completion.

EPA additionally cites "significant technical issues associated with the [NCP] rule that remain unresolved," Salyer Decl. ¶ 25. These issues center on EPA's inability to locate contemplated new "reference oils" for performing the toxicity and efficacy tests that its Proposed Rule contemplates, despite at least *six years* of searching. The narrative arc of EPA's search for the elusive reference oils is itself befuddling: for example, EPA states that the oils the Proposed Rule contemplated in 2015 were already rendered unsuitable for use due to damage from Hurricane Sandy in 2012, three years before rule promulgation. *Id.* at ¶ 28.

Most disturbing, however, is that at present, EPA still has *no workable strategy* for procuring such oils. *See id.* at ¶ 32 ("EPA has yet to locate a source that has agreed to provide these oils. . . . EPA is currently considering its options to address this issue.") This admission suggests the likelihood of additional open-ended delay, making it all the more important for the Court to compel action, impose near-term deadlines on EPA, and closely supervise the agency's progress until a final rule issues. As courts have recognized, ongoing delay can be particularly "troubling" when defendants are "not starting from scratch" on an issue. *Common Cause v. Fed. Election Comm'n*, 692 F. Supp. 1397, 1401 (D.D.C. 1988).

**III.  This Court Has Broad Discretion to Fashion an Equitable Remedy**

A.  This Court Has Discretion to Order Relief Responsive to Case Facts

The APA commands that a court "shall . . . compel agency action" when faced with unlawfully agency delay. 5 U.S.C. § 706(1). EPA appears to acknowledge that this is the appropriate and expected remedy here, proposing and justifying dates by which it will issue each part of a contemplated two-part final rule. *See* EPA's Br. 20–24.

However, as Plaintiffs described in their summary judgment brief (Pls.' Br. 22–24), the Court has flexibility to craft an order responsive to Plaintiffs' injuries. Plaintiffs have suggested that in light of the considerable elapsed time since EPA issued its proposed rule, the most

appropriate remedy would be for EPA to revisit and reissue its proposed rule before finalizing it. EPA's brief makes particularly vivid another reason why such a remedy may be (as the Requested Relief in Plaintiffs' Complaint indicates) the "other relief" that is "just and proper": it appears that EPA will continue to be unable to execute the very testing protocol it has proposed, *regardless* of rule prioritization, based on the continuing unavailability of reference oils. *See* EPA's Br. 19 (citing agency's ongoing "obstacles obtaining reference oils needed in order to conduct necessary testing"). If EPA's current Proposed Rule contemplates a testing protocol for dispersants that appears impossible to implement, it is unclear why the agency so strenuously resists a process that would enable it to reconceptualize its approach and proceed to a final rule.

B.    EPA's New Proposal for Bifurcated Rulemaking Is Illogical and Unresponsive to the Critical Issues Motivating this Suit

EPA here proposes a rulemaking course of action that was not foreshadowed in its 2015 Proposed Rule; that is irrational in its sequencing; and that impermissibly defers action on the activities Plaintiffs have identified as critical. The Court should reject it.

EPA in its briefing newly proposes bifurcation of its rulemaking-in-progress. First, EPA proposes to issue a final rule regarding *monitoring* of dispersants. EPA's Br. 21. Only much later does EPA propose to finalize a rule addressing the potential *harm* from dispersants, *i.e.*, a rule identifying which dispersants may be used in oil spill response, and under what circumstances. *Id.* at 21–24. This task ordering is irrational on its face, and inverts the process suggested in the Proposed Rule.

The Proposed Rule stated that the scale of dispersant use in response to the BP Deepwater Horizon Oil Spill "raised many questions about efficacy, toxicity, environmental trade-offs, and monitoring challenges that EPA seeks to address through the proposed revisions to Subpart J." [AR] 80 Fed. Reg. at 3381. This presentation of questions reflects a logical task sequencing. First, EPA should require dispersant manufacturers to demonstrate that their products are "effective" for their intended use (otherwise, there is no reason to authorize addition of chemicals to the marine environment). Second, EPA should require robust data about "toxicity" of those products (because dispersant products currently in use cause toxic harm, as

Plaintiffs' declarations attest). Third, EPA should examine "environmental trade-offs" (such as whether dispersing oil on the water's surface, which may confer some ecological benefits, risks exacerbating ecological harm in the water column or on the sea floor if dispersant-and-oil mixtures sink).

Only once EPA has determined which products will be authorized for use, and on what conditions, does establishment of a "monitoring" regime make sense. Thus, EPA's proposal to focus on completing a monitoring rule, without any indication of which dispersant chemicals it will monitor or the locations and conditions under which such chemicals will be authorized for use, is logically backwards. As EPA's filings make clear, the monitoring rule is contemplated to be finalized first *not* because this sequencing makes sense or is responsive to the health and ecological harms documented in Plaintiffs' filings and in public comments in the rulemaking record, but simply because it is comparatively easy. *See* Salyer Decl. ¶ 34 (describing EPA's "challenges" with respect to securing the reference oils necessary to finalize an effectiveness and toxicity testing rule for dispersants).

