UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EARTH ISLAND INSTITUTE, et al., | Case No. 20-cv-00670-WHO |
| Plaintiffs, | |
| v. | **ORDER GRANTING EARTH ISLAND'S MOTION FOR SUMMARY JUDGMENT** |
| MICHAEL S. REGAN, et al., | |
| Defendants. | Re: Dkt. No. 63 |

Plaintiffs (collectively, "Earth Island") seek a declaratory judgment that defendants

Michael S. Regan as Administrator[1] and the U.S. Environmental Protection Agency (collectively,

"EPA") failed to perform a nondiscretionary duty to issue a final rule to update Subpart J of the

National Contingency Plan ("NCP") as required by the Clean Water Act ("CWA") regarding,

among other things, the removal of oil and hazardous substances after oil spills, and violated the

Administrative Procedure Act ("APA") because of its unreasonable delay.  Earth Island seeks

injunctive relief to require the EPA to remediate these failures expeditiously.

In cross-motions for summary judgment, the parties contest whether the EPA violated the

CWA and the APA.  I previously denied the EPA's motion to dismiss premised on the lack of a

nondiscretionary duty under the CWA.  Order Re: Motion To Dismiss ("Order"), Dkt. No. 42.

Now, for the reasons explained below, I find that the EPA breached its nondiscretionary duty to

issue the final rule, delayed unreasonably in the process, and will be required to take final action

on the listing and authorization of use provisions by May 31, 2023.  I GRANT Earth Island's

motion for summary judgment and DENY the EPA's cross-motion for summary judgment.

---

[1] Mr. Regan is substituted for Andrew R. Wheeler in his official capacity as Administrator.

United States District Court
Northern District of California

1

**BACKGROUND**

2

**I.      LEGAL AND FACTUAL BACKGROUND**

3        Under the CWA, Congress directed the EPA to "prepare and publish a National

4    Contingency Plan (NCP) for removal of oil and hazardous substances pursuant to this section."  33

5    U.S.C. § 1321(d)(1).  The EPA has discharged that duty.  Order at 7.  The purpose of the NCP is

6    to "provide for efficient, coordinated, and effective action to minimize damage from oil and

7    hazardous substance discharges, including containment, dispersal, and removal of oil and

8    hazardous substances."  33 U.S.C. § 1321(d)(2).  It has been revised multiple times.  Dkt. No. 64

9    ("EPA Opp.") at 3.

10       Earth Island's complaint focuses on Subpart J, which sets forth "[p]rocedures and

11   techniques to be employed in identifying, containing, dispersing, and removing oil and hazardous

12   substances" and a schedule for identifying and evaluating "dispersants, other chemicals, and other

13   spill mitigating devices and substances" which may be used in response to oil discharges.  33

14   U.S.C. § 1321(d)(2)(F), (G).  To add a product to the schedule, the manufacturer of the product

15   must submit technical product data specified in 40 C.F.R. § 300.915 to the EPA.  40 C.F.R.

16   § 300.920.  "Among other things, Subpart J set a threshold for effectiveness that must be met for a

17   dispersant to be included on the NCP Product Schedule and requires the manufacturer to provide

18   the results of effectiveness and toxicity testing using defined procedures, as well as other specific

19   information."  EPA Opp. at 4 (citing 40 C.F.R. § 300.915).  The EPA has not updated Subpart J,

20   the portion of the NCP at issue, since 1994.  *Id.*

21       After the BP Deepwater Horizon Oil Spill in 2010, the EPA began reevaluating the role of

22   dispersants in oil spill response to mitigate the environmental impacts of oil discharges.  In 2011,

23   the EPA's Office of the Inspector General ("OIG") issued a report about the NCP's approach to

24   efficacy and toxicity review of dispersants.  Dkt. No. 68 at 97–138 ("2011 EPA-OIG Report").

25   The report specifically found that the "EPA has not updated the NCP since 1994 to include the

26   most appropriate efficacy testing protocol," and noted that if the NCP had reflected up-to-date

27   testing procedures for dispersant efficacy, "more reliable efficacy data" would have been available

28   at the time of the BP Deepwater Horizon Oil Spill.  *Id.* at 8.

United States District Court
Northern District of California

2

1          In November 2012, several of the plaintiffs submitted a petition requesting that the EPA

2     exercise its authority under the CWA and amend the NCP.  Compl. ¶ 113; *see also* Dkt. No. 68 at

3     41–96 ("EII 2012 Petition").  In January 2013, EPA responded, informing the petitioners that it

4     was already working on a proposed rule and encouraged the petitioners to participate in the public

5     comment process.  *See* Dkt. No. 64-2 ("EPA Letter, Jan. 3, 2013").  In June 2014, plaintiff

6     ALERT filed a supplemental petition and sought a "complete overhaul of the NCP."  Compl.

7     ¶ 115; *see also* Dkt. No. 68 at 4–40 ("EII 2014 Petition").  EPA informed ALERT of the status of

8     the proposed rule and sought copies of the 2012 petition and 2014 supplemental petition for use in

9     the rulemaking docket.  *See* Dkt. No. 64-3 ("EPA Letter, July 23, 2014").

10         In 2015, the EPA proposed amendments to Subpart J (the "Proposed Rule").  Dkt. No. 68

11    at 765–832 ("80 Fed. Reg. 3380 (Jan. 22, 2015)").  The EPA's Proposed Rule was "anticipated to

12    encourage the development of safer and more effective spill mitigating products, and would better

13    target the use of these products to reduce the risks to human health and the environment."  *Id.* at

14    3380.  The Proposed Rule addressed three primary components:  (1) establishing new monitoring

15    requirements for certain atypical dispersant use situations; (2) revising the data and information

16    requirements for chemical agent products to be listed on the Subpart J Product Schedule, and (3)

17    revising the authorization of use of procedures for chemical agents in response to an oil discharge

18    to waters of the United States.  *Id.*  Comments to the Proposed Rule closed on April 22, 2015.  *Id.*

19    at 3381.  The EPA received 81,973 comments on the Proposed Rule during the public comment

20    period.