Conversely, EPA's proposal defers until at least 2023—but perhaps indefinitely—resolution of the difficult central issues, which relate to the actual dispersant products used in response to spills. EPA's failure to make progress on key issues to date surely reflects EPA's deprioritization of its NCP update in the years prior to this litigation. *See* Salyer Decl. ¶¶ 22–23 (describing the NCP rule's 2017 demotion from "Long Term" to "Inactive" status).  This in turn manifests a lack of "the utmost diligence in discharging . . . statutory responsibilities," contrary to EPA's assertion. EPA's Br. 16–17 (quoting *Nat. Res. Def. Council v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974)).

C.     EPA's Proposed Timeline for Rule Completion Is Too Long

Whether or not EPA can defend the logic of finalizing a monitoring rule before knowing what and where it will monitor, and whether or not the Court orders EPA to revise its proposed rule before issuing it, the timeline that EPA proposes for completing its NCP rulemaking is too long. Although EPA's elaboration of bureaucratic impediments to rule completion (*see* EPA's Br. 21–24) suggest that the agency can never both observe required procedures and act

1   expeditiously, courts routinely impose short timelines on agencies where rules have long

2   languished in administrative purgatory. In response, agencies prove able to accelerate. In

3   *Community Voice*, for example, "EPA estimated that . . . a final rule could come in 2023," 878

4   F.3d at 783, but faced with a much more ambitious court-ordered timeline, EPA issued a final

5   rule *four years* sooner. *See* Final Rule, Review of the Dust-Lead Hazard Standards and the

6   Definition of Lead-Based Paint, 84 Fed. Reg. 32,632 (July 9, 2019).

7       Other cases of extensive agency delay similarly manifest courts' impatience with further

8   dilatoriness. In *In re American Rivers & Idaho Rivers United*, for example, the D.C. Circuit

9   reacted to a federal agency's six-year delay in responding to a petition by ordering agency action

10  within 45 days. 372 F.3d 413, 420 (D.C. Cir. 2004). In *Cutler v. Hayes*, the court emphasized its

11  ability to "compel an agency unreasonably delaying to speed up its activities," and further stated

12  that "[t]he deference traditionally accorded an agency to develop its own schedule is sharply

13  reduced when injury likely will result from avoidable delay[,] . . . and 'delays that might be

14  altogether reasonable in the sphere of economic regulation are less tolerable when human lives

15  are at stake.'" 818 F.2d 879, 898 (D.C. Cir. 1987) (citation omitted). As examples, the Court

16  cited cases requiring delinquent agencies to act under deadlines shorter than what agencies

17  themselves proposed. *Id.* at 895, n.137.

18      To ensure EPA's expeditious progress on rulemaking, Plaintiffs further request that the

19  Court order EPA to provide one or more status reports to the Court, either on the schedule in

20  Plaintiffs' proposed order (ECF No. 63-8, at 1) or such schedule as the Court deems appropriate.

21  *See, e.g.*, *TRAC*, 750 F.2d at 81 (requiring status reports every 60 days); *In re United Mine*

22  *Workers of Am. Int'l Union*, 190 F.3d 545, 546 (D.C. Cir. 1999) (retaining jurisdiction and

23  requiring status reports pending completion of agency action); *Nat'l Wildlife Fed'n v. Nat'l*

24  *Marine Fisheries Serv.*, 524 F.3d 917, 937 (9th Cir. 2008) (finding reasonable the district court's

25  requiring status reports every 90 days during remand on unlawful biological opinion, noting that

26  requiring such reports is "clearly permissible").

27

28

PLAINTIFFS' REPLY & OPPOSITION                                                    16
CASE NO. 3:20-CV-00670-WHO

## CONCLUSION

For the foregoing reasons and the reasons stated in Plaintiffs' opening brief, the Court should grant Plaintiffs' motion for summary judgment and deny Defendants' cross-motion for summary judgment. The Court should further declare that EPA's ongoing delay in updating the National Contingency Plan violates both the Clean Water Act and the Administrative Procedure Act; should establish a schedule for EPA's rulemaking actions, through final rule promulgation; should require EPA to submit one or more status reports during rulemaking; and should retain jurisdiction to ensure the agency's compliance with court-imposed deadlines.

DATED: June 3, 2021                    Respectfully submitted,


                                       /s/ *Claudia Polsky*
                                       Claudia Polsky (CA Bar No. 185505)
                                       Environmental Law Clinic
                                       UC Berkeley School of Law

                                       *Counsel for Plaintiffs ALERT Project/Earth
                                       Island Institute, Alaska Community
                                       Action on Toxics, Cook Inletkeeper,
                                       Rosemary Ahtuangaruak, and Kindra
                                       Arnesen*


                                       /s/ *Kristen Monsell*
                                       Kristen Monsell (CA Bar No. 304793)
                                       Center for Biological Diversity

                                       *Counsel for Plaintiff Center for
                                       Biological Diversity*