21         On July 6, 2021, the EPA submitted a portion of the final rule to the Federal Register on

22    the first component:  monitoring requirements for dispersant use in atypical situations.  *See* Dkt.

23    No. 70.  To this date, nearly six years since the public comment period on the Proposed Rule

24    closed, the EPA has not issued a final rule on the other two components of the Proposed Rule.

25    **II.      PROCEDURAL BACKGROUND**

26         Earth Island filed this action on January 30, 2020, alleging two causes of action under the

27    CWA and the APA.  Dkt. No. 1 ("Compl.").  Under its first cause of action, Earth Island alleged that

28    the EPA failed to update the NCP since 1994 and thereby failed to incorporate scientific and

3

United States District Court
Northern District of California

1    technological developments to assure that the NCP is "effective" and can "minimize damage" as

2    required by the CWA.  Compl. ¶¶ 126–32.  Under the second cause of action, Earth Island alleged

3    that the EPA violated Section 555(b) of the APA because it failed to conclude the rulemaking

4    process more than four (now more than five) years since the comment period on the Proposed

5    Rule closed, more than five (now six) years since it accepted ALERT's supplemental petition for

6    rulemaking, and more than seven (now eight) years since ALERT's and other plaintiffs' initial

7    petition for rulemaking.  Compl. ¶¶ 133–36.

8             In April 2021, Earth Island filed the present motion for summary judgment.  In May 2021,

9    the EPA filed its opposition and cross-motion for summary judgment.  Dkt. Nos. 63 ("EII Mot.");

10   EPA Opp.

11                                           **LEGAL STANDARD**

12            A party is entitled to summary judgment where it "shows that there is no genuine dispute

13   as to any material fact and [it] is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A

14   dispute is genuine if it could reasonably be resolved in favor of the nonmoving party.  *Anderson v.*

15   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material where it could affect the

16   outcome of the case.  *Id.*

17            The moving party has the initial burden of informing the court of the basis for its motion

18   and identifying those portions of the record that demonstrate the absence of a genuine dispute of

19   material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Once the movant has

20   made this showing, the burden shifts to the nonmoving party to identify specific evidence showing

21   that a material factual issue remains for trial.  *Id.*  The nonmoving party may not rest on mere

22   allegations or denials from its pleadings but must "cit[e] to particular parts of materials in the

23   record" demonstrating the presence of a material factual dispute.  FED. R. CIV. P. 56(c)(1)(A); *see*

24   *also Liberty Lobby*, 477 U.S. at 248.  The nonmoving party need not show that the issue will be

25   conclusively resolved in its favor.  *Id.* at 248–49.  All that is required is the identification of

26   sufficient evidence to create a genuine dispute of material fact, thereby "requir[ing] a jury or judge

27   to resolve the parties' differing versions of the truth at trial."  *Id.* (internal quotation marks

28   omitted).  If the nonmoving party cannot produce such evidence, the movant "is entitled

1    to . . . judgment as a matter of law because the nonmoving party has failed to make a sufficient

2    showing on an essential element of her case." *Celotex*, 477 U.S. at 323.

3         On summary judgment, the court draws all reasonable factual inferences in favor of the

4    nonmoving party. *Liberty Lobby*, 477 U.S. at 255. "Credibility determinations, the weighing of

5    the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those

6    of a judge." *Id.* However, conclusory and speculative testimony does not raise a genuine factual

7    dispute and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE*

8    *Corp.*, 594 F.2d 730, 738–39 (9th Cir. 1979).

9                                    **DISCUSSION**

10   **I.       WHETHER THE EPA VIOLATED THE CLEAN WATER ACT**

11        The parties dispute (1) whether the NCP is ineffective or inefficient, thereby triggering the

12   EPA's nondiscretionary duty to revise and amend the NCP; and (2) if so, whether the EPA

13   fulfilled its nondiscretionary duty. EII Reply at 2; EPA Reply at 2. In my prior Order, I found

14   that the EPA's duty in this case "is quite clear: to revise or amend the NCP in light of new

15   information."[2] Order at 10. The EPA contends that if "new information" is "intended to be

16   interpreted in the broadest possible way (e.g., *any* new information), then EPA's liability cannot

17   be in dispute, as new information has been received." EPA Reply at 9 (emphasis in original).

18        This is a poor argument. I explained that the EPA has a nondiscretionary obligation to

19   revise or amend the NCP "in order to achieve the purpose of the CWA and the purpose of the

20   NCP." Order at 9. I relied on *In re A Community Voice*, 878 F.3d 779, 785 (9th Cir. 2017), where

21   the Ninth Circuit held that the EPA must "amend initial rules and standards in light of new

22   information," and explained that the "new information" was clear in the record: "the current

23   standards for [hazardous substances were] insufficient to accomplish Congress' goal, thereby

24

25   [2] Earth Island asserts that a recent Supreme Court case, decided after the EPA's prior motion to
     dismiss was briefed, "confirms the correctness" of my conclusion in the prior Order. EII Mot. at
26   12 (discussing *County of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462 (2020)). The EPA
     contends that *County of Maui* is distinguishable and that Earth Island's attempt to revisit the basis
27   for my prior earlier ruling is wholly improper, especially in light of my rejection of EPA's request
     to seek reconsideration of this issue. EPA Opp. at 11–12; *see* Dkt. No. 53. I do not find it
28   necessary to reconsider whether the Administrator has a nondiscretionary duty to update the NCP
     under the CWA.

United States District Court
Northern District of California

1   creating an 'obvious need, apparent to [the EPA]." If the EPA were allowed "to fail to review,

2   update, or amend the NCP for decades despite scientific advances, the occurrence of incidences

3   involving discharge of oil and hazardous substances, and an internal report concluding that the

4   NCP was outdated and inadequate" for example, "such inaction would frustrate the purpose of the

5   NCP to achieve an effective and efficient response to pollution." Order at 8. If "new information"

6   meant "any new information" then the EPA would always have a duty to amend or revise the NCP

7   because the EPA "will always become aware of new information that may relate to the wide

8   variety of actions EPA takes under the NCP." EPA Reply at 9. My ruling was different; I held

9   that the EPA has a nondiscretionary duty to revise or amend the NCP when there is new

10  information that shows that the current standards for efficient, coordinated, and effective action to

11  minimize damage from oil and hazardous substance pollution are insufficient to safely provide for

12  mitigation of any pollution. *See* Order at 8; *see* 33 U.S.C. § 1321(d)(2).

### A.       Whether the NCP Is Ineffective or Inefficient

Under this framework, Earth Island asserts that the EPA violated the CWA because it
failed to perform its nondiscretionary duty to revise or amend the NCP in light of new
information.[3] EII Reply at 2. The EPA contends that Earth Island has failed to show that the
EPA's nondiscretionary duty was triggered because there is no evidence that the NCP is
ineffective or inefficient. EPA Reply at 2. It is wrong.

### 1.       EPA Office of Inspector General Reports

Earth Island relies on the EPA's OIG Report after the 2010 Deepwater Horizon Oil Spill to
prove that the NCP is inadequate. EII Mot. at 13; EII Reply at 2. EPA contends that the OIG
reports do not make any finding that the NCP is ineffective or inefficient. EPA Reply at 3.
Instead, according to the EPA, the report only focused on the Deepwater Horizon Oil Spill and
made recommendations that, in part, helped form the basis of EPA's 2015 Proposed Rule. *Id.* at
3–4. The EPA argues that the 2011 EPA-OIG Report "lauded EPA's efforts and responses and

---

[3] In its motion, Earth Island mistakenly asserted that I had "already determined that the EPA has violated the Clean Water Act" in my prior Order but in its reply, Earth Island clarified that it should have stated that I "necessarily implied" rather than "determined" the agency's liability. EII Reply at 3 n.2.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   therefore demonstrated that EPA's action under the NCP is 'efficient, coordinated, and effective.'"

2   *Id.* at 5.  For example, the Inspector General ("IG") revised the report to clarify that the IG did not

3   intend to imply that EPA's actions, such as its support to the U.S. Coast Guard, were inadequate or

4   inappropriate.  2011 EPA-OIG Report at 21.  The EPA adds that the OIG Report recognized that

5   even if the NCP had been amended to include a different efficacy testing procedure of dispersants,

6   the dispersant used in the Deepwater Horizon Oil Spill would likely not have changed.  EPA

7   Reply at 6; *see* 2011 EPA-OIG Report at 10.

8          Contrary to the EPA's implication that the NCP is effective, the Report explained that,

9   "While this may have been the case, we maintain that more reliable data may have been available

10   had OSWER [now the EPA's Office of Land and Emergency Management] proceeded with its

11   plan to update Subpart J prior to the spill."  2011 EPA-OIG Report at 11.  Moreover, the EPA

12   "agreed with recommendations from its OIG that were intended to remedy inadequacies in NCP

13   dispersant review protocols."  EII Mot. at 13.

14          After the 2010 Deepwater Horizon response, the OIG initiated its 2011 audit of "EPA's

15   contingency planning for emergency response to determine whether the contingency planning

16   structure for responding to oil spills and hazardous substance releases is effective, and whether

17   plans are updated to reflect lessons learned from recent major events and new developments or

18   industry trends."  *EPA Could Improve Contingency Planning for Oil and Hazardous Substance*

19   *Response* (Feb. 15, 2013) ("2013 EPA-OIG Report").  After its investigation, the OIG provided

20   seven recommendations, all of which the EPA agreed to execute by mid-to-late 2012.  2011

21   EPA-OIG Report at 20.  In particular, the EPA agreed to adopt "[r]egulatory revisions to the

22   NCP's Subpart J testing requirements" to "incorporate the most appropriate efficacy testing

23   protocol," to "address chemical agent tests (such as dispersants) using crude oil, subsurface use of

24   dispersants, and quantity, location, and duration of chemical agent use criteria," and to "address

25   the need to capture and maintain dispersant and manufacturer production capacities, equipment

26   requirements, and other necessary information to better prepare for future oil spills."

27   *Memorandum from Asst. Administrator to Inspector General re: Response to Final OIG*

28   *Evaluation Report "Revisions Needed to National Contingency Plan Based on Deepwater Horizon*

1   *Oil Spill"* (Nov. 11, 2011) at 1–3 (discussing OIG's recommendations 1, 3, and 7).  The OIG

2   accepted all of the EPA's corrective plans, including the revisions to the NCP Subpart J.

3   *Memorandum from Inspector General to Asst. Administrator re: Response to Corrective Action*

4   *Plan for OIG Report No. 11-P-1534* (Feb. 7, 2012).

5          The EPA now contends that the OIG's actions are unpersuasive because the Administrator

6   has not delegated his authority to the OIG and that none of the reports constitute "a determination

7   by the Administrator as to when it is advisable to promulgate revisions or amendments to the

8   NCP."  EPA Opp. at 14 (citing 40 C.F.R. § 131.22(b)(1)).  But the 2011 EPA-OIG Report

9   explicitly acknowledged that "the EPA Administrator testified that changes are needed to the

10  NCP's Subpart J, including dispersant registration and a more complete range of tests to address

11  human and environmental health."  2011 EPA-OIG Report at 10.  The EPA's counsel argued

12  during the July 7, 2021, hearing that the Administrator's statement was not an admission that the

13  NCP is inefficient or ineffective but that the NCP can be improved.  For the reasons below, this

14  argument fails.

### 2.      EPA's 2015 Proposed Rule

16         The issuance of a proposed regulation through the Federal Register requires Administrator

17  approval.  As a result, the "EPA's commencement of rulemaking to update the NCP negates any

18  EPA argument that its 'Administrator' never determined the existing NCP to be inadequate, as is

19  necessary to trigger a CWA duty."  EII Reply at 4 n.4.

20         Earth Island points to the preamble to the EPA's 2015 Proposed Rule and argues that it is

21  an "unambiguous Administrator affirmation that the existing plan is not adequate."  EII Reply at 4.

22  The preamble expressed the EPA's intention to revise the NCP to "address[] the efficacy, toxicity,

23  environmental monitoring of dispersants, and other chemical and biological agents, as well as

24  public, state, local, and federal officials' concerns regarding their use."  80 Fed. Reg. 3380 (Jan.

25  25, 2015).  The proposed revisions to Subpart J of the NCP were "anticipated to encourage the

26  development of safer and more effective spill mitigating products, and would better target the use

27  of these products to reduce the risks to human health and the environment."  *Id.*  The changes were

28  a result of "research [by the EPA's Office of Research and Development], the Deepwater Horizon

United States District Court
Northern District of California

8

event, the new protocols in the proposed revisions, in addition to increasing the overall scientific

soundness of the data, to take into consideration not only the efficacy but also the toxicity,

long-term environmental impacts, endangered species protection, and human health concerns

raised during responses to oil discharges, including the Deepwater Horizon blowout." *Id.* at 3381.

The EPA contends that the proposed revisions to make the NPC more effective or more

efficient "are not a de facto demonstration that the NCP is ineffective or inefficient." EPA Reply

at 6. According to the EPA, the Proposed Rule was merely a way for the EPA to gather public

comments on how to "improve what is and continues to be a functioning NCP." *Id.* It claims that

if I were to adopt Earth Island's "flawed logic," then any time the EPA publishes a proposed rule

to amend the NCP, a person can file a citizen suit alleging that the proposed rule constitutes an

admission that the Administrator has failed to perform a nondiscretionary duty to amend the NCP.

*Id.* Although I agree that any proposed rulemaking is not necessarily a determination by the

Administrator that the NCP is inadequate, a proposed rule can be such a determination. In this

case, the OIG reports and the language of the subsequent Proposed Rule support the conclusion

that the NCP is ineffective and inefficient.

### 3.    Earth Island's Petitions and Declarations

Earth Island also asserts that its "petitions, opening summary judgment brief, and

declarations as well as public comments on EPA's proposed rule further particularize aspects of

the NCP's inadequacy." EII Reply at 4. The EPA responds that the purpose of Earth Island's

petitions and declarations is not to provide for the "efficient, coordinated, and effective action to

minimize damage from oil and hazardous substance discharges" but rather the "prohibition of the

use of dispersants." EPA Reply at 7. It also argues that by using Earth Island's own petitions and

declarations as a basis for finding the NCP inadequate, Earth Island is asking me to stand in the

shoes of the EPA and grant their petitions.[4] EPA Reply at 7. Of course, I lack authority to grant

Earth Island's petitions. That said, I conclude that EPA's own documents, such as the OIG

Reports and the resulting Proposed Rule, show that the NCP is ineffective and inefficient and

---

[4] The parties dispute whether the EPA granted Earth Island's petitions. I conclude that the EPA did not grant nor deny Earth Island's petitions. *See supra* Part II(B)(1).

United States District Court
Northern District of California

1    therefore that EPA's nondiscretionary duty to revise or amend the NCP is triggered.

2    **B.      Whether the EPA Fulfilled Its Nondiscretionary Duty**

3    The EPA contends that even if I find that the NCP is ineffective or inefficient, it has

4    fulfilled any nondiscretionary duty to revise or amend the NCP because it has amended the NCP

5    multiple times. EPA Reply at 2. But the amendments do not address chemical dispersants and oil

6    spill response and are therefore unresponsive to the "new information" that triggers the EPA's

7    duty to update the NCP. EII Reply at 3. Among other things, the amendments concern technical

8    changes, the involuntary acquisition of property by the government, and the designation of federal

9    trustees. *See* EPA Opp. at 10 n.3. The EPA says that these amendments are relevant because they

10   counter Earth Island's allegations. EPA Reply at 2. For example, according to the EPA, the

11   amendments show that the NCP has been updated since 1994, that the use of chemical dispersants

12   is not prioritized over mechanical cleanup methods, and that the EPA has incorporated scientific

13   and technological developments to minimize damage. *Id.*

14   But the EPA does not argue that these amendments address the new information relevant

15   to dispersant efficacy, toxicity, and terms of authorization. EII Reply at 4. As Earth Island

16   asserts, the 2015 Proposed Rule at issue here "was not a global overhaul of the NCP, but rather, a

17   surgical intervention that specifically addressed Subpart J." EII Reply at 3. It is undisputed that

18   before the EPA's final action on the monitoring provisions portion of the Proposed Rule on July 6,

19   2021, the EPA had not amended the relevant portion of the NCP, Subpart J since 1994. *See* EPA

20   Opp. at 1. In addition, the EPA has failed to finalize all components of the 2015 Proposed Rule to

21   amend Subpart J of the NCP. *See id.* at 20. Accordingly, Earth Island has provided sufficient

22   facts to show that EPA has failed to fulfill its nondiscretionary duty to revise or amend the NCP.

23   **II.     WHETHER EPA'S DELAY IN ISSUING A FINAL RULE IS UNREASONABLE**

24   Earth Island also asserts that the EPA violated the APA when it failed to conclude the

25   rulemaking process for the 2015 Proposed Rule. Compl. ¶ 133–36. The EPA contends that the

26   APA claim is precluded because Earth Island has an alternative adequate remedy under the CWA.

27   EPA Reply at 10–12. But Earth Island's APA and CWA claims are distinct and because the EPA

28   failed to issue a final rule for more than six years, its delay is unreasonable under the APA.

10

A.      **Whether Earth Island's CWA Claim Precludes Its APA Claim**

The EPA contends that if Earth Island has "a cognizable claim against EPA under the CWA citizen suit provision for the failure to update Subpart J of the NCP, that precludes an additional claim under the APA that seeks similar relief." EPA Opp. at 15. Section 706(1) of the APA allows a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). But Section 704 states, "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. An alternative remedy is adequate if it would remedy the injury about which the plaintiff complains. *See Coker v. Sullivan*, 902 F.2d 84, 90 n.5 (D.C. Cir. 1990). "[T]he alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009).

Earth Island does not dispute that legal standard but argues that its statutory CWA claim and APA claim are "distinct and nonduplicative, because they involve two separate EPA violations." EII Reply at 5. Earth Island asserts that relief under the CWA is not an adequate alternative remedy because the "APA claim arises not from the substantive illegality of EPA's conduct under the CWA, but rather, from EPA's violation of the APA's *own* procedural guarantee of timely action on petitions." *Id.* (emphasis in original). In other words, the question of whether the EPA violated the CWA because of its failure to maintain an up-to-date NCP is distinct from whether the EPA also violated the APA because it unreasonably delayed taking final action on Earth Island's petitions and the EPA's Proposed Rule. *Id.* at 8.

In *Sierra Club v. Johnson*, No. 08-CV-01409-WHA, 2008 WL 3820385, at *2 (N.D. Cal. Aug. 8, 2008), the Hon. William H. Alsup dismissed the plaintiff's "unlawfully withheld" APA claim because it was based on the same allegation under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")—that the defendants failed to discharge a mandatory duty—but allowed plaintiffs' "unreasonable delay" APA claim because it was not duplicative. The "unreasonable delay" claim did not ask "whether defendants violated a nondiscretionary duty but whether twenty years constitutes an unreasonable delay."[5] *Id.*

---

[5] The *Sierra Club* court dismissed the "unreasonable delay" claim without prejudice because under

United States District Court
Northern District of California

1    Likewise, in this case, the "unreasonable delay" claim does not ask whether the EPA violated a

2    nondiscretionary duty but whether its years-long delay constitutes an unreasonable delay.

3           Earth Island also relies on *Community Voice*, where the Ninth Circuit concluded that the

4    EPA had a duty to update its lead-based paint and dust-lead hazard standards under the TSCA and

5    the Paint Hazard Act, as well as a duty under the APA to fully respond to plaintiffs' petitions.

6    *Community Voice*, 878 F.3d at 786.  Earth Island argues that the Ninth Circuit held that the EPA

7    violated both duties, "notwithstanding that they converged in the same remedy: the grant of a writ

8    of mandamus and an order to EPA to issue proposed and final rules by specified deadlines."  EII

9    Reply at 6.  The EPA contends that *Community Voice* is distinguishable because unlike in

10   *Community Voice*, the EPA has not granted Earth Island's petitions in this case.  EPA Reply at

11   10–11.  But this is immaterial because Earth Island points out that the EPA's failure to finalize its

12   Proposed Rule for six years constitutes unreasonable delay under the APA. [6]  EII Reply at 8.  Earth

13   Island's CWA claim does not preclude its "unreasonable delay" APA claim.[7]

14          **B.      Whether the EPA's Delay Is Unreasonable**

15          Earth Island asserts that the EPA's delay six-plus years on its rulemaking to update the

16   NCP and for more than eight years on taking final action on Earth Island's original petitions are

17   unreasonable under the APA.  EII Mot. at 15.  "Agency action" includes "an agency rule, order,

18   license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).

19   An administrative agency must conclude matters presented to it "within a reasonable time," 5

20

21   CERCLA, the D.C. Circuit has exclusive jurisdiction over unreasonable delay cases.  *Sierra Club*,
22   2008 WL 3820385, at *2.  That is not the case here under the CWA.  *See* EII Reply at 8 n.7.

23   [6] The cases that the EPA rely on are distinguishable.  *See, e.g.*, *Coos County Board of
     Commissioners v. Kempthorne*, 531 F.3d 792 (9th Cir. 2008) (finding that the two causes of action
24   were identical because plaintiffs alleged that the defendant had failed to perform an discrete
     agency action under both the Endangered Species Act ("ESA") and the APA); *Garcia v.
25   McCarthy*, No. 13-CV-03939-WHO, 2014 WL 187386, at *11 (N.D. Cal. Jan. 16, 2014)
     (concluding that plaintiffs' APA claim was barred because plaintiffs had an alternative adequate
26   remedy in the form of state court litigation against the state agency recipient of Title VI funds).

27   [7] Earth Island does not argue what the basis is for its "unlawfully withheld" APA claim, but if the
28   basis is the same as the one for the CWA, then Earth Island's "unlawfully withheld" APA claim is
     precluded.

12

1    U.S.C. § 555(b), and the APA permits a court to "compel agency action unlawfully withheld or

2    unreasonably delayed," 5 U.S.C. § 706(1).  In determining whether an agency's delay is

3    unreasonable under the APA, the Ninth Circuit has adopted the factors in *Telecommunications*

4    *Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("TRAC").  *See Indep. Min.*

5    *Co. v. Babbitt*, 105 F.3d 502, 507 n.7 (9th Cir. 1997); *see also Ray v. Cuccinelli*,

6    No. 20-CV-06279-JSC, 2020 WL 6462398, at *8 (N.D. Cal. Nov. 3, 2020).  These factors include:

7    (1) "the time agencies take to make decisions must be governed by a 'rule of reason'"; (2)

8    "whether Congress has provided a timetable or other indication of the speed with which it expects

9    the agency to proceed"; (3) "that delays otherwise reasonable in the sphere of economic regulation

10   are less tolerable when human health and welfare are at stake"; (4) "consideration of the effect of

11   expediting delayed action on agency activities of a higher or competing priority"; (5) "accounting

12   for the nature and extent of the interests prejudiced by the delay"; and (6) "that the court need not

13   'find any impropriety lurking behind agency lassitude in order to hold that agency action is

14   unreasonably delayed.'"  *Id.*

15                   **1.      Rule of Reason**

16           The first TRAC factor "requires that the time it takes for the agency to act is governed by a

17   'rule of reason.'"  *Ray*, 2020 WL 6462398, at *8.  Earth Island relies on Ninth Circuit precedent

18   that makes plain that EPA's delay is unreasonable.  EII Mot. at 16.  For example, in *Community*

19   *Voice*, the Ninth Circuit held that the EPA had unreasonably delayed in failing to act on a

20   rulemaking petition that it granted eight years earlier.  *Community Voice*, 878 F.3d at 782.

21   Specifically, the Ninth Circuit held that "having chosen to grant the petition for rulemaking, EPA

22   came under a duty to conclude a rulemaking proceeding within a reasonable time," and the EPA

23   does not comply merely by "begin[ning] an appropriate proceeding."  *Id.* at 785.  Similarly, in *In*

24   *re Pesticide Action Network N. Am., Nat. Res. Def. Council, Inc.*, 798 F.3d 809, 814 (9th Cir.

25   2015), the Ninth Circuit found that the EPA's eight-year delay in responding to a petition

26   implicating serious health harms had "stretched the 'rule of reason' beyond its limits."  Then in

27   *Nat. Res. Def. Council v. EPA*, 956 F.3d 1134 (9th Cir. 2020) ("*NRDC*"), the Ninth Circuit relied

28   on *Community Voice* and *In re Pesticide Action* to find that the "rule of reason tips sharply in

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1    favor" of compelling agency action where the EPA delayed for more than ten years in responding

2    to the plaintiff's petition.  *NRDC*, 956 F.3d at 1140 (internal quotation marks omitted).

3         The EPA would distinguish those cases because it had not granted or denied Earth Island's

4    petitions.  EPA Opp. at 14 n.7.  It also contends that Earth Island has abandoned any claim for

5    relief regarding its petitions because it failed to seek relief for a grant or denial of its petitions in

6    its Complaint and motion for summary judgment.  *Id.*  Earth Island claims that the EPA accepted

7    its petitions and seeks relief for the EPA's failure to complete its 2015 rulemaking after accepting

8    Earth Island's petitions in its Complaint, but as the EPA points out, "acceptance" does not

9    constitute a "grant" of the petition.  EPA Opp. at 14.  Unlike the petition in *Community Voice,* the

10   EPA did not explicitly grant Earth Island's petitions in this case.  *Compare* Dkt. No. 71 ("EPA

11   Letter to Community Voice Petition") ("EPA has decided to grant your request and intends to

12   begin an appropriate proceeding") with Dkt. No. 64-2 ("EPA Letter, Jan. 3, 2013") and Dkt. No.

13   64-3 ("EPA Letter, July 23, 2014").

14        On the other hand, neither did the EPA deny Earth Island's petitions.  More importantly,

15   the EPA issued the Proposed Rule as it told Earth Island it would but has not issued a final rule for

16   more than six years.  EII Reply at 11.  In its 2013 letter, the EPA characterized Earth Island's

17   petition as a request for the EPA "to amend the [NCP], particularly Subpart J" and the EPA

18   explained that it was "considering a proposed rulemaking to revise Subpart J and modifications"

19   and welcomed Earth Island's comments "on the proposed rule during the public comment period."

20   Dkt. No. 64-2.  Then in response to Earth Island's 2014 petition, the EPA said that it was

21   "working on a proposed rulemaking to revise Subpart J of the NCP" and that the Office of

22   Management Budget ("OMB") was in the process of reviewing the proposed rule.  Dkt. No. 64-3.

23   On January 25, 2015, the EPA did in fact issue the Proposed Rule.  *See* 80 Fed. Reg. 3380.

24        As a result, having chosen to consider and issue the Proposed Rule to amend Subpart J of

25   the NCP, the EPA came under duty to take final action on the Proposed Rule within a reasonable

26   time.  *See* 5 U.S.C. § 555(b); *see Community Voice*, 878 F.3d at 785.  "Once an agency decides to

27   take a particular action, a duty to do so within a reasonable time is created."  *See Pub. Citizen*

28   *Health Research Grp. v. Comm'r, Food & Drug Admin.*, 724 F.Supp. 1013, 1020 (D. D.C. 1989).

United States District Court
Northern District of California

1    Accordingly, the EPA's delay for more than six years since its issuance of the Proposed Rule

2    weighs against finding that the EPA's conduct is reasonable.  *See Community Voice*, 878 F.3d at

3    787 (citing *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir. 1992)) (noting that

4    the D.C. Circuit has found that a six-year delay for rulemaking was unreasonable).

5                           **2.    Other TRAC Factors**

6            Earth Island argues that the remaining TRAC factors weigh in favor of finding that EPA's

7    conduct is unreasonable.  It asserts that the second TRAC factor—statutory guidance as to a

8    reasonable timetable for agency action—weighs in its favor because the EPA's delay undermines

9    the purpose of the CWA to "restore and maintain the chemical, physical, and biological integrity

10   of the Nation's waters."  33 U.S.C. § 1251(a); *see Cutler v. Hayes*, 818 F.2d 879, 897–98 (D.C.

11   Cir. 1987) (holding that this factor requires a court to consider whether the "delay may be

12   undermining the statutory scheme"); EII Mot. at 17.  Under the third and fifth factors, Earth Island

13   asserts that the EPA's delay threatens public health and welfare because the use of chemical

14   dispersants poses serious risks to people's health, lives, and livelihood.  EII Mot. at 18–19.  Under

15   the sixth factor, Earth Island argues that although it has no evidence of impropriety specific to the

16   NCP rulemaking, EPA's "prioritization of deregulation" from 2016–2020, including issuing

17   complex rulemakings that reduced health and environmental protections in less than two years,

18   suggests impropriety.  *Id.* at 20–21. The EPA does not respond to these arguments directly and

19   instead argues that in general, the "EPA has acted reasonably in the proposed Subpart J rule

20   process."  EPA Opp. at 18.

21           Finally, under the fourth factor, Earth Island asserts that because the "EPA has repeatedly

22   acknowledged that the existing NCP is insufficiently protective of public health and the

23   environment, and does not reflect the best available science," the EPA is required to prioritize

24   issuing a final rule.  *Id.* at 19–20.  The EPA contends that its delay was justified due to competing

25   priorities such as emergencies, including hurricanes, wildfires, and winter storms.  Dkt. No. 64-4

26   ("Sayler Decl.") ¶ 20.  These emergencies do not explain why the EPA enacted other complex

27   deregulatory actions during this period but did not attend to this one.  EII Reply at 12.

28           The EPA also argues that because it understood its NCP rulemaking to be discretionary, it

15

1    moved the NCP rulemaking to an "inactive" status.  Sayler Decl. ¶¶ 22–23.  The EPA prioritized

2    other actions such as the Risk Management Program Rule and a response to a consent decree

3    regarding the CWA Hazardous Substances Spill Prevention.  *Id.* ¶¶ 14–17, 22–23.  Regardless of

4    whether the EPA has "diligently continued to work on the rulemaking" as the EPA asserts,

5    "removing any internal deadline does not bode well for completion."  EII Reply at 13; *see* EPA

6    Opp. at 18.  The EPA points to technical issues that have delayed it, such as the inability to locate

7    new "reference oils" for performing the toxicity and efficacy tests that the Proposed Rule

8    contemplates.  Sayler Decl. ¶¶ 25–34.  But, as Earth Island says, the EPA's admission that it has

9    "no workable strategy for procuring such oils" after six years of searching makes it "all the more

10   important for the Court to compel action, impose near-term deadlines on EPA, and closely

11   supervise the agency's progress until a final rule issues."  EII Reply at 13; *see* Sayler Decl. ¶ 32.

12   The TRAC factors weigh in favor of finding that the EPA's delay is unreasonable and compelling

13   agency action.

14   **III.    REMEDY**

15         The parties dispute the proper remedy and the source of my authority to fashion relief.

16   Earth Island requests an order that the EPA (1) update and reissue a proposed rule to amend the

17   NCP within 90 days of my decision; (2) issue a final rule within one year of my decision; and (3)

18   provide a status report 180 days from the date of my decision.  EII Mot. at 1.  The EPA rejects a

19   remedy that involves updating and reissuing the proposed rule.  EPA Opp. at 24–25.  Instead, the

20   EPA proposes that it will take final action on the following components of the Proposed Rule by

21   May 31, 2023:  the authorization of chemical agent use in response to oil discharges as well as

22   listing provisions for chemical agent products on the NCP Product Schedule.[8]  *Id.*

23         The EPA contends that the appropriate remedy for a finding of a failure on the part of the

24   Administrator to perform a nondiscretionary duty under the Clean Water Act is found in the

25   CWA's citizen suit provision:  a court is authorized "to order the Administrator to perform [a

26

27   [8] The EPA initially proposed that it will take final action on the other part of the Proposed Rule, the monitoring provisions, by August 31, 2021.  EPA Opp. at 24–25.  Earth Island had opposed
28   the bifurcation of the remedy but on July 6, 2021, a day before the hearing for this case, the EPA took final action on monitoring provisions portion of the Proposed Rule.  *See* Dkt. No. 70.

United States District Court
Northern District of California

United States District Court
Northern District of California

1     nondiscretionary] act or duty" under the Act.  33 U.S.C. § 1365(a); EPA Opp. at 16.  Earth Island

2     argues that the appropriate remedy for an action that has been unreasonably delayed is the APA

3     under which a court "shall . . . compel agency action."  5 U.S.C. § 706(1).  Both parties are

4     correct.  For Earth Island's CWA claim, relief is found in 33 U.S.C. § 1365(a) and for its APA

5     "unreasonable delay" claim, relief is found in 5 U.S.C. § 706(1).

6            **A.     Writ of Mandamus Claim**

7            Earth Island also asserts that I have authority to craft relief under the All Writs Act

8     ("AWA").  *See* 28 U.S.C. § 1651(a) (federal courts "may issue all writs necessary or appropriate

9     in aid of their respective jurisdictions and agreeable to the usages and principles of law."); EII

10    Mot. at 23–24.  It acknowledges that although "unreasonable delay cases filed in federal appellate

11    courts are typically styled as petitions for writs of mandamus, here Plaintiffs simply seek the

12    analogous district court remedy:  a court order compelling EPA action."  EII Reply at 6 n.5.  It

13    contends that under the AWA, I have the authority to order the EPA to "update and reissue the

14    proposed rule for public comment before finalizing the rule."  EII Mot. at 24.

15           The EPA responds that because the Complaint does not assert a mandamus claim or cite

16    the AWA as a basis for jurisdiction, there "should be no dispute that this Court lacks jurisdiction

17    to consider a claim for a writ of mandamus."  EPA Opp. at 16.  But the AWA is "not an

18    independent grant of jurisdiction to a court; it merely permits a court to issue writs in aid of

19    jurisdiction acquired to grant some other form of relief."  *TRAC*, 750 F.2d at 77.  The EPA also

20    contends that Earth Island has not shown how it has "no other adequate means to attain relief" as

21    required for a court to consider a petition for a writ of mandamus.  *Id.*; *see Kerr v. U.S. Dist. Court*

22    *for the N. Dist. of Cal.*, 426 U.S. 394, 403 (1976).  But the CWA and APA do not provide the

23    same relief Earth Island seeks under the AWA—an order for the EPA to reissue the Proposed

24    Rule.

25           That said, Earth Island does not provide any support for its argument that under the AWA I

26    have the authority to require the EPA to revise and re-issue the Proposed Rule.  EPA Opp. at 24.

27    The EPA is also unaware of any instance where a court required an agency to revise a proposed

28    rule under the AWA.  *Id.*  In this regard, Earth Island's reliance on *Center for Biological Diversity*

17

1   *v. Brennan*, No. 06-CV-7062-SBA, 571 F. Supp. 2d 1105, 1134 (N.D. Cal. 2007), is misplaced.

2   In that case, the court ordered the agency to reissue a proposed rule because there was a statutory

3   requirement that federal officials produce an "updated" National Global Research Plant at least

4   every three years; such a requirement is absent from this case.  Further, Earth Island does not seek

5   this relief in its Complaint and does not explain why taking final action on the Proposed Rule

6   would not comply with the EPA's nondiscretionary duty to revise and amend the NCP.  *See*

7   Compl.; EPA Opp. at 25.  It also does not identify any specific information made available since

8   the proposal that would trigger anew EPA's mandatory duty.[9]  EPA Opp. at 25.  Accordingly, I

9   will not order the EPA to update and reissue a new proposed rule.

10         **B.      Remedy Timeline**

11         The question then is the timeline for the remedy.  The EPA proposes that it will take final

12   action on the listing and authorization of use provisions by May 31, 2023.  EPA Opp. at 21.  Earth

13   Island argues that the EPA should issue a final rule within one year of my decision.  EII Mot. at 1.

14         In considering the EPA's proposed timeline, it is important to note the Ninth Circuit's

15   recognition in *Pesticide Action Network* that the EPA's years-long "unreasonable delay in

16   responding to the administrative petition has already been the subject of three non-frivolous

17   lawsuits" and its admonishment that "[t]here should not be a fourth."  *Pesticide Action Network*,

18   798 F.3d at 814–15.  Last year, the Ninth Circuit once again ordered the EPA to respond to

19   another administrative petition after another years-long delay.  *NRDC*, 956 F.3d at 1142 (citing

20   *Pesticide Action Network*, 798 F.3d at 814–15).  But unlike those cases, here the EPA clearly

21   outlines the various steps that must be completed to take final action on the Proposed Rule.  *See*

22   EPA Opp. at 21–24; *cf. NRDC*, 956 F.3d at 1140 (finding that "[i]n light of the fact that [the

23   Agency's] timetables have suffered over the years from a persistent excess of optimism the EPA's

24   ambiguous plan to possibly issue a proposed rule [more than twelve years] after the administrative

25

26   ─────────────────────
     [9] As a reason to reissue the Proposed Rule, Earth Island points to the EPA's admission that there
27   are ongoing obstacles to obtaining the reference oils needed in order to conduct necessary testing.
     EII Reply at 13–14.  But the EPA does not admit that the contemplated testing protocol under the
28   current Proposed Rule is "impossible to implement."  In fact, it provides a timeline for issuing the
     final rule despite these obstacles.  EPA Opp. at 21.

United States District Court
Northern District of California

1    petition is too little, too late") (internal citations omitted).

2         The multiple requisite steps to finalize the Proposed Rule support the EPA's argument that

3    its proposed timeline is reasonable.  For example, steps such as the "Workgroup Engagement and

4    Options Development," where the Workgroup Engagement reviews and considers the comments,

5    is expected to take months, through the end of November 2021.  EPA Opp. at 22.  Then the EPA

6    will need another month to present the option recommendations to senior leadership.  *Id.* at 23.

7    By January 2022, the EPA will prepare a Response to Comments for Workgroup member input

8    and review, a process that is expected to end around November 2022 due to several review cycles

9    and a minimum of three weeks to review and comment on drafts.  *Id.*  Then, at least another three

10   weeks is needed to prepare for the Final Agency Review meeting, which is set to conclude by

11   January 2023.  *Id.*  In February 2023, the EPA will submit the rule to the OMB, whose standard

12   review timeframe is 90 days.  *Id.* at 23–24.  Finally, by May 31, 2023 the Administrator will

13   review and the EPA will submit to the Federal Register for publication.  *Id.* at 24.

14        I adopt the EPA's proposed remedy.  Because the EPA's timeline spans over the next two

15   years, I agree that the EPA should file status reports until the final rule is published.  *See NRDC*,

16   956 F.3d at 1142 (ordering the EPA to file status reports every two months).

17                                   **CONCLUSION**

18        For the reasons explained above, Earth Island's motion for summary judgment is

19   GRANTED and the EPA's cross-motion for summary judgment is DENIED.  I adopt the EPA's

20   proposed remedy.  The EPA shall take final action on the listing and authorization of use

21   provisions by May 31, 2023.  The EPA shall also file a status report every 180 days until the final

22   rule is published.

23        **IT IS SO ORDERED.**

24   Dated:  August 9, 2021

25

26



27                                   William H. Orrick
                                     United States District Judge

28

United States District Court
Northern District of